UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

VAMEROLYN CHAPMAN,

          Plaintiff,                      Case No.  15-cv-14232
                                           Hon. John Corbett O'Meara

v                                         Magistrate Judge Mona K. Majzoub

STATE FARM FIRE AND CASUALTY COMPANY,

          Defendant.

_____/

| | |
|---|---|
| JO ROBIN DAVIS (P31263) | THOMAS M. RIZZO (P32357) |
| Jo Robin Davis, PLLC | BRIAN J. GALLAGHER (P72712) |
| Attorney For Plaintiff | DEVIN R. DAY (P60298) |
| 30300 Northwestern Highway, Suite 104 | RizzoBryan, P.C. |
| Farmington Hills, MI  48334 | Attorney For Defendant |
| (248)  932-0100, ext. 254 | 220 Lyon Street NW, Suite 200 |
| | Grand Rapids, MI 49503-2209 |
| | (616) 451-8111 |

_____/

## PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF KEVIN PIKE

      NOW COMES Plaintiff VAMEROLYN CHAPMAN, by and through her attorneys, Jo Robin Davis, PLLC, and for her Motion To Exclude Testimony of Kevin Pike states as to the Court as follows:

      1.    Plaintiff VAMEROLYN CHAPMAN owned rental property at 5413 Kermit Street, Flint, Michigan.

      2.    Said property was insured by Defendant STATE FARM FIRE AND CASUALTY COMPANY.

      3.    Said property was destroyed by fire on 11/21/2014, the fire report is attached as Exhibit A.

4.     Eleven days later, on 12/2/2014, the fire scene was investigated by origin and cause investigator Kevin Pike on behalf of State Farm.  His report is attached as Exhibit B.  His testimony is attached as Exhibit C.

5.     Mr. Pike's conclusion the fire cause was an incendiary fire is unreliable and inadmissible under Fed R Evid 702 and 403.

WHEREFORE, Plaintiff VAMEROLYN CHAPMAN respectfully requests that this Honorable Court enter an Order excluding Kevin Pike's opinion testimony.

Dated:  October 4, 2017                    Respectfully submitted,

                                        /s/ Jo Robin Davis_____
                                        JO ROBIN DAVIS (P31263)
                                        Jo Robin Davis, PLLC
                                        Attorney for Plaintiff
                                        30300 Northwestern Hwy, Suite 104
                                        Farmington Hills, MI  48334
                                        (248) 932-0100

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

VAMEROLYN CHAPMAN,

     Plaintiff,

                             Case No.  15-cv-14232
                             Hon. John Corbett O'Meara
v                                 Magistrate Judge Mona K. Majzoub

STATE FARM FIRE AND CASUALTY COMPANY,

     Defendant.

_____/

| JO ROBIN DAVIS (P31263) | THOMAS M. RIZZO (P32357) |
|---|---|
| Jo Robin Davis, PLLC | BRIAN J. GALLAGHER (P72712) |
| Attorney For Plaintiff | DEVIN R. DAY (P60298) |
| 30300 Northwestern Highway, Suite 104 | RizzoBryan, P.C. |
| Farmington Hills, MI  48334 | Attorney For Defendant |
| (248)  932-0100, ext. 254 | 220 Lyon Street NW, Suite 200 |
| | Grand Rapids, MI 49503-2209 |
| | (616) 451-8111 |

_____/

## BRIEF IN SUPPORT OF MOTION

## INTRODUCTION

Plaintiff's rental property was insured by Defendant STATE FARM FIRE AND
CASUALTY COMPANY when destroyed by fire on 11/21/2014.  Defendant retained cause and
origin investigator Kevin Pike, who using the unreliable and unscientific method of negative
corpus, concluded the fire was intentionally set.   For the reasons set below, his conclusion is
inadmissible pursuant to Fed R Evid 702 and Daubert v Merrell Dow Pharmaceuticals, Inc, 509
US 579 (1993).

## STANDARD OF REVIEW

Courts considering expert testimony must examine admissibility within the context of
Fed R Evid 702.  In Daubert, supra, at 597, 113, S Ct, 2786, the Supreme Court held Rule 702
requires district courts to ensure  that expert testimony "both rests on a reliable foundation and is

relevant to the task at hand."   Rule 702 imposes a gatekeeping duty on district courts, which must exclude unreliable and irrelevant evidence.  <u>Meemic Ins Co</u> v <u>Hewlett-Packard Co</u>, 717 F Supp 2d 752 (ED Mich, 2010), citing <u>Conwood Co LP</u> v <u>US Tobacco Co</u>, 290 F 3d 768, 792 (6th Cir, 2002).

The Court must first determine whether the expert's testimony reflects scientific knowledge; whether the findings are derived from the scientific method.  An expert opinion that is based on scientifically valid principals will satisfy Fed R Evid 702; but an expert's subjective belief or unsupported speculation will not.   <u>Smelser</u> v <u>Norfolk Southern Ry Co</u>, 105 F 3d 299, 333 (6th Cir, 1997), abrogated on other grounds by <u>Morales</u> v <u>American Honda Motor Co, Inc</u>, 151 F 3d 500 (6 Cir, 1998) quoting <u>Daubert</u>, (on remand) 43 F3d at 1316.  The Court should focus on the expert's methodology, but his conclusions must be connected to the existing data by more than the ipse dixit of the expert.  <u>General Elec Co</u> v <u>Joiner</u>, 522 US 136, 146; 118 S Ct 512; 139 L Ed.2d 508 (1997), where the Court held "Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."

## **<u>ARGUMENT</u>**

In <u>Owners Insurance Co</u> v <u>White</u>, 2014 WL 12461045 (ND Georgia, 1/23/14), Exhibit D, the insurance company hired Mr. Dodd to determine the origin and cause of the fire.  Dodd admitted to using negative corpus to conclude the fire was intentionally set.  The Court held Dodd's conclusion that the fire was the result an intentional act was inadmissible:

> "The NFPA clearly rejects the use of negative corpus as a violation of the scientific method. The methodology does not generate testable hypotheses. A hypothesis based on negative corpus is not testable or falsifiable by experimental techniques. Opinions based on negative corpus should be excluded as unreliable and inapposite to the principles undergirding Rule 702."

4

The Court concluded at *4 "the scientific method does not allow an investigator to opine on what started the fire when there is no evidence supporting his opinion."

In <u>Somnis</u> v <u>Country Mut Ins Co</u>, 840 F Supp 2d 1166 (D Minnesota, 2012), the Court held that Fed R Evid 403 counseled against permitting the origin and cause investigator to testify the fire was intentionally set:

> "Federal Rule of Evidence 403 also counsels against permitting St. Onge to testify that the fire was intentional. Given that "[e]xpert evidence can be both powerful and quite misleading," *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786, the Court must be particularly careful to exclude such testimony if it might lead the jury to simply rely on the expert's opinion and "surrender[ ][its] own common sense." *Westcott v. Crinklaw,* 68 F.3d 1073, 1076 (8th Cir.1995) (citations omitted). Permitting St. Onge to draw an inference that the jury can reach on its own would do "little more than put his imprimatur on the defendant's case," *Tuli v. Brigham & Women's Hosp., Inc.,* 592 F.Supp.2d 208, 212 (D.Mass.2009), and, in essence, simply "tell the jury what result to reach." *Lee,* 616 F.3d at 809 (quoting Fed.R.Evid. 704 advisory committee's note). As succinctly stated in *Hines,* it is for "[t]he jury ... to draw reasonable inferences from the firsthand data. When an expert witness is called upon to draw those inferences, several concerns are raised.... [A] certain patina attaches to an expert's testimony unlike any other witness; this is 'science,' a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve." 55 F.Supp.2d at 64. These concerns are manifest here."  (Footnote omitted).

The Court concluded:

> For the reasons set forth above, St. Onge may testify at trial that his examination of the fire scene failed to reveal an accidental cause for the fire. **However, his opinion that the fire was incendiary "would not be** <u>**helpful because it would not tell the jury anything that lay persons**</u> <u>**could not logically deduce on their own**</u>; he would be drawing h[is] conclusion in the same manner as lay persons, i.e., by exercising simple logic." *Ruminer v. Gen. Motors Corp.,* No. 4:03–CV–00349, 2006 WL 287945, at *13 (E.D.Ark. Feb. 6, 2006). To the extent County Mutual believes the jury should reach that conclusion, it may press that point in its closing argument. *See In re Zyprexa Prods. Liab. Litig.,* 489 F.Supp.2d 230, 283 (E.D.N.Y.2007) (Weinstein, J.) ("Expert testimony should not merely reiterate arguments based on inferences that can be drawn by laypersons; those can properly be advanced by the parties in their summations.").

In this case, Mr. Pike should not be allowed to testify as to his ultimate conclusion the fire cause was incendiary.  His conclusion is based on the unreliable methodology of negative corpus which is not supported by the scientific method.  Mr. Pike's use of negative corpus to reach the conclusion of the fire was intentionally set renders his opinion unreliable and inadmissible.

NFPA 921 (2014) §§19.6.5 and 19.6.5.1 provides as follows:

"19.6.5* Appropriate Use.  The process of elimination is an integral part of the scientific method.  Alternative hypotheses should be considered and challenged against the facts.  Elimination of a testable hypothesis by disproving the hypothesis with reliable evidence is a fundamental part of the scientific method.  However, the process of elimination can be used inappropriately.  The process of determining the ignition source for a fire, by eliminating all ignition sources found, known, or believed to to have been present in the area of origin, and then claiming  such methodology is proof of an ignition source for which there is no supporting evidence of its existence, is referred to by some investigators as negative corpus.  Negative corpus has typically been used in classifying fires as incendiary, although the process has also been used to characterize fires classified as accidental.  This process is not consistent with the scientific method, is inappropriate, and should not be used because it generates untestable hypotheses, and may result in incorrect determinations of the ignition source and first fuel ignited.  Any hypotheses formulated for the casual factors (e.g., first fuel, ignition source,, and ignition sequence), must be based on the analysis of the facts.  Those facts are derived from evidence, observations, calculations, experiments, and the laws of science.  Speculative information cannot be included in the analysis."

19.6.5.1* Cause Undetermined.  In the circumstance where all hypothesized fire causes have been eliminated and the investigator is left with no hypothesis that is evidenced by the facts of the investigation, the only choice for the investigator is to conclude that the fire cause, or specific causal factors, remains undetermined.  It is improper to bases hypotheses on the absence of any supportive evidence.  That is, improper to opine a specific fire cause, ignition source, fuel or cause classification that has no evidence to support it even though all other such hypothesized elements were eliminated."

Although Mr. Pike claims to have followed the scientific method, his report and testimony establish he did not.  He testified:

> Did you have any hypothesis other than this being an incendiary fire during the course of your investigation at this particular home?

> I looked at everything. I mean, I didn't walk in and say it was an incendiary fire. I mean, I looked at all potential causes and after I eliminated them all this was the cause that I determined this fire was.
>
> So you had no hypothesis other than the fact that this was an incendiary fire?
>
> No, that's -- I had a hypothesis that it could be possibly an electrical fire, but I eliminated it. I looked at the mechanical in the house. Eliminated it. Smoking, eliminated. I can go through a bunch of causes. You go through everything to make sure you eliminate them all.
>
> **So your hypothesis that the fire was incendiary is based on your process of elimination, correct?**
>
> **Correct.** (p. 22, lines 21-25; p. 23, lines 1-14)

As set forth above in NFPA 921§19.6.5, this process is not consistent with the scientific method, is inappropriate and should not be used because it generates untestable hypotheses. As set forth in NFPA 921 (2014), 19.6.5.1, "it is improper to opine a specific fire cause, ignition source, fuel or cause classification that has no evidence to support it even though all other such hypothesized elements were eliminated."

In <u>Pruitt</u> v <u>Stewart</u>, 2017 WL 2276983 (ED Michigan, 5/25/17), Exhibit E, the Court denied a petition for habeas corpus but discussed the inadmissibility of opinion of testimony based on negative corpus:

> The Michigan Court of Appeals described the "negative corpus" analytical approach this way: "[T]he approach provides that after the elimination of any accidental causes of a fire, it is reasonable to infer that the fire was arson." *Pruitt*, 2014 WL 1320253 at *5. **The state court acknowledged that negative corpus has been rejected by the National Fire Protection Association because it is "'not consistent with the Scientific Method' and because 'it generates untestable hypotheses.'"** *Id.* (quoting NFPA 921 § 18.6.5 (2011)). The court of appeals held that most of Row's testimony did not violate Michigan Rule of Evidence 702, but his ultimate conclusion that the fire was intentionally set was inadmissible under Rule 702 because it "rested on a combination of negative

corpus and a reliance upon circumstantial evidence not within the purview of his qualification as an arson expert."

## **CONCLUSION**

Mr. Pike's opinion testimony is not admissible under Fed R Evid 702 and 403.

WHEREFORE, Plaintiff VAMEROLYN CHAPMAN respectfully requests that this Honorable Court enter an Order excluding Kevin Pike's opinion testimony.

Dated:  October 4, 2017                                    Respectfully submitted,

                                                                              /s/ Jo Robin Davis
                                                                              JO ROBIN DAVIS (P31263)
                                                                              Jo Robin Davis, PLLC
                                                                              Attorney for Plaintiff
                                                                              30300 Northwestern Hwy, Suite 104
                                                                              Farmington Hills, MI  48334
                                                                              (248) 932-0100

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

VAMEROLYN CHAPMAN,

    Plaintiff,         Case No.  15-cv-14232
                  Hon. John Corbett O'Meara
v                  Magistrate Judge Mona K. Majzoub

STATE FARM FIRE AND CASUALTY COMPANY,

    Defendant.

_____/

| | |
|---|---|
| JO ROBIN DAVIS (P31263) | THOMAS M. RIZZO (P32357) |
| Jo Robin Davis, PLLC | BRIAN J. GALLAGHER (P72712) |
| Attorney For Plaintiff | DEVIN R. DAY (P60298) |
| 30300 Northwestern Highway, Suite 104 | RizzoBryan, P.C. |
| Farmington Hills, MI  48334 | Attorney For Defendant |
| (248)  932-0100, ext. 254 | 220 Lyon Street NW, Suite 200 |
| | Grand Rapids, MI 49503-2209 |
| | (616) 451-8111 |

_____/

## PROOF OF SERVICE

   I, Rosemarie L. Watt, hereby certify that on October 4, 2017, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

          /s/ Rosemarie L. Watt___
          ROSEMARIE L. WATT

# EXHIBIT A

12-04-14;02:02PM; ;8107627340 # 3/ 6

Page 1 of 4

**A** | 02507 | MI | MM 11 | DD 21 | YYYY 2014 | 006 | 2014-00003569 | 000 | ☐ Delete ☐ Change | **NFIRS-1 BASIC**

FDID — State — Incident Date — Station — Incident Number — Exposure

**B Location Type** ☆

☐ Check this box to indicate that the address for this incident is provided on the Wildland Fire Module in Section B. "Alternative Location Specification." Use only for wildland fires.

☐ Census Tract

☒ Street address
☐ Intersection
☐ In front of
☐ Rear of
☐ Adjacent to
☐ Directions
☐ US National Grid

| 5413 | | KERMIT | | ST | |
| Number/Milepost | Prefix | Street or Highway | | Street Type | Suffix |

| Flint | MI | 48505 | - |
| Apt./Suite/Room — City | State | ZIP Code |

Cross Street, Directions or National Grid, as applicable

**C IncidentType** ☆

| 111 | Building fire |
Incident Type

**D Aid Given or Received** ☆ ☒ None

1 ☐ Mutual aid received
2 ☐ Auto. aid received
3 ☐ Mutual aid given
4 ☐ Auto. aid given
5 ☐ Other aid given

| Their FDID | Their State |
| Their Incident Number | |

**E1 Dates and Times** Midnight is 0000

Check boxes if dates are the same as Alarm Date.

| | Month | Day | Year | Hour/Min |
| Alarm ALARM always required | 11 | 21 | 2014 | 2146 |
| ☒ Arrival ARRIVAL required, unless cancelled or did not arrive | 11 | 21 | 2014 | 2153 |
| ☐ Controlled CONTROLLED optional, except for wildland fires | | | | |
| ☒ Last Unit Cleared LAST UNIT CLEARED, required except for wildland fires | 11 | 21 | 2014 | 2244 |

**E2 Shifts and Alarms** Local option

| Shift or Platoon | Alarms 1 | District 6435 |

**E3 Special Studies** Local option

| Special Study ID# | Special Study Value |

**F Actions Taken** ☆

| 11 | Extinguishment by fire s |
Primary Action Taken (1)

Additional Action Taken (2)

Additional Action Taken (3)

**G1 Resources** ☆

☒ Check this box and skip this block if an Apparatus or Personnel Module is used.

| | Apparatus | Personnel |
| Suppression | 5 | 9 |
| EMS | 0 | 0 |
| Other | 1 | 3 |

☐ Check box if resource counts include aid received resources.

**G2 Estimated Dollar Losses and Values**

LOSSES: Required for all fires if known. Optional for non-fires.

| | | | None |
| Property | $ | 6,000 | ☐ |
| Contents | $ | 2,500 | ☐ |

PRE-INCIDENT VALUE: Optional

| Property | $ | | ☒ |
| Contents | $ | | ☒ |

**Completed Modules**

☒ Fire-2
☒ Structure Fire-3
☐ Civilian Fire Cas.-4
☐ Fire Service Cas.-5
☐ EMS-6
☐ HazMat-7
☐ Wildland Fire-8
☒ Apparatus-9
☐ Personnel-10
☐ Arson-11

**H1 Casualties** ☆ ☒ None

| | Deaths | Injuries |
| Fire Service | 0 | 0 |
| Civilian | 0 | 0 |

**H2 Detector** Required for confined fires.

1 ☐ Detector alerted occupants
2 ☐ Detector did not alert them
U ☐ Unknown

**H3 Hazardous Materials Release** ☒ None

1 ☐ Natural gas: slow leak, no evacuation or HazMat actions
2 ☐ Propane gas: <21-lb tank (as in home BBQ grill)
3 ☐ Gasoline: vehicle fuel tank or portable container
4 ☐ Kerosene: fuel burning equipment or portable storage
5 ☐ Diesel fuel/fuel oil: vehicle fuel tank or portable storage
6 ☐ Household solvents: home/office spill, cleanup only
7 ☐ Motor oil: from engine or portable container
8 ☐ Paint: from paint cans totaling < 55 gallons
0 ☐ Other: special HazMat action required or spill > 55 gal (Please complete the HazMat form.)

**I Mixed Use Property** ☒ Not mixed

10 ☐ Assembly use
20 ☐ Education use
33 ☐ Medical use
40 ☐ Residential use
51 ☐ Row of stores
53 ☐ Enclosed mall
58 ☐ Business & residential
59 ☐ Office use
60 ☐ Industrial use
63 ☐ Military use
65 ☐ Farm use
00 ☐ Other mixed use

**J Property Use** ☆ ☐ None

*Structures*

131 ☐ Church, place of worship
161 ☐ Restaurant or cafeteria
162 ☐ Bar/tavern or nightclub
213 ☐ Elementary school, kindergarten
215 ☐ High school, junior high
241 ☐ College, adult education
311 ☐ Nursing home
331 ☐ Hospital

341 ☐ Clinic, clinic-type infirmary
342 ☐ Doctor/dentist office
361 ☐ Prison or jail, not juvenile
419 ☒ 1-or 2-family dwelling
429 ☐ Multifamily dwelling
439 ☐ Rooming/boarding house
449 ☐ Commercial hotel or motel
459 ☐ Residential, board and care
464 ☐ Dormitory/barracks
519 ☐ Food and beverage sales

539 ☐ Household goods, sales, repairs
571 ☐ Gas or service station
579 ☐ Motor vehicle/boat sales/repairs
599 ☐ Business office
615 ☐ Electric-generation plant
629 ☐ Laboratory/science laboratory
700 ☐ Manufacturing plant
819 ☐ Livestock/poultry storage (barn)
882 ☐ Non-residential parking garage
891 ☐ Warehouse

*Outside*

124 ☐ Playground or park
655 ☐ Crops or orchard
669 ☐ Forest (timberland)
807 ☐ Outdoor storage area
919 ☐ Dump or sanitary landfill
931 ☐ Open land or field

936 ☐ Vacant lot
938 ☐ Graded/cared for plot of land
946 ☐ Lake, river, stream
951 ☐ Railroad right-of-way
960 ☐ Other street
961 ☐ Highway/divided highway
962 ☐ Residential street/driveway

981 ☐ Construction site
984 ☐ Industrial plant yard

Look up and enter a Property Use code and description only if you have NOT checked a Property Use box

⇨ Property Use | Code |

Property Use Description

01062015

12-04-14;02:02PM;                                                      ;8107627340          #  4/  6

Page 2 of 4



**A**  | 02507 | | MI | | 11 | 21 | 2014 | | 006 | | 2014-00003569 | | 000 | □ Delete   □ Change
FDID ☆   State ☆   Incident Date ☆   Station   Incident Number ☆   Exposure ☆

NFIRS - 1
BASIC

**K2**  **Owner**  □ Same as person involved? Then check this box and skip the rest of this block.
Local Option

Business Name (if applicable)        Area Code   Phone Number

□ Check this box if same address as Incident Location (Section B), than skip the three duplicate address lines.

Mr., Ms., Mrs.   First Name        MI   Last Name        Suffix

Number        Prefix   Street or Highway        Street Type   Suffix

Post Office Box        Apt./Suite/Room   City

State   ZIP Code   -

**M**  **Authorization**

Check box if same as Officer in charge.  ⇨ ☒

034377        | Fire Lieutena | Fire Suppress |
Officer in charge ID   Signature   Christian Perkins   Position or rank   Assignment   Month   Day   Year

034377        | Fire Lieutena | Fire Suppress |
Member making report ID   Signature   Christian Perkins   Position or rank   Assignment   Month   Day   Year

**A**  | 02507 | | MI | | 11 | 21 | 2014 | | 006 | | 2014-00003569 | | 000 | □ Delete   □ Change
FDID ☆   State ☆   Incident Date ☆   Station   Incident Number ☆   Exposure ☆

NFIRS - 1
BASIC

**L**  **Remarks**
Local Option

01062015

12-04-14;02:02PM;                                                    ;8107627340         #  5/  6

**A** | 02507 | MI | MM 11 | DD 21 | YYYY 2014 | 006 | 2014-00003569 | 000 | ☐ Delete  ☐ Change | **NFIRS - 2 FIRE**

FDID ☆ | State ☆ | Incident Date ☆ | Station | Incident Number ☆ | Exposure ☆

**B  Property Details**

**B1** | ___ 1 ___ | ☐ Not Residential

Estimated number of residential living units in building of origin whether or not all units became involved

**B2** | ___ 1 ___ | ☐ Buildings not involved

Number of buildings involved

**B3** | ___ | ☒ None  ☐ Less than one acre

Acres burned (outside fires)

**C  On-Site Materials or Products** ☐ None

Complete if there were any significant amounts of commercial, industrial, energy, or agricultural products or materials on the property, whether or not they became involved

Enter up to three codes.
Check one box for each code entered.

| | On-Site Materials Storage Use |
|---|---|
| On-site material (1) ___ | 1 ☐ Bulk storage or warehousing  2 ☐ Processing or manufacturing  3 ☐ Packaged goods for sale  4 ☐ Repair or service  U ☐ Undetermined |
| On-site material (2) ___ | 1 ☐ Bulk storage or warehousing  2 ☐ Processing or manufacturing  3 ☐ Packaged goods for sale  4 ☐ Repair or service  U ☐ Undetermined |
| On-site material (3) ___ | 1 ☐ Bulk storage or warehousing  2 ☐ Processing or manufacturing  3 ☐ Packaged goods for sale  4 ☐ Repair or service  U ☐ Undetermined |

**D  Ignition**

**D1** | _71_ | Substructure area or spac...

Area of fire origin ☆

**D2** | UU | Undetermined

Heat source ☆

**D3** | UU | Undetermined

Item first ignited ☆  1 ☐ Check box if fire spread was confined to object of origin.

**D4** | UU | Undetermined

Type of material first ignited   Required only if item first ignited code is 00 or <70

**E1  Cause of Ignition** ☆  ⇨ Skip to Section G

☐ Check box if this is an exposure report.

1 ☐ Intentional
2 ☒ Unintentional
3 ☐ Failure of equipment or heat source
4 ☐ Act of nature
5 ☐ Cause under investigation
U ☐ Cause undetermined after investigation

**E2  Factors Contributing to Ignition** ☆

☐ None

UU | Undetermined
Factor contributing to ignition (1)

___ 
Factor contributing to ignition (2)

**E3  Human Factors Contributing to Ignition**

Check all applicable boxes ☆ ☒ None

1 ☐ Asleep
2 ☐ Possibly impaired by alcohol or drugs
3 ☐ Unattended person
4 ☐ Possibly mentally disabled
5 ☐ Physically disabled
6 ☐ Multiple persons involved

7 ☐ Age was a factor
Estimated age of person involved
1 ☐ Male    2 ☐ Female

**F1  Equipment Involved in Ignition**

☐ None ⇨ If equipment was not involved, skip to Section G

Equipment Involved
Brand
Model
Serial #
Year

**F2  Equipment Power Source**

___ 
Equipment Power Source

**F3  Equipment Portability**

1 ☐ Portable
2 ☐ Stationary

Portable equipment normally can be moved by one or two persons, is designed to be used in multiple locations, and requires no tools to install.

**G  Fire Suppression Factors** ☒ None

Enter up to three codes.

Fire suppression factor (1)
Fire suppression factor (2)
Fire suppression factor (3)

**H1  Mobile Property Involved** ☐ None

1 ☐ Not involved in ignition, but burned
2 ☐ Involved in ignition, but did not burn
3 ☐ Involved in ignition and burned

Mobile property model

License Plate Number | State | VIN

**H2  Mobile Property Type and Make**

Mobile property type

Mobile property make

Year

**Local Use**

☐ Pre-Fire Plan Available

Some of the information presented in this report may be based upon reports from other agencies:
☐ Arson report attached
☐ Police report attached
☐ Coroner report attached
☐ Other reports attached

Structure fire? Please be sure to complete the Structure Fire form (NFIRS-3).

01052015

12-04-14;02:02PM;                                                                  8107627340          #  6/  6

Page 4 of 4



**I1 Structure Type** ☆
If fire was in an enclosed building or a portable/mobile structure, complete the rest of this form.

1 ☒ Enclosed building
2 ☐ Portable/mobile structure
3 ☐ Open structure
4 ☐ Air-supported structure
5 ☐ Tent
6 ☐ Open platform (e.g., piers)
7 ☐ Underground structure (work areas)
8 ☐ Connective structure (e.g., fences)
0 ☐ Other type of structure

**I2 Building Status** ☆
1 ☐ Under construction
2 ☒ In Normal Use
3 ☐ Idle, not routinely used
4 ☐ Under major renovation
5 ☐ Vacant and secured
6 ☐ Vacant and unsecured
7 ☐ Being demolished
0 ☐ Other
U ☐ Undetermined

**I3 Building Height** ☆
Count the roof as part of the highest story.

| 1 |

Total number of stories at or above grade

| 1 |

Total number of stories below grade

**I4 Main Floor Size** ☆
NFIRS-3 STRUCTURE FIRE

| 900 |

Total square feet

OR

BY

Length in feet    Width in feet

---

**J1 Fire Origin** ☆
| 1 | ☐ Below grade

Story of fire origin

**J2 Fire Spread** ☆
If fire spread was confined to object of origin, do not check a box (Ref. Block D3, Fire Module.)

2 ☐ Confined to room of origin
3 ☐ Confined to floor of origin
4 ☒ Confined to building of origin
5 ☐ Beyond building of origin

**J3 Number of Stories Damaged by Flame**
Count the roof as part of the highest story.

| | Number of stories w/minor damage
(1 to 24% flame damage)

| 1 | Number of stories w/significant damage
(25 to 49% flame damage)

| | Number of stories w/heavy damage
(50 to 74% flame damage)

| | Number of stories w/extreme damage
(75 to 100% flame damage)

**K Type of Material Contributing Most to Flame Spread**

☐ Check if no flame spread OR if same as Material First Ignited (Block D4, Fire Module) OR if unable to determine.  ⇒ Skip to Section L

**K1** |        |
Item contributing most to flame spread

**K2** |        |
Type of material contributing most to flame spread

Required only if item contributing code is 00 or < 70.

---

**L1 Presence of Detectors** ☆
(in area of the fire)

N ☒ None Present   Skip to Section M
1 ☐ Present
U ☐ Undetermined

**L2 Detector Type**
1 ☐ Smoke
2 ☐ Heat
3 ☐ Combination smoke and heat
4 ☐ Sprinkler, water flow detection
5 ☐ More than one type present
0 ☐ Other
U ☐ Undetermined

**L3 Detector Power Supply**
1 ☐ Battery only
2 ☐ Hardwire only
3 ☐ Plug-in
4 ☐ Hardwire with battery
5 ☐ Plug-in with battery
6 ☐ Mechanical
7 ☐ Multiple detectors & power supplies
0 ☐ Other
U ☐ Undetermined

**L4 Detector Operation**
1 ☐ Fire too small to activate
2 ☐ Operated   Complete Block L5
3 ☐ Failed to operate   Complete Block L6
U ☐ Undetermined

**L5 Detector Effectiveness**
Required if detector operated.

1 ☐ Alerted occupants, occupants responded
2 ☐ Alerted occupants, occupants failed to respond
3 ☐ There were no occupants
4 ☐ Failed to alert occupants
U ☐ Undetermined

**L6 Detector Failure Reason**
Required if detector failed to operate.

1 ☐ Power failure, shutoff, or disconnect
2 ☐ Improper installation or placement
3 ☐ Defective
4 ☐ Lack of maintenance, includes not cleaning
5 ☐ Battery missing or disconnected
6 ☐ Battery discharged or dead
7 ☐ Other
U ☐ Undetermined

---

**M1 Presence of Automatic Extinguishing System** ☆
N ☒ None Present
1 ☐ Present   Complete rest of Section M
2 ☐ Partial System Present
U ☐ Undetermined

**M2 Type of Automatic Extinguishing System**
Required if fire was within designed range of AES

1 ☐ Wet-pipe
2 ☐ Dry-pipe sprinkler
3 ☐ Other sprinkler system
4 ☐ Dry chemical system
5 ☐ Foam system
6 ☐ Halogen-type system
7 ☐ Carbon dioxide (CO2) system
0 ☐ Other special hazard system
U ☐ Undetermined

**M3 Operation of Automatic Extinguishing System**
Required if fire was within designed range.

1 ☐ Operated/effective   (go to M4)
2 ☐ Operated/not effective   (go to M4)
3 ☐ Fire too small to activate
4 ☐ Failed to operate   (go to M5)
0 ☐ Other
U ☐ Undetermined

**M4 Number of Sprinkler Heads Operating**
Required if system operated

| |
Number of sprinkler heads operating

**M5 Reason for Automatic Extinguishing System Failure**
Required if system failed or not effective

1 ☐ System shut off
2 ☐ Not enough agent discharged
3 ☐ Agent discharged but did not reach fire
4 ☐ Wrong type of system
5 ☐ Fire not in area protected
6 ☐ System components damaged
7 ☐ Lack of maintenance
8 ☐ Manual intervention
0 ☐ Other
U ☐ Undetermined

01062015

# EXHIBIT B



Mary Williams
State Farm Insurance
Claim 22-562D-932 / RCIS Case 202988/14-1051238

December 31, 2014

Confidential

Fire Investigation Report

# Corporate Investigative Services

5800 Gratiot Road, Suite 201  |  Saginaw, MI 48638
989.790.0450|  **rehmann**.com



## Privileged and Confidential

The information contained in this document is intended only for the confidential use of the recipient(s) named herein. The information provided in this report was prepared and transmitted under the Michigan investigator/client privilege law and, as such, is protected and not to be transmitted or transferred without prior written approval of Rehmann Corporate Investigative Services, LLC (Rehmann CIS). This information is intended for investigative purposes only. If you are not the intended recipient or an agent responsible for delivering this document to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of any part or parts of this document is strictly prohibited. If you have received this document in error, please notify Rehmann CIS immediately. Rehmann CIS does not guarantee the accuracy or completeness of outside agency records.

Copyright 2014 Rehmann



01062015

## Case Information

| | |
|---|---|
| **RCIS Client Number:** | 202988 |
| **RCIS Case Number:** | 14-1051238 |
| | |
| **Client Name:** | Mary Williams |
| **Client Company:** | State Farm Insurance |
| **Client Address:** | PO Box 661011 |
| **Client Address 2:** | Dallas, TX 75266-1011 |
| **Client Office Phone:** | |
| **Client Cell Phone** | 269.370.3589 |
| **Client Email:** | mary.williams.bsl5@statefarm.com |
| **Claim Number:** | 22-562D-932 |
| | |
| **Insured Name:** | Vamerolyn Chapman & Michael Lewis |
| **Insured Address:** | 2511 Flushing Road |
| **Insured Address 2:** | Flint, MI 48504 |
| **Insured Phone:** | Cell: 810.964.3200 |
| | |
| **Date of Loss:** | 11/21/2014 |
| **Location of Loss:** | 5413 Kermit Street |
| **Location of Loss 2:** | Flint, MI 48505 |
| **County of Loss:** | Genesee |
| | |
| **Date of Scene Investigation:** | 12/2/2014 and 12/5/2014 |
| **Name of Investigator:** | Kevin Pike, IAAI-CFI, CFEI |



# Table of Contents

Assignment Received ..................................................................................... 4

Parties Involved ............................................................................................. 4

Contact with Insured .................................................................................... 4

Consent ......................................................................................................... 6

Fire Department ........................................................................................... 6

Weather Conditions ..................................................................................... 6

Property Description .................................................................................... 6

Diagram ......................................................................................................... 7

Contents ........................................................................................................ 7

Exterior Examination ................................................................................... 7

Interior Examination .................................................................................... 8

Area of Origin ............................................................................................... 9

Scene Reconstruction ................................................................................. 10

Evidence ...................................................................................................... 10

Building Security ......................................................................................... 10

Photographs ................................................................................................ 10

Recontact Client ......................................................................................... 10

Experts Retained ........................................................................................ 10

Fire Origin ................................................................................................... 11

Cause of the Fire ........................................................................................ 11



## Methodology

*This report is a compilation of our findings for client use. This investigation was conducted utilizing the systematic approach to fire investigation, proper investigative methodology, the process of elimination, the analysis and correlation of fire patterns, identification of possible ignition sources, elimination of accidental causes, and final opinion findings based on the scientific method. The investigative information includes, but is not limited to, interviews, observations, witness statements, photographs, diagrams, physical evidence, analysis notes, and other pertinent data available at the time this report was prepared. Conclusions and opinions were developed utilizing the investigator's education, fire investigation training, experience, and standard investigative techniques, practice, and analysis.*

## Assignment Received

Mary Williams, of State Farm Insurance, contacted Rehmann Corporate Investigative Services on December 1, 2014, requesting an origin and cause fire investigation at the previously-captioned loss site.

## Parties Involved

In addition to the Rehmann CIS investigator, persons interviewed, involved, or consulted include the following:

Vamerolyn Chapman
Insured
2511 Flushing Road
Flint, MI 48504
810.964.3200

Flint City Fire Department
310 E. Fifth Street
Flint, MI 48502

Thomas Pawlyn, P.E.
Electrical Engineer
Rehmann Corporate Investigative Services
1500 W. Big Beaver Road, 2nd Floor
Troy, MI 48084
248.267.8445

## Contact with Insured

I contacted Vamerolyn Chapman and made arrangements to meet at the fire scene on December 2, 2014. I met with and interviewed Ms. Chapman on the prearranged date. The interview was not recorded, but the substance of the interview follows.


Rehmann
*Business wisdom delivered.*
01062015

Ms. Chapman advised that she was not under the influence of alcohol or drugs and that she does not suffer from any conditions that might affect her answers to my questions. She stated that she does not live at the loss location but that her son, Antonio Duran, DOB 6/18/85, telephone number 810.423.3845, does reside there. She advised that she has owned the house since 1999 and that she had no plans to sell it prior to the fire. She stated that she paid off the loan on the house in 2002.

Ms. Chapman stated that the house was built in the 1950s and that since she has owned it, she has remodeled the kitchen and bathroom, installed new lights in the kitchen, and installed new windows and a new roof in 2002. She was not aware of any previous fires at the house, and she stated that she has not had any other fire losses.

Ms. Chapman advised that the insurance policy through State Farm Insurance is the only coverage she has on the property. She stated that the fire department investigated the fire and indicated to her that the cause was undetermined. Ms. Chapman did not have an opinion as to how the fire started, but she advised that she had heard that it started in the basement ceiling.

Ms. Chapman stated that no one was home at the time of the fire and that her son has the only keys to the house. She advised that there is an ADT alarm system in the house; however, it was not monitored at the time of the fire. She stated that the neighbor who resides in the blue house discovered the fire and called 911. She learned of the fire from her son, and she was at her house when she received the call.

Ms. Chapman advised that she was last at the house in August of this year. She described the general condition of the house as good, and she stated that it was clean and well maintained prior to the fire. She advised that there were working smoke detectors in the house and that the electricity, gas, and city water were all turned on to the house. She stated that Consumers Energy supplies the electricity and natural gas to the house and that both are billed in her name. The water service is billed in her son's name. Ms. Chapman did not know who provided cable or internet service to the house. She stated that she did not have any service or maintenance contracts with any utility companies.

Ms. Chapman was not aware of any wiring problems in the house prior to the fire or problems with circuit breakers tripping. She added that the furnace and water heater both worked properly prior to the fire, and she did not know whether there were any portable heaters in the house. Ms. Chapman stated that all the appliances and equipment in the house worked properly prior to the fire and that nothing in or on the house had been recently repaired. Ms. Chapman did not think that anyone smoked in the house.

Ms. Chapman was unable to name anyone who might want to intentionally start a fire at the house. She advised that she had not been involved in any conflicts or received any threats prior to the fire. She stated that there had been two break-ins at the house last month; however, she did not have any further information about them. She did not know of anyone who had previously been accused of arson, nor did she know of anyone with a mental disorder that might have caused him/her to intentionally start the fire. Ms. Chapman did not think that anyone would accuse her of intentionally setting the fire, and she advised that no one would be able to say that they saw her at the house at the time of the fire.



Ms. Chapman advised that the living room sofa, the stove, refrigerator, washer, and dryer all belonged to her, and she stated that she has not recovered anything from the house since the fire.

## Consent

Prior to the interview, I requested that Vamerolyn Chapman sign a Rehmann Corporate Investigative Services Consent to Conduct Scene Investigation form. The form was read and explained and she indicated that she understood and provided verbal and written consent for me to conduct a scene investigation. The signed consent form will be retained in our file. A copy is attached as Exhibit A.

## Fire Department

The Flint City Fire Department responded to this fire. A copy of the official incident report is attached as Exhibit B.

## Weather Conditions

Information about weather conditions at the time of the fire was obtained from the closest weather reporting station. At the time of the fire, there were no severe storms or other weather conditions present that might have caused the ignition of the fire or that would have hindered the fire department's response to or extinguishment of the fire. A copy of the local weather report for the day of the fire is attached as Exhibit C.

## Property Description

The Chapman property is a single-story, wood-framed, single-family dwelling. The structure sits on the west side of Kermit Street, with the address side of the house facing to the east. The house is situated in a residential neighborhood of similarly constructed properties.

Exterior: The exterior of the house is covered with white aluminum siding, with white trim work around the doors and windows. The structure sits on a cement basement foundation and has a pitched, asphalt-shingled roof.

Interior: The main floor of the house consists of two bedrooms, a bathroom, kitchen, and living room, all of which sits over an unfinished basement.

Mechanical/electrical/utilities: The electrical service meter is located on the west exterior side of the house. The meter base was intact, but the meter had been removed. The service entrance to the house and the service entrance to the service drop were both intact. The connections for the service drop at the house and pole were also intact. There was no damage noted to or around the service meter entrance consistent with a fire originating here. It was not involved in the cause of the fire.

The gas service meter is located in the basement. It was hooked up in the operational condition. It showed damage from fire products consistent with approaching fire products. Both gas supply valves were open. Fire patterns noted to and around the gas service meter were consistent with fire attack and the meter not being involved in the cause of the fire.

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932
Page 6 of 12



The furnace and water heater are also located in the basement. They were both hooked up in the operational condition, with gas supply valves open. I noted damage to the water heater from looters cutting the copper piping. I also observed damage from fire products consistent with approaching fire products, and neither appliance was involved in the cause of the fire.

The electrical service panel is located on the south side of the basement laundry area. It is a fuse-style panel, and it sustained fire damage that appeared to be from approaching fire products. Electrical engineer Tom Pawlyn, of RCIS, examined the service panel, and his findings can be found in his report provided under separate cover.

## Diagram

A diagram of the basement of the residence is attached as Exhibit D. The diagram was not drawn to scale but is being provided to assist in understanding this report, to show the general layout of the structure, and to identify the area of fire origin.

## Contents

The structure contained furnishings, appliances, and items of personal property customarily associated with a single-family residence. A detailed inventory of the contents was not completed, but photographs taken during the investigation document some of them. Damage to contents will be described in the appropriate sections of this report.

## Exterior Examination

**East:** On the east side of the house, there are four windows to the first floor and an entry door. The windows were all closed and intact, showing no exterior damage from fire products. They were determined to be closed and intact at the time of the fire.

The entry door is a steel door with a screen door on the exterior. I noted forced damage to the entry door, but protected spots showed that this damage was done after the fire. Ms. Chapman advised that this door was barred shut at the time of the loss, rendering entry impossible.

There was no exterior damage from fire products noted on the east side of the house.

**South:** On the south side of the house, there are three windows to the basement and two windows to the first floor. All five windows were closed and intact, showing no exterior damage from fire products. Protected spots showed that they were all closed and intact at the time of the fire.

There was no exterior damage from fire products noted on the south side of the house.

**West:** On the west side of the house, there are four windows to the first floor. All the windows were closed and intact, except for the center window, which had the bottom pane broken out. Protected spots showed that all the windows were closed and intact at the time of the fire, with the window pane being broken out after the events of the fire.



There was no exterior damage from fire products noted on the west side of the house, except for the collapse of the roof around the chimney. Interior-to-exterior damage was noted here, with collapse to the interior.

North: On the north side of the house, there is one window to the basement, one window to the first floor, and an entry door. Both windows were closed and intact, showing no exterior damage from fire products. Protected spots showed that they were closed and intact at the time of the fire.

The entry door is a steel door, with a glass storm door on the exterior. The storm door was intact, with no forced damage noted. The entry door showed multiple spots of forcible entry damage. Ms. Chapman advised that this door was forced open by fire crews to gain entry to the house. Looters also forced open this door after the fire. Protected spots showed that the door was forced open after the fire.

I noted light smoke damage around the soffits and eaves on the north side, from fire products traveling through the attic. No other damage from fire products was noted on this side.

## Interior Examination

The structure was entered from the north side entry door. From here, you enter into a small landing that separates the stairway that accesses both the first floor and the basement. Based on an initial walk-through of the structure, I determined that the heaviest amount of damage was in the basement. I will begin my examination in the first floor and then proceed to the basement.

First floor: Entering the first floor from the north entry door, you enter into the kitchen. The first floor consists of the kitchen in the northwest corner; living room in the northeast corner; a small bedroom hallway between the kitchen and the living room that accesses the two bedrooms and the bathroom; bedroom one in the southeast corner; bedroom two in the southwest corner; and the bathroom in the middle of the west side. The walls and ceilings throughout the first floor are plaster over gypsum, and the flooring is wood in all rooms except for the bathroom, which has ceramic tile. The walls, ceilings, and flooring were mostly intact, except for ceilings in the kitchen and bathroom and the common wall between the kitchen and bathroom, which were removed by fire crews checking for hidden fires.

The remaining walls and ceilings showed light-to-moderate smoke damage. Less severe damage was noted on the east side of the first floor. As you move up the east wall towards the ceiling, the damage from fire products gets heavier and more severe. As you move west through the east side rooms, including the living room and bedroom one, the damage from fire products gets heavier and more severe, with the heaviest damage on the first floor to and around the common wall space that separates the bathroom and the kitchen. Fire products noted in this area were consistent with heavy fire involvement in the basement extending up the internal wall space and causing damage to the underside of the roof and then spreading through the attic from this point.

The contents throughout the first floor included normal household furnishings. All the contents sustained damage consistent with approaching fire products, based on their positions within their respective rooms.

Based on the examination of the first floor, I determined that the fire did not start here.

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932
Page 8 of 12



Rehmann
*Business wisdom delivered.*
01062015

**Basement:** The basement is entered from the north side of the kitchen, near the north entry door. The stairs head down to the south to an open utility area. The walls in the basement are cement block; the ceiling is open wood frame; and the flooring cement. The basement is separated into two distinct rooms. The living space is on the east side, with the laundry and utility area on the west side. Based on the initial walk-through of the basement, I determined that the heaviest amount of damage was in the utility area.

In the living space, the walls and ceiling were all intact, showing light-to-moderate smoke damage throughout. Less severe smoke damage was observed on the east side of this room. As you move up the east wall towards the ceiling, damage from fire products gets heavier and more severe. As you move west through the living space, heavier smoke damage with minor heat damage was observed, with the heaviest to and around the open doorway that separates the living space and the utility area. Closer examination of this doorway showed heavier damage from fire products on the utility area side as compared to the living space side, indicating fire products' path of travel from west to east, as a fire originated in the basement utility area and extended east into the living space via this open doorway. Damage gets less severe as you move east through the living area in a normal fire path of travel.

Contents throughout the living space included some table tables and chairs on the south end, with a weight bench on the north end. All the contents sustained damage consistent with approaching fire products, based on their position within this room.

Based on the examination of the basement living space, I determined that this fire did not originate in this room.

In the basement utility area, the walls and ceiling are intact, showing moderate-to-heavy smoke damage with some heat and flame damage. Examination of fire patterns throughout the utility area showed heavier fire damage in two distinct areas, one in the southwest corner below the electrical service panel and the other in the middle of the west side, below the bathtub on the first floor. Based on an examination of fire patterns, I determined that these are two distinct and unconnected areas of heavy burning. These areas will be described further in the area of origin portion of this report.

The remaining walls and ceiling in the utility area showed damage consistent with approaching fire products, getting less severe as you move away from the two areas of origins described. Contents in this side of the basement included paint and household remodeling items in the southwest corner; a chair along the south wall; a dryer on the west side; and household storage on the north end. I examined the contents, including the dryer, and noted that they all sustained damage consistent with approaching fire products, based on their position in the room. The paint cans in the southwest corner, however, showed damage consistent with the fire originating here.

## Area of Origin

There are two distinct and unconnected areas of origin located in the basement. The first area of origin is in the southwest corner of the basement utility area, in and around some paint cans and household items. The second area of origin is at ceiling level below the bathtub on the first floor. Examination and fire patterns showed that these fires are separate and unconnected. In both areas of origin, I could not eliminate an open flame source as a potential ignition source for these fires. Additionally,

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932
Page 9 of 12



electrical branch circuit wiring ran to these areas and was examined by electrical engineer Tom Pawlyn.

## Scene Reconstruction

I conducted debris removal on December 5, 2014. This debris removal consisted of removing interior wall and ceiling finishes, including insulation along the south wall of the first-floor kitchen. This was done to confirm that fire patterns extending to the first floor were from a fire originating in the basement. All other reconstruction was done by engineer Tom Pawlyn during his scene examination and electrical artifacts study.

After completion of my debris removal and reconstruction, I could not eliminate an open flame source set by human hand igniting common combustibles, including wood framing members and household items found in the southwest corner, as the cause of this fire. I also could not eliminate vapors from an ignitable liquid being placed to the common combustibles as an alternate fuel source.

## Evidence

No evidence was collected from the scene.

## Building Security

Based on my scene examination and review of information obtained, I determined that this structure was secured and unoccupied at the time of this fire.

## Photographs

Digital photographs were taken during the course of this investigation. All digital photographs taken during my scene investigation can be viewed on the enclosed CD. Several photographs are individually described in a photo log, included as Exhibit E.

## Recontact Client

I contacted Mary Williams on December 5, 2014, to provide an update regarding this investigation. Permission was granted to call in other experts to examine the electrical system. After completion of this examination, no further investigation was required and a full report was submitted.

## Experts Retained

Tom Pawlyn, of Rehmann Corporate Investigative Services, was retained to conduct an electrical examination at this loss. This examination took place on December 12, 2014. After completion of this examination, I received a verbal report from Mr. Pawlyn. Per Mr. Pawlyn, there were no electrical causes identified, and based on his examination, two separate and unconnected fires were confirmed.

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932
Page 10 of 12



01062015

## Fire Origin

The fire at the Chapman/Lewis property originated in two separate and unconnected locations within the basement, one being the southwest corner and the other at ceiling level in the middle of the west side.

## Cause of the Fire

Based on information and evidence available to me at the time of my investigation, it is my opinion that this fire originated in two separate and unconnected locations. In both areas, common combustibles or vapors from an ignitable liquid placed to the common combustibles cannot be eliminated as the items first ignited. An open flame source set by human hand is the only ignition source that cannot be eliminated.

This fire is an incendiary fire to a secured and unoccupied dwelling house.

Submitted by:

*Kevin Pike*

Kevin Pike, IAAI-CFI, CFEI
Senior Fire Investigator

KGP/sts

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932
Page 11 of 12



## Exhibits

- Exhibit A — Consent

- Exhibit B — Fire Department Report

- Exhibit C — Weather

- Exhibit D — Diagram

- Exhibit E — Photo Log



**Exhibit A**

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932



## Consent to Conduct Scene Investigation

I, _____Vamerolyn Chapman_____, am the _____Owner_____ of the building/property located at _____5413 Kermit Flint, MI_____. I willingly and freely give my permission to Kevin Pike, IAAI-CFI, CFEI, of Rehmann Corporate Investigative Services (RCIS), to enter the property and conduct a complete and thorough scene investigation and search for evidence related to the loss that occurred on 11/21/2014. This consent includes the grounds, buildings, and/or vehicles thereon under my control at the above location.

I give consent to remove any and all physical items that may be related to the origin and cause of the aforementioned loss. This consent also applies to any further examinations, analysis, destructive testing, and the disposal of these items taken as evidence. I understand that articles removed may be used as evidence for this investigation.

I understand that I may engage the services of an investigator, at my expense, to participate in the determination of the origin and cause.

In addition, I give my permission to release my utility records including gas, electric, and water services, alarm records, cable/satellite television and internet provider records to RCIS in regards to this loss if requested by the insurance company. Also, I give my permission to release any records pertaining to the loss, if requested by the insurance company.

This authorization to enter the premises and remove property shall remain valid for the duration of this investigation. My signature below is given voluntarily and states that I understand and agree to the conditions of this consent form.

Signature: _____Vamerolyn Chapman_____

Date/Time: _____12/2/14_____

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932



01062015

# Exhibit B

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932



12-04-14;02:02PM;                                          ;8107627340        #  3/  6

Page 1 of 4

**A** — FDID: 02507 | State: MI | Incident Date: MM 11 DD 21 YYYY 2014 | Station: 006 | Incident Number: 2014-00003569 | Exposure: 000 | ☐ Delete ☐ Change | **NFIRS-1 BASIC**

**B Location Type**
☐ Check this box to indicate that the address for this incident is provided on the Wildland Fire Module in Section B. "Alternative Location Specification." Use only for wildland fires. | Census Tract
☒ Street address
☐ Intersection
☐ In front of
☐ Rear of
☐ Adjacent to
☐ Directions
☐ US National Grid
Number/Milepost: 5413 | Prefix: | Street or Highway: KERMIT | Street Type: ST | Suffix:
Apt/Suite/Room: | City: Flint | State: MI | ZIP Code: 48505 -
Cross Street, Directions or National Grid, as applicable

**C IncidentType**
Incident Type: 111  Building fire

**D Aid Given or Received**  ☒ None
1 ☐ Mutual aid received
2 ☐ Auto. aid received
3 ☐ Mutual aid given
4 ☐ Auto. aid given
5 ☐ Other aid given
Their FDID | Their State | Their Incident Number

**E1 Dates and Times**   Midnight is 0000
Check boxes if dates are the same as Alarm Date.   Month Day Year Hour/Min
Alarm: ALARM always required  11 21 2014 2146
☒ Arrival: ARRIVAL required, unless cancelled or did not arrive  11 21 2014 2153
☐ Controlled: CONTROLLED optional, except for wildland fires
☒ Last Unit Cleared: LAST UNIT CLEARED, required except for wildland fires  11 21 2014 2244

**E2 Shifts and Alarms**   Local option
Shift or Platoon: | Alarms: 1 | District: 6435

**E3 Special Studies**   Local option
Special Study ID# | Special Study Value

**F Actions Taken**
Primary Action Taken (1): 11  Extinguishment by fire s
Additional Action Taken (2):
Additional Action Taken (3):

**G1 Resources**
☒ Check this box and skip this block if an Apparatus or Personnel Module is used.
| | Apparatus | Personnel |
| Suppression | 5 | 9 |
| EMS | 0 | 0 |
| Other | 1 | 1 |
☐ Check box if resource counts include aid received resources.

**G2 Estimated Dollar Losses and Values**
LOSSES: Required for all fires if known. Optional for non-fires. | None
Property $ 6,000 ☐
Contents $ 2,500 ☐
PRE-INCIDENT VALUE: Optional
Property $ ☒
Contents $ ☒

**Completed Modules**
☒ Fire-2
☒ Structure Fire-3
☐ Civilian Fire Cas.-4
☐ Fire Service Cas.-5
☐ EMS-6
☐ HazMat-7
☐ Wildland Fire-8
☒ Apparatus-9
☐ Personnel-10
☐ Arson-11

**H1 Casualties**  ☒ None
| | Deaths | Injuries |
| Fire Service | 0 | 0 |
| Civilian | 0 | 0 |

**H2 Detector** Required for confined fires.
1 ☐ Detector alerted occupants
2 ☐ Detector did not alert them
U ☐ Unknown

**H3 Hazardous Materials Release**  ☒ None
1 ☐ Natural gas: slow leak, no evacuation or HazMat actions
2 ☐ Propane gas: <21-lb tank (as in home BBQ grill)
3 ☐ Gasoline: vehicle fuel tank or portable container
4 ☐ Kerosene: fuel burning equipment or portable storage
5 ☐ Diesel fuel/fuel oil: vehicle fuel tank or portable storage
6 ☐ Household solvents: home/office spill, cleanup only
7 ☐ Motor oil: from engine or portable container
8 ☐ Paint: from paint cans totaling < 55 gallons
0 ☐ Other: special HazMat action required or spill > 55 gal (Please complete the HazMat form.)

**I Mixed Use Property**  ☒ Not mixed
10 ☐ Assembly use
20 ☐ Education use
33 ☐ Medical use
40 ☐ Residential use
51 ☐ Row of stores
53 ☐ Enclosed mall
58 ☐ Business & residential
59 ☐ Office use
60 ☐ Industrial use
63 ☐ Military use
65 ☐ Farm use
00 ☐ Other mixed use

**J Property Use**  ☐ None
*Structures*
131 ☐ Church, place of worship
161 ☐ Restaurant or cafeteria
162 ☐ Bar/tavern or nightclub
213 ☐ Elementary school, kindergarten
215 ☐ High school, junior high
241 ☐ College, adult education
311 ☐ Nursing home
331 ☐ Hospital
341 ☐ Clinic, clinic-type infirmary
342 ☐ Doctor/dentist office
361 ☐ Prison or jail, not juvenile
419 ☒ 1-or 2-family dwelling
429 ☐ Multifamily dwelling
439 ☐ Rooming/boarding house
449 ☐ Commercial hotel or motel
459 ☐ Residential, board and care
464 ☐ Dormitory/barracks
519 ☐ Food and beverage sales
539 ☐ Household goods, sales, repairs
571 ☐ Gas or service station
579 ☐ Motor vehicle/boat sales/repairs
599 ☐ Business office
615 ☐ Electric-generation plant
629 ☐ Laboratory/science laboratory
700 ☐ Manufacturing plant
819 ☐ Livestock/poultry storage (barn)
882 ☐ Non-residential parking garage
891 ☐ Warehouse

*Outside*
124 ☐ Playground or park
655 ☐ Crops or orchard
669 ☐ Forest (timberland)
807 ☐ Outdoor storage area
919 ☐ Dump or sanitary landfill
931 ☐ Open land or field
936 ☐ Vacant lot
938 ☐ Graded/cared for plot of land
946 ☐ Lake, river, stream
951 ☐ Railroad right-of-way
960 ☐ Other street
961 ☐ Highway/divided highway
962 ☐ Residential street/driveway
981 ☐ Construction site
984 ☐ Industrial plant yard

Look up and enter a Property Use code and description only if you have NOT checked a Property Use box.
⇒ Property Use — Code
Property Use Description

01062015

SF/Chapman Claim File 1204







SF/Chapman Claim File 1207

12-04-14;02:02PM;                                    ;8107627340        #  5/  6

Page 3 of 4

**A** | 02507 | MI | MM 11 | DD 21 | YYYY 2014 | 006 | 2014-00003569 | 000 | ☐ Delete  ☐ Change | **NFIRS - 2 FIRE**

FDID ☆  State ☆  Incident Date ☆  Station  Incident Number ☆  Exposure ☆

---

**B  Property Details**

**B1** [ 1 ] ☐ Not Residential

Estimated number of residential living units in building of origin whether or not all units became involved

**B2** [ 1 ] ☐ Buildings not involved

Number of buildings involved

**B3** [ ] ☒ None
[ ] ☐ Less than one acre

Acres burned (outside fires)

**C  On-Site Materials or Products** ☐ None

Complete if there were any significant amounts of commercial, industrial, energy, or agricultural products or materials on the property, whether or not they became involved

Enter up to three codes.
Check one box for each code entered.

[ ] On-site material (1)

On-Site Materials Storage Use

1 ☐ Bulk storage or warehousing
2 ☐ Processing or manufacturing
3 ☐ Packaged goods for sale
4 ☐ Repair or service
U ☐ Undetermined

[ ] On-site material (2)

1 ☐ Bulk storage or warehousing
2 ☐ Processing or manufacturing
3 ☐ Packaged goods for sale
4 ☐ Repair or service
U ☐ Undetermined

[ ] On-site material (3)

1 ☐ Bulk storage or warehousing
2 ☐ Processing or manufacturing
3 ☐ Packaged goods for sale
4 ☐ Repair or service
U ☐ Undetermined

---

**D  Ignition**

**D1** [ 71 ] Substructure area or space

Area of fire origin ☆

**D2** [ UU ] Undetermined ☆

Heat source ☆

**D3** [ UU ] Undetermined  [ 1 ] ☐ Check box if fire spread was confined to object of origin.

Item first ignited ☆

**D4** [ UU ] Undetermined

Type of material first ignited   Required only if item first ignited code is 00 or <70

**E1  Cause of Ignition** ☆  ⇨ Skip to Section G

☐ Check box if this is an exposure report.

1 ☐ Intentional
2 ☒ Unintentional
3 ☐ Failure of equipment or heat source
4 ☐ Act of nature
5 ☐ Cause under investigation
U ☐ Cause undetermined after investigation

**E2  Factors Contributing to Ignition** ☆  ☐ None

[ UU ] Undetermined

Factor contributing to ignition (1)

[ ] Factor contributing to ignition (2)

**E3  Human Factors Contributing to Ignition**

Check all applicable boxes ☆ ☒ None

1 ☐ Asleep
2 ☐ Possibly impaired by alcohol or drugs
3 ☐ Unattended person
4 ☐ Possibly mentally disabled
5 ☐ Physically disabled
6 ☐ Multiple persons involved

7 ☐ Age was a factor

Estimated age of person involved

1 ☐ Male    2 ☐ Female

---

**F1  Equipment Involved in Ignition**
☐ None ⇨ If equipment was not involved, skip to Section G

[ ] Equipment Involved

Brand [ ]
Model [ ]
Serial # [ ]
Year [ ]

**F2  Equipment Power Source**

[ ] Equipment Power Source

**F3  Equipment Portability**

1 ☐ Portable
2 ☐ Stationary

Portable equipment normally can be moved by one or two persons, is designed to be used in multiple locations, and requires no tools to install.

**G  Fire Suppression Factors** ☒ None

Enter up to three codes.

[ ] Fire suppression factor (1)

[ ] Fire suppression factor (2)

[ ] Fire suppression factor (3)

---

**H1  Mobile Property Involved** ☐ None

1 ☐ Not involved in ignition, but burned
2 ☐ Involved in ignition, but did not burn
3 ☐ Involved in ignition and burned

**H2  Mobile Property Type and Make**

[ ] Mobile property type

[ ] Mobile property make

[ ] Mobile property model   [ ] Year

[ ] License Plate Number   [ ] State   [ ] VIN

**Local Use**

☐ Pre-Fire Plan Available

Some of the information presented in this report may be based upon reports from other agencies.

☐ Arson report attached
☐ Police report attached
☐ Coroner report attached
☐ Other reports attached

Structure fire? Please be sure to complete the Structure Fire form (NFIRS-3).

01062015



SF/Chapman Claim File 1209

12-04-14;02:02PM;                                                8107627340        #  6/  6

Page 4 of 4



**I1 Structure Type** ☆

NFIRS-3 STRUCTURE FIRE

If fire was in an enclosed building or a portable/mobile structure, complete the rest of this form.

1 ☒ Enclosed building
2 ☐ Portable/mobile structures
3 ☐ Open structure
4 ☐ Air-supported structure
5 ☐ Tent
6 ☐ Open platform (e.g., piers)
7 ☐ Underground structure (work areas)
8 ☐ Connective structure (e.g., fences)
0 ☐ Other type of structure

**I2 Building Status** ☆

1 ☐ Under construction
2 ☒ In Normal Use
3 ☐ Idle, not routinely used
4 ☐ Under major renovation
5 ☐ Vacant and secured
6 ☐ Vacant and unsecured
7 ☐ Being demolished
0 ☐ Other
U ☐ Undetermined

**I3 Building Height** ☆

Count the roof as part of the highest story.

[ 1 ]
Total number of stories at or above grade

[ 1 ]
Total number of stories below grade

**I4 Main Floor Size** ☆

[      900 ]
Total square feet

**OR**

[        ] **BY** [        ]
Length in feet       Width in feet

---

**J1 Fire Origin** ☆

[ 1 ] ☐ Below grade
Story of fire origin

**J2 Fire Spread** ☆

If fire spread was confined to object of origin, do not check a box (Ref. Block D3, Fire Module.)

2 ☐ Confined to room of origin
3 ☐ Confined to floor of origin
4 ☒ Confined to building of origin
5 ☐ Beyond building of origin

**J3 Number of Stories Damaged by Flame**

Count the roof as part of the highest story.

[      ] Number of stories w/minor damage (1 to 24% flame damage)

[  1  ] Number of stories w/significant damage (25 to 49% flame damage)

[      ] Number of stories w/heavy damage (50 to 74% flame damage)

[      ] Number of stories w/extreme damage (75 to 100% flame damage)

**K Type of Material Contributing Most to Flame Spread**

☐ Check if no flame spread OR if same as Material First Ignited (Block D4, Fire Module) OR if unable to determine.   ⇒ Skip to Section L

**K1** [      ]
Item contributing most to flame spread

**K2** [      ]
Type of material contributing most to flame spread    Required only if item contributing code is 00 or < 70.

---

**L1 Presence of Detectors** ☆

(in area of the fire)

N ☒ None Present    Skip to Section M
1 ☐ Present
U ☐ Undetermined

**L2 Detector Type**

1 ☐ Smoke
2 ☐ Heat
3 ☐ Combination smoke and heat
4 ☐ Sprinkler, water flow detection
5 ☐ More than one type present
0 ☐ Other
U ☐ Undetermined

**L3 Detector Power Supply**

1 ☐ Battery only
2 ☐ Hardwire only
3 ☐ Plug-in
4 ☐ Hardwire with battery
5 ☐ Plug-in with battery
6 ☐ Mechanical
7 ☐ Multiple detectors & power supplies
0 ☐ Other
U ☐ Undetermined

**L4 Detector Operation**

1 ☐ Fire too small to activate
2 ☐ Operated    Complete Block L5
3 ☐ Failed to operate    Complete Block L6
U ☐ Undetermined

**L5 Detector Effectiveness**

Required if detector operated.

1 ☐ Alerted occupants, occupants responded
2 ☐ Alerted occupants, occupants failed to respond
3 ☐ There were no occupants
4 ☐ Failed to alert occupants
U ☐ Undetermined

**L6 Detector Failure Reason**

Required if detector failed to operated.

1 ☐ Power failure, shutoff, or disconnect
2 ☐ Improper installation or placement
3 ☐ Defective
4 ☐ Lack of maintenance, includes not cleaning
5 ☐ Battery missing or disconnected
6 ☐ Battery discharged or dead
7 ☐ Other
U ☐ Undetermined

---

**M1 Presence of Automatic Extinguishing System** ☆

N ☒ None Present
1 ☐ Present    Complete rest of Section M
2 ☐ Partial System Present
U ☐ Undetermined

**M2 Type of Automatic Extinguishing System**

Required if fire was within designed range of AES

1 ☐ Wet-pipe
2 ☐ Dry-pipe sprinkler
3 ☐ Other sprinkler system
4 ☐ Dry chemical system
5 ☐ Foam system
6 ☐ Halogen-type system
7 ☐ Carbon dioxide (CO2) system
0 ☐ Other special hazard system
U ☐ Undetermined

**M3 Operation of Automatic Extinguishing System**

Required if fire was within designed range

1 ☐ Operated/effective    (go to M4)
2 ☐ Operated/not effective    (go to M4)
3 ☐ Fire too small to activate
4 ☐ Failed to operate    (go to M5)
0 ☐ Other
U ☐ Undetermined

**M4 Number of Sprinkler Heads Operating**

Required if system operated

[        ]
Number of sprinkler heads operating

**M5 Reason for Automatic Extinguishing System Failure**

Required if system failed or not effective

1 ☐ System shut off
2 ☐ Not enough agent discharged
3 ☐ Agent discharged but did not reach fire
4 ☐ Wrong type of system
5 ☐ Fire not in area protected
6 ☐ System components damaged
7 ☐ Lack of maintenance
8 ☐ Manual intervention
0 ☐ Other
U ☐ Undetermined

01062015

SF/Chapman Claim File 1210



SF/Chapman Claim File 1211

**Exhibit C**

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932



# Weather

Date of Loss: 11/21/2014 / Location of Loss: Flint, MI 48505

Reporting Weather Station: Flint, Michigan

## Hourly Observations

| Time (EST) | Temp. | Windchill | Dew Point | Humidity | Pressure | Visibility | Wind Dir | Wind Speed | Gust Speed | Precip | Events | Conditions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12:53 AM | 12.0 °F | 0.5 °F | 7.0 °F | 80% | 30.23 in | 10.0 mi | West | 8.1 mph | - | | N/A | Clear |
| 1:53 AM | 10.0 °F | 0.4 °F | 6.1 °F | 84% | 30.26 in | 10.0 mi | West | 5.8 mph | - | | N/A | Clear |
| 2:53 AM | 8.1 °F | -3.2 °F | 3.9 °F | 83% | 30.30 in | 10.0 mi | West | 6.9 mph | - | | N/A | Clear |
| 3:53 AM | 8.6 °F | -3.7 °F | 3.2 °F | 79% | 30.27 in | 10.0 mi | West | 8.1 mph | - | | N/A | Clear |
| 4:53 AM | 6.1 °F | -5.6 °F | 1.9 °F | 83% | 30.35 in | 10.0 mi | West | 6.9 mph | - | | N/A | Clear |
| 5:53 AM | 9.0 °F | -0.9 °F | 3.9 °F | 80% | 30.38 in | 10.0 mi | West | 5.8 mph | - | | N/A | Clear |
| 6:53 AM | 9.0 °F | 0.6 °F | 3.0 °F | 77% | 30.41 in | 10.0 mi | SW | 4.6 mph | - | | N/A | Clear |
| 7:53 AM | 5.0 °F | -4.1 °F | 3.0 °F | 92% | 30.44 in | 10.0 mi | WSW | 4.6 mph | - | | N/A | Clear |
| 8:53 AM | 9.0 °F | -0.9 °F | 5.0 °F | 84% | 30.46 in | 10.0 mi | WSW | 5.8 mph | - | | N/A | Clear |
| 9:53 AM | 15.1 °F | 6.4 °F | 10.9 °F | 84% | 30.47 in | 10.0 mi | SW | 5.8 mph | - | | N/A | Clear |
| 10:53 AM | 19.9 °F | 10.1 °F | 10.9 °F | 68% | 30.49 in | 10.0 mi | West | 8.1 mph | - | | N/A | Clear |
| 11:53 AM | 23.0 °F | 13.1 °F | 10.9 °F | 60% | 30.49 in | 10.0 mi | SW | 9.2 mph | - | | N/A | Clear |
| 12:53 PM | 25.0 °F | 14.8 °F | 9.0 °F | 51% | 30.48 in | 10.0 mi | West | 10.4 mph | - | | N/A | Clear |
| 1:53 PM | 25.0 °F | 14.8 °F | 9.0 °F | 51% | 30.47 in | 10.0 mi | WSW | 10.4 mph | - | | N/A | Clear |
| 2:53 PM | 26.1 °F | 17.6 °F | 9.0 °F | 49% | 30.45 in | 10.0 mi | WSW | 8.1 mph | - | | N/A | Clear |
| 3:53 PM | 26.1 °F | 16.8 °F | 10.0 °F | 51% | 30.45 in | 10.0 mi | SSW | 9.2 mph | - | | N/A | Clear |
| 4:53 PM | 24.1 °F | 18.2 °F | 10.0 °F | 55% | 30.45 in | 10.0 mi | SW | 4.6 mph | - | | N/A | Clear |
| 5:53 PM | 21.0 °F | 16.2 °F | 9.0 °F | 60% | 30.44 in | 10.0 mi | South | 3.5 mph | - | | N/A | Clear |
| 6:53 PM | 21.9 °F | 13.4 °F | 9.0 °F | 58% | 30.42 in | 10.0 mi | South | 6.9 mph | - | | N/A | Clear |
| 7:53 PM | 25.0 °F | 14.8 °F | 12.9 °F | 60% | 30.41 in | 10.0 mi | SSW | 10.4 mph | - | | N/A | Clear |
| 8:53 PM | 23.0 °F | 14.7 °F | 12.0 °F | 63% | 30.39 in | 10.0 mi | South | 6.9 mph | - | | N/A | Clear |
| 9:53 PM | 21.9 °F | 11.7 °F | 12.0 °F | 66% | 30.37 in | 10.0 mi | South | 9.2 mph | - | | N/A | Clear |
| 10:53 PM | 23.0 °F | 11.7 °F | 10.9 °F | 60% | 30.34 in | 10.0 mi | SSW | 11.5 mph | - | | N/A | Clear |
| 11:53 PM | 24.1 °F | 13.1 °F | 10.9 °F | 57% | 30.32 in | 10.0 mi | South | 11.5 mph | - | | N/A | Clear |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932



**Exhibit D**

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932



**14-1051238 Chapman**



14-1051238
5413 Kermit
Flint, MI
Claim # 22-562D-932
Not to scale

Area of
Origin

Area of
Origin
(Ceiling)

Laundry/utility area

Living space

N

Floor 1

01062015

# Exhibit E

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932



## Photo Log

RCIS Case 202988/14-1051238 | Claim 22-562D-932



| 1 | | East side exterior. |
| 6 | | Exterior view of east side entry door. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 7 | | South side exterior. |
| 10 | | Electrical service meter on the south side exterior. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 13 | West side exterior. |
| 18 | North side exterior. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





23     Exterior view of the north entry door.

26     Force damage to north entry door.

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 27 | | Looking south into the kitchen prior to debris removal. |
| 31 | | Looking north through the kitchen. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 38 | | Floor level on the south side of the kitchen. |
| 44 | | Looking north through the living room. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 49 | | Interior side of the east entry door. |
| 50 | | Looking south through the kitchen. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 59 | North side of bedroom one. |
| 66 | South side of bedroom two. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 78 | Looking west into the bathroom. |
| 83 | Looking south through the basement living area. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 86 | | Looking north through the basement living space. |
| 87 | | Gas service meter. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 91 | | Looking south through the basement utility area. |
| 93 | | Front of the dryer. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 95 | | Front of the water heater. |
| 100 | | Basement ceiling showing the west side area of origin. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 102 | | Looking north through the basement utility area. |
| 105 | | Water meter. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





106 — Southwest corner of the basement utility area, showing the area of origin there.

108 — Electrical service panel.

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





109 — Another view of the electrical service panel.

111 — Southwest basement area of origin.

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932



| 117 |  | Looking south through the kitchen during debris removal. |

| 122 |  | Looking south through the kitchen after debris removal. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 126 | Looking down at the west side basement area of origin from the south side of the kitchen. |

| 129 | Another view looking up at the west side basement area of origin. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932





| 133 | Evidence tape on the south side of the kitchen. |
| 135 | Evidence tape securing the basement. |

Privileged & Confidential
RCIS 202988/14-1051238 | Claim 22-562D-932



CDP USE ONLY:
Virus Scanned: ☒
Alias: _I4KC_

# Electronic Media Notification

Claim Number: _22-562D-932_

Date Received: _1-6-2015_     CIOS PREPPER: _D19V_

Media Sent in by: _Rehmana_

Type of Media received:

- ☒ CD with additional documents
- ☐ CD without additional documents
- ☐ Flash drive/memory card with additional documents
- ☐ Flash drive/memory card without additional documents

Total number of electronic media items received: _1_

---

Processed by __BA8N__

Documents were: (Check all that apply)

- ☐ Email Captured
  - o Number of emails_____ Doc Type_____
- ☐ Printed and scanned from electronic media
  - o Doc Type: _____
- ✓ Electronic Media uploaded thru Doc and Photo Capture
  - o Documents
  - ✓ Photos
- ✓ Additional documents scanned separately
- ☐ Unable to process. Sent CD or Flash drive/memory card to Claim handler: x-rays, MRI's, video file, voice file, etc
- ☐ Returned to sender; virus found, damaged or unable to access data
- ☐ Returned Mail with CD(s)
- ☐ Forwarding electronic media to: _____

Comments: _____

_____

V.12 05-14-14

01062015

# EXHIBIT C

# CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.

## KEVIN G. PIKE

### April 6, 2017

Prepared by



depos@networkreporting.com
Phone: 800.632.2720
Fax: 800.968.8653
www.networkreporting.com

*Let us assist you GLOBALLY for all of your deposition needs.*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN


VAMEROLYN CHAPMAN,

      Plaintiff,

vs.                                    Case No. 15-cv-14232

                   Hon. John Corbett O'Meara

STATE FARM FIRE AND CASUALTY

COMPANY,

      Defendant.

_____/

DEPOSITION OF KEVIN G. PIKE

    The deposition of KEVIN G. PIKE, taken before
CHRISTINE A. LERCHENFELD, Notary Public and Court
Reporter, in and for the County of Macomb, State of
Michigan, acting in the County of Oakland, on Thursday,
April 6, 2017, at 1500 West Big Beaver Road, Second
Floor, Troy, Michigan 48084, commencing at 10:03 A.M.
APPEARANCES:

        JO ROBIN DAVIS (P31263)

        30300 Northwestern Highway, Suite 104

        Farmington Hills, Michigan  48334

        (248) 932-0100

        Appearing on behalf of Plaintiff.


Page 1



---

**Page 2**

1  APPEARANCES, (continued):
2      THOMAS M. RIZZO (P32357)
3      220 Lyon Street NW, Suite 200
4      Grand Rapids, Michigan  49503
5      (616) 451-8111
6      Appearing on behalf of Defendant.
7
8                    ** ** ** ** **
9
10
11  REPORTED BY:   Christine A. Lerchenfeld, CER6501
12          Certified Electronic Reporter
13      FOR:   Network Reporting Corporation
14          Firm Registration Number 8151
15          1-800-632-2720
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1                TABLE OF CONTENTS
2
3  WITNESS                              PAGE
4              KEVIN G. PIKE
5      Examination by Ms. Davis              4
6                  *  *  *  *
7
8
9  EXHIBITS:                          MARKED
10      Exhibit Number 1 - Curriculum Vitae        5
11      Exhibit Number 2 - 5/15/15 Note            9
12      Exhibit Number 3 - Invoice                43
13
14
15
16
17
18
19
20
21
22              ** ** ** ** **
23
24
25

---

**Page 4**

1                  Troy, Michigan
2            Thursday, April 6, 2017
3                    10:03 a.m.
4              ** ** ** ** **
5                  KEVIN G. PIKE
6              ** ** ** ** **
7          COURT REPORTER:  Would you raise your
8  right hand, please?  Do you solemnly swear or affirm
9  to tell the truth, the whole truth and nothing but
10  the truth in this matter?
11          THE WITNESS:  Yes, I will.
12          MS. DAVIS:  Good morning, Mr. Pike.  We
13  are here to depose you in the matter of Chapman
14  versus State Farm, pending in -- I don't have the
15  dep notice.  Thank you.  Pending in the United
16  States District Court for the Eastern District of
17  Michigan before Judge John Corbett O'Meara.
18                  EXAMINATION
19  BY MS. DAVIS:
20  Q  I've deposed you before, I know a lot about your
21      background.  Has anything changed since I last took
22      your deposition, which would have been in May of
23      2016?
24  A  I actually -- this is an updated C.V. minus a dep I
25      just had within the last two weeks.  I haven't got

---

**Page 5**

1      it on there yet, but there's one more dep after
2      that.  And there's some updates with some of the
3      numbers of fires and stuff I've done.
4  Q  Who's the last deposition?
5  A  It was for Allstate.  Phil Yeager (ph) had it and
6      then Malinowski's (ph) office was deposing me.
7  Q  Okay.  I think we have enough depositions.
8          MS. DAVIS:  Can we mark this as an
9      exhibit, please?
10          (Exhibit Number 1 was marked for
11          identification at 10:05 a.m.)
12  BY MS. DAVIS:
13  Q  Exhibit 1 is your current and up-to-date curriculum
14      vitae?
15  A  Yes.
16  Q  Let me just take a quick look.  I presume that
17      Rehmann, your division in Rehmann, still does 98
18      percent of its work for insurance companies; is that
19      correct?
20  A  I would say yes.  Insurance companies or attorneys
21      for insurance companies, yes.
22  Q  How long have you been at Rehmann?
23  A  I think it's been five and a half years.  It's been
24      since September of 2011.
25  Q  And what's your position here?



CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.                    DEPOSITION OF KEVIN G. PIKE

1   A   Manager of the fire investigation group.
2   Q   I assume if there's a fire investigation group that
3       means there's people who investigate fires other
4       than you?
5   A   Yes, there's three other investigators.
6   Q   Do all charge the same for conducting origin and
7       cause investigations?
8   A   Yes, we do.
9   Q   And what is the current rate for conducting an
10      investigation?
11  A   I believe we're at $100 an hour.
12  Q   And that's for the actual origin and cause work?
13  A   Travel, origin and cause and then there's a mileage
14      fee.
15  Q   And what do you charge to testify?
16  A   I believe it's 195.
17  Q   And that would be in court and/or deposition?
18  A   Correct.
19  Q   How much did Rehmann charge State Farm referable to
20      this particular loss which would be the loss at the
21      Chapman dwelling at --
22  A   Go back a couple pages, there's a cover page.
23  Q   That will tell me the address?
24  A   Yes.
25  Q   Okay.  Thank you.

Page 6

1   A   Right under the cover page there should be -- there
2       you go.
3   Q   5413 Kermit Street in Flint.
4   A   And the question was how much did we charge?
5   Q   Yes.
6   A   I don't know.  The invoice is in the file.  I turn
7       my hours in and then it's produced by our billing
8       department, so I never see the invoice.
9   Q   What file is in front of you?
10  A   This is the same packet what you have there.
11  Q   Can I see the rest of your file?
12  A   Yeah.  This is just a copy of what's in here.  They
13      double-side it, so I single-side it so I can read it
14      easier.
15  Q   I agree.  I've worked with you in the past.  It's
16      generally my understanding that you record
17      interviews, correct?
18  A   Correct.
19  Q   Why in this case did you not?
20  A   Because it's State Farm's policy that the fire
21      investigators do not record interviews.
22  Q   Do you know why?
23  A   I was at a meeting quite a few years ago about it.
24      Something about putting the insured through undue
25      stress because they may record their interviews with

Page 7

1       their adjusters, their special investigators, EUOs
2       or other scenarios, so they asked us probably seven
3       years ago to stop recording interviews.
4   Q   So it's for the benefit of the insured?
5   A   I believe so.  That's what we were told.
6   Q   Okay.  And "Do not send a photo CD or photo log."
7       Do you know why that is?
8   A   That bottom page is instructions from the adjusters
9       how they want reports sent to them.  Because I
10      believe a lot of their stuff if sent out of state
11      electronically and then scanned into their file.  So
12      a lot of people don't want the little disks hanging
13      around because they have nothing to do with them.
14  Q   How much of your work, this fire investigation unit,
15      is for State Farm?
16  A   I don't know exact percentages, but it's one of our
17      -- it's probably our major client.
18  Q   Seventy-five percent?
19  A   No.  I would say closer to 50 percent.
20  Q   I'm looking at a notepad from -- can you identify
21      what this document is?
22  A   It's a handwritten note on a conversation I had with
23      Lisa Shubitowski from State Farm on May 15th, 2015.
24  Q   Would you mind if we marked this as an exhibit?
25  A   Can we make a copy of it?

Page 8

1   Q   That would be fine.
2   A   Okay.  I'll make that real quick.
3           (Off the record at 10:11 a.m.)
4           (Exhibit Number 2 was marked for
5           identification while off the record.)
6           (Back on the record at 10:13 a.m.)
7   BY MS. DAVIS:
8   Q   Deposition Exhibit Number 2 is a copy of that note
9       you just referenced?
10  A   Yes.
11  Q   You had a phone call with Ms. Shubitowski on May
12      15th of 2015.  That would be regarding your origin
13      and cause investigation?
14  A   Correct.
15  Q   And that occurred in December of 2014, correct?
16  A   Correct.
17  Q   If I read this correctly it says, "Concern from her
18      boss why no samples were taken," correct?
19  A   Correct.
20  Q   Why were no samples taken?
21  A   Because, just like it's listed there, in area of
22      origin number 1 there was too much damage.  In area
23      of origin number 2 there was paint and stains in the
24      area so I would have gotten a false positive.  And I
25      explained to her that I had two separate unconnected

Page 9

3 (Pages 6 to 9)



1    fires and the samples were not needed.
2  Q   I see in your file there's a real estate summary
3      sheet.  What is that?
4  A   That was sent over by the -- I believe Sergeant
5      Bigelow (ph) from Flint Arson.
6  Q   That's one of my questions.  Did you talk to
7      Sergeant Bigelow regarding this particular loss?
8  A   I talked to him, but he was not investigating it.
9  Q   Was anybody from Flint investigating it?
10 A   Not that I know of.
11 Q   Did you ask him why he was not?
12 A   I don't recall what he said.  He just said he wasn't
13     going to investigate it.
14 Q   Did you review the Michigan Fire Incident Report
15     before you went out and conducted your origin and
16     cause investigation?
17 A   I don't believe so.
18 Q   If I remember correctly -- you're right.  It's two-
19     sided, it's impossible.
20 A   That's why I make my own copy.
21 Q   If I remember correctly, the fire report listed the
22     cause of ignition as unintentional.  Is that your
23     understanding?
24 A   Yes, it is.
25 Q   Did you talk to Sergeant Bigelow about that?

Page 10

1  A   No, I did not.  That report was produced by the fire
2      suppression team, not Sergeant Bigelow.
3  Q   I understand that.  But once you received this did
4      you ever talk to Sergeant Bigelow about that
5      finding?
6  A   I don't recall specifically.  I may have called him
7      back and told him what my findings were.
8  Q   Did you ever talk to the responding firefighters who
9      filled out this Michigan Fire Incident Report?
10 A   No, I did not.
11 Q   Did anybody from your office, from Rehmann, anybody
12     talk to those firefighters?
13 A   No, they did not.
14 Q   Did anybody talk to the firefighters to determine
15     whether the home was locked and/or secure when they
16     arrived?
17 A   That was confirmed to me by the insured during our
18     interview and then by my physical examination of the
19     scene.
20 Q   When was the last time Mrs. Chapman had been at the
21     home prior to the loss, according to what she told
22     you?
23 A   I believe she said August prior.
24 Q   In August, okay.  So how would she know whether or
25     not the home was locked and secure immediately prior

Page 11

1      to the fire?
2  A   I believe she possibly talked to fire crews or
3      somebody about the fire, because she was specific
4      that the front door was barred and could not be
5      entered from the exterior and the side door, which
6      would be the north door, was forced open by the fire
7      department is what she made in her statement to me.
8  Q   That's what she told you?
9  A   Yes.
10 Q   You didn't confirm that with the fire department,
11     did you?
12 A   I confirmed it off of the patterns on the doors,
13     but --
14 Q   You're not answering my question.
15 A   With the fire department, no, I did not.  I did not
16     talk to anybody other than Sergeant Bigelow.
17 Q   Do you have notes of your conversation with Mrs.
18     Chapman?
19 A   They may -- we do them electronically on an iPad, so
20     I don't know if they were produced.  My office sends
21     out the requests so I don't know if they produce the
22     electronic notes or not, but I can get them to you.
23 Q   Okay.  That would be great.  When you say you do
24     them electronically you do them on an iPad?
25 A   Correct.

Page 12

1  Q   So during the course of the -- when you're talking
2      to her you're inputting notes into an iPad?
3  A   I have a form.  When we get our assignments there's
4      a set of documents that we use on the scene and part
5      of it is an interview form.  So as I'm talking to
6      her and I ask a question off the form, then I write
7      the answer down and then I use that -- we read off
8      that form to put everything in this report.  So what
9      was on that form is in this report.
10 Q   Well, where's the form?
11 A   It's probably on the electronic if it's not printed
12     in the file.
13 Q   Well, let me see if it's -- well, I'm saying: you
14     said you handwrote something down.
15 A   Correct.
16 Q   I want to know where -- whatever that piece of paper
17     that you wrote something down on where is that?
18 A   There's not a piece of paper, it's electronic form
19     that I write physically on my iPad.
20 Q   You write on your iPad, okay.
21 A   And save it into the file.
22 Q   So you write on your iPad?
23 A   Correct.
24 Q   And the form, is that similar to the form that you
25     used in the past which asks you what questions --

Page 13

4 (Pages 10 to 13)



CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.                    DEPOSITION OF KEVIN G. PIKE

---

1      you know, it sets forth a list of the questions that
2      you should ask an insured during that time?
3  A   **It's a form we use on every fire.**
4  Q   So you use the form, but the form is on your iPad
5      now, it's not a piece of paper?
6  A   **Correct.**
7  Q   Wonderful.  May I have a copy of that if you can get
8      it for me, please?
9  A   **I have a note to email it.**
10 Q   Okay.  When you met with Mrs. Chapman she was
11     cooperative?
12 A   **Yes.**
13 Q   She signed the consent form with no problem?
14 A   **Yes.  No problem.  She signed the consent form**
15     **with --**
16 Q   She signed the consent form.  She signed it.  She
17     didn't have a problem signing the consent form?
18 A   **Correct.**
19 Q   Okay.  You said that the furnishings were consistent
20     with a single-family residence; is that correct?
21 A   **Yes.**
22 Q   Do I have in my copy of the report all of the photos
23     you took?
24 A   **A CD should have been provided, yes.**
25 Q   Well, I've got -- I may have the CD, but are there

                        Page 14

---

1  Q   When you say peer review what does that involve?
2  A   **One of the other investigators will read through my**
3      **report just to make sure all the components are**
4      **there.**
5  Q   Do you dictate the report?
6  A   **Yes.**
7  Q   Where would the dictation be?
8  A   **If it's saved it would be in the electronic file,**
9      **because we keep an electronic file.**
10 Q   If you've got it can I have that?
11 A   **I'll put a note down.**
12 Q   I've got to get the approval from Mr. Rizzo.
13 A   **I'll email them to him.**
14 Q   Did you go out there, yourself, just you, alone?
15 A   **Yes.**
16 Q   On December 2, 2014?
17 A   **Yes.**
18 Q   Do you have a copy of this invoice anywhere?
19 A   **It's probably in the file, yeah.**
20 Q   Do you want to take a look at it for a second?  I
21     just want to go through it.
22 A   **Okay.**
23 Q   You charged $25 to get the fire report?
24 A   **You'd have to ask admin on that.  Like I said, I**
25     **don't produce these.  I put my hours on a timesheet.**

                        Page 16

---

1      photos in addition to those in the report?
2  A   **Yes.**
3  Q   And those are photographs that you didn't feel were
4      necessary to include?
5  A   **Correct.**
6  Q   How many origin and cause investigations do you
7      normally conduct in a week?
8  A   **Four to five a week.**
9  Q   And how many hours do they generally take?  Let's
10     say from start to finish.
11 A   **It varies on each fire depending on reports and how**
12     **long I'm at the scene and how much work I have to**
13     **do.  So it varies.**
14 Q   Would you say this was an average investigation?
15 A   **Yes.**
16 Q   And this took you, apparently, if you look at your
17     bill, 14 hours?
18 A   **If that's what's on there.  I haven't seen the bill.**
19 Q   Well, I'll show you the bill.  It's attached to
20     something.  I found it somewhere.
21 A   **It would actually be, based on what I see here,**
22     **11.25 hours looks like my work, .5 hours for peer**
23     **review would have been somebody else and the 3.25**
24     **hours for admin would have been the admin staff, not**
25     **my work.**

                        Page 15

---

1  Q   I understand.  So you spent 4.5 hours at the loss
2      location, right?
3  A   **Correct.**
4  Q   Did you go back when the electrical engineer went
5      back?
6  A   **No, I did not.**
7  Q   Did the electrical engineer prepare a written
8      report?
9  A   **Not that I received.**
10 Q   Is the electrical engineer someone from Rehmann?
11 A   **He was at the time, yeah.**
12 Q   If there was a report would it have been given to
13     you?
14 A   **It would have been saved in the electronic file.  He**
15     **has his own separate file.**
16 Q   Is there -- can I get access to his file?  I mean,
17     there's another file on this particular loss which
18     includes the electrical --
19         MR. RIZZO:  You know what?  It's my
20     understanding he did not prepare a report.
21         MS. DAVIS:  That's my understanding too,
22     but I wonder if there's any notes.
23         MR. RIZZO:  I have inquired about that and
24     may already have an answer.  Brian was looking at
25     that at my direction yesterday and I will get

                        Page 17

---

                                    5 (Pages 14 to 17)

CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.                          DEPOSITION OF KEVIN G. PIKE

| | |
|---|---|
| 1  everything he has or if there is anything and get it | 1  my report. |
| 2  to you. | 2  Q   In the first paragraph. |
| 3       MS. DAVIS:  Okay. | 3  A   Okay. |
| 4  BY MS. DAVIS: | 4  Q   And she had owned the house since 1999? |
| 5  Q   The electrical guy is no longer with Rehmann? | 5  A   Correct. |
| 6  A   No, he's on his own. | 6  Q   She had no plans to sell; is that correct? |
| 7  Q   Who is it? | 7  A   That's what she told me, yes. |
| 8  A   Tom Pawlyn, P-a-w-l-y-n. | 8  Q   Okay.  And she had a mortgage on the home, but had |
| 9  Q   Where is he; do you know?  Is he available? | 9      paid it off in 2002, right? |
| 10  A   Yes, he's still in Troy here.  He just opened his | 10  A   Yes. |
| 11      own company.  We still work together. | 11  Q   Since she owned it she had remodeled the kitchen and |
| 12  Q   This case was assigned to you by a Mary Williams at | 12      bathroom, installed new lights in the kitchen, new |
| 13      State Farm? | 13      windows and a new roof, right? |
| 14  A   It was called in to Rehmann and then it was | 14  A   That's what it says here in my report, yes. |
| 15      assigned.  I think at the time I was manager so I | 15  Q   Is that what she told you? |
| 16      assigned myself to it. | 16  A   That's what -- yes.  If it's in my report that's |
| 17  Q   Is there a list or checklist or anything which tells | 17      what she told me. |
| 18      you if you're going to assign yourself or somebody | 18  Q   Okay.  She also told you she had not had any other |
| 19      else on your team?  What are the factors? | 19      fire losses, correct? |
| 20  A   I usually try to do geographical location based on | 20  A   Correct. |
| 21      office and where guys are stationed out of. | 21  Q   And she told you the fire department had designated |
| 22  Q   Since you're from Saginaw this made sense for you to | 22      the cause of the fire as undetermined? |
| 23      take the Flint one? | 23  A   Correct. |
| 24  A   Correct.  And then it depends on availability. | 24  Q   Those were the words she used? |
| 25  Q   I think you told me, but how many other | 25  A   Yes. |
| Page 18 | Page 20 |

| | |
|---|---|
| 1  investigators are on your team? | 1  Q   And she had told you that she had heard the fire |
| 2  A   Three. | 2      started in the basement ceiling, right? |
| 3  Q   And they are whom? | 3  A   Yes. |
| 4  A   Dave Stayer (ph), Brandon Clostermann (ph) and Jim | 4  Q   And is that consistent with your findings, that the |
| 5      Shinski (ph). | 5      fire started in the basement? |
| 6  Q   So if you go to the portion of your report, and I | 6  A   Yes. |
| 7      know that there's a -- is it still true that you | 7  Q   If you go down to the last paragraph she said that |
| 8      have kind of an outline for the reports and then you | 8      she -- it says that she told you there had been two |
| 9      fill in the operative paths? | 9      break-ins at the house in the last month; is that |
| 10  A   Yes. | 10      correct? |
| 11  Q   What's it called?  I'm sorry, I'm not awake this | 11  A   That's what she told me. |
| 12      morning.  You have a form and it goes through and it | 12  Q   Did you do anything to confirm that?  Did you talk |
| 13      has the different captions and then you fill it in, | 13      to anybody at the Flint Police Department to |
| 14      right? | 14      determine whether or not there had been break-ins at |
| 15  A   Correct. | 15      that loss location? |
| 16  Q   Okay.  That doesn't make sense, but it would if I | 16  A   No, I did not. |
| 17      could think of the word I was looking for. | 17  Q   Did you ask Detective Bigelow when you talked to |
| 18  A   Template? | 18      him? |
| 19  Q   Template.  Thank you.  Now, under contact with the | 19  A   No, that wasn't part of my assignment.  Only SIU |
| 20      insured, Ms. Chapman told you that she did not live | 20      would handle that. |
| 21      at that loss location, correct? | 21  Q   SIU is special investigation unit for State Farm, |
| 22  A   That's what she said, yes. | 22      correct? |
| 23  Q   And she said that her son Antonio Durand (ph) lived | 23  A   Correct. |
| 24      there, right? | 24  Q   You don't have your own SIU department here, do you? |
| 25  A   Yes.  I'm trying to make sure I'm where you're at in | 25  A   I have one guy that does that type of work, but he |
| Page 19 | Page 21 |

6 (Pages 18 to 21)



CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.                    DEPOSITION OF KEVIN G. PIKE

1      was not hired on this case.
2  Q   You told me before that you conduct your
3     investigations consistent with the scientific
4     method; is that correct?
5  **A  Yes.**
6  Q   Can you explain that to me, please?  What do you
7     mean?
8  **A  Well, there's steps that I take.  Basically, through**
9    **the scientific method there's a fire, there's an**
10  **incident, I get assigned to it, I go out.  I gather**
11  **information, I develop a hypothesis, I test the**
12  **hypothesis and then I come up with a conclusion.**
13  Q   Do you develop the hypothesis before you go to the
14     home, during the course of your investigation or
15     after you gather all the evidence?
16  **A  After I gather the evidence and as I'm working**
17  **through the home I'm developing a hypothesis based**
18  **on what I see on my visual observations.  And it's a**
19  **working hypothesis till the investigation is**
20  **complete.**
21  Q   Did you have any hypothesis other than this being an
22     incendiary fire during the course of your
23     investigation at this particular home?
24  **A  I looked at everything.  I mean, I didn't walk in**
25  **and say it was an incendiary fire.  I mean, I looked**

Page 22

1      at all potential causes and after I eliminated them
2     all this was the cause that I determined this fire
3     was.
4  Q   So you had no hypothesis other than the fact that
5     this was an incendiary fire?
6  **A  No, that's -- I had a hypothesis that it could be**
7  **possibly an electrical fire, but I eliminated it.  I**
8  **looked at the mechanical in the house.  Eliminated**
9  **it.  Smoking, eliminated.  I can go through a bunch**
10  **of causes.  You go through everything to make sure**
11  **you eliminate them all.**
12  Q   So your hypothesis that the fire was incendiary is
13     based on your process of elimination, correct?
14  **A  Correct.**
15  Q   How did you determine, if you go to page 7 of 12,
16     how did you determine that the windowpane was broken
17     out after the events of the fire?
18  **A  We examine the windowpane itself and the glass and**
19  **if there's staining or smoke staining on one side**
20  **versus the other you can determine its condition at**
21  **the time of the fire.**
22  Q   Do you have photographs of that particular window?
23  **A  I probably do, yes.**
24  Q   Where would that be?
25  **A  Either in my photo log or the photo disk.**

Page 23

1  Q   Well, let's look at the photo log and see if you can
2     find that for me.
3  **A  Let me see which side it was.**
4  **A  The west side.**
5  **A  In the photo log I do not have a close-up for that**
6  **window.**
7  Q   Do you have a photo of it in any of the other photos
8     you took?
9  **A  I probably have it in the photo disk that was**
10  **provided.**
11  Q   I didn't print them all out.  Do you have the
12     photos?
13  **A  I don't have them printed out.**
14  Q   Okay.  In any event, you put the photos that are
15     important in your report and there's nothing showing
16     that particular windowpane in the report, correct?
17  **A  No, there's not.**
18  Q   So I'm right; yes?
19  **A  Yes, you're right.  There's not one in the report,**
20  **in the photo log.**
21  Q   If you go up to the top and go to where it says
22     "Exterior Examination South," which was on the same
23     page, just a little higher up, do you have photos of
24     the protected spot showing that all of the windows
25     were closed and intact at the time of the fire?

Page 24

1  **A  They would be either in the photo log and if I don't**
2  **have a close-up there they would be in the photo CD**
3  **provided.**
4  Q   Can you look and see if there's anything in the
5     photo log?
6  **A  There's an overview showing all the windows intact,**
7  **but there's not a close-up of each window.**
8  Q   Which photo would that be?
9  **A  Seven.**
10  Q   Pardon?
11  **A  Photo 7.**
12  Q   That's the photograph of the south side exterior?
13  **A  Correct.**
14  Q   It shows two windows, right?
15  **A  There's some down in the foundation wall that are in**
16  **the shadow.**
17  Q   Right.  Is that one that we would see in photograph
18     number 10?
19  **A  That's one of the windows on the -- you see the**
20  **basement window on the west side --**
21  Q   Right.
22  **A  -- there.  That photo is just showing the electrical**
23  **circuits.**
24  Q   Right.  But you can see that from there, correct?
25  **A  You can see that window, correct.**

Page 25

7 (Pages 22 to 25)



CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.                    DEPOSITION OF KEVIN G. PIKE

1  Q   Can you show me the photograph of -- if you go to
2      page -- excuse me, I'm not asking questions clearly.
3      Go to page 8 of 12, the paragraph that says, "The
4      entry door is a steel door with a glass storm door
5      on the exterior." You see that paragraph?
6  A   Okay.
7  Q   It says, "The entry door showed multiple spots of
8      forcible entry damage." Can you show me a picture
9      of that entry door?
10 A   Photos 23 and 26.
11 Q   It's my understanding that Mrs. Chapman was not
12     there when the firefighters were there. Is that
13     also your understanding?
14 A   That would be my understanding.
15 Q   Did you talk to any of the firefighters or maybe
16     Detective Bigelow to determine whether or not that
17     door was forced open by the fire crews as opposed to
18     somebody else?
19 A   Ms. Chapman told me it was forced open by fire
20     crews.
21 Q   I understand that, but did you do anything to
22     determine whether or not that was, in fact, correct?
23 A   I did not talk to any fire crews or Sergeant Bigelow
24     directly about that, that I can recall. I did not
25     talk to fire crews.

Page 26

1  Q   Okay. Did you do anything to determine whether or
2      not that door was actually forced open by the fire
3      crews to gain entry to the house?
4  A   I did not talk to anybody else.
5  Q   Well, did your investigation establish, one way or
6      another, whether or not the door was forced open by
7      the fire crews?
8  A   Based on Ms. Chapman's statement that's what I took
9      into account, that she had accurate information for
10     me on that.
11 Q   Okay. Did you ask her where she got that
12     information?
13 A   I don't recall, offhand, but what she told me I'm
14     going to put in my report and my notes that she told
15     me that that door was forced open by fire crews.
16 Q   She also told you that looters forced the door open
17     after the fire?
18 A   Yes.
19 Q   Were you able to determine the difference between
20     the forcing open that she told you was done by the
21     fire department as opposed to the forced entry done
22     by the looters?
23 A   Not specifically, no.
24 Q   I believe you found on page -- if you go to page 9
25     of 12.

Page 27

1  A   Okay.
2  Q   It says you found two distinct areas of heavier fire
3      damage. Where would those be?
4  A   What paragraph are you looking at?
5  Q   It says in the basement utility area.
6  A   Okay. One was in the southwest corner below the
7      electrical service panel.
8  Q   That would be in the paint cans?
9  A   Yeah. There was paint cans on the floor there, yes.
10     And the other one was in the ceiling --
11 Q   Kind of a rafter pack thing?
12 A   Yes, in the area of the -- below the bathtub in the
13     common wall between the bathroom and kitchen. It
14     was in the ceiling there.
15 Q   Did you see any -- when you talk about the second
16     one in the rafters did you see any evidence of
17     anything incendiary? Was there anything that would
18     have caught fire up there?
19 A   No. There was a lot of damage there.
20 Q   There was a lot of damage. You didn't see any
21     remnants of any newspaper or anything else?
22 A   No, I did not.
23 Q   How would somebody go about setting a fire in that
24     particular place in the ceiling of the basement?
25 A   In my experience I've had them stuff clothing up

Page 28

1      there and then ignite it with either an open flame
2      or pouring ignitable liquid on it. I've had them
3      use newspapers. Any combustible material they stuff
4      up there to get a fire going which then ignites the
5      structural framing and then the fire smolders and
6      burns. They also do it in that area by the
7      utilities, because then it draws the fire to other
8      levels of the house and does more damage.
9  Q   Did you find any evidence of any remnants of any of
10     these combustibles in the rafter area?
11 A   No, I did not.
12 Q   Do you know how long the fire -- strike that. Do
13     you have a photograph of that particular area or
14     more?
15 A   Which -- you talked about two areas.
16 Q   I'm talking about where you saw -- no, the second
17     one that we were just talking about, where it
18     started in the ceiling.
19 A   The one I have in my photographs is 129, in my photo
20     log. I know there's more in the photo CD. And then
21     I have photo 100 also shows some.
22 Q   And then the other area you considered was the
23     southwest corner below the electrical. Do you have
24     a photo or photos of that?
25 A   Photo 106 and photo 111.

Page 29

8 (Pages 26 to 29)



CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.                    DEPOSITION OF KEVIN G. PIKE

1  Q  Wait a minute.  106 shows a bunch of paint cans.
2     The bucket in the front of the photo what was that
3     made of?
4  A  There's three buckets there.
5  Q  Okay.  There's a gray bucket.
6  A  It looks like it's a plastic bucket.
7  Q  It didn't melt?
8  A  It melted some, but not completely.
9  Q  Where did it melt?  Because I can only see the part
10    that shows it didn't melt.
11 A  You see the fire towards the back of the picture on
12    the wall?
13 Q  Yes.
14 A  It would have melted on the side that's not visible
15    in this photograph.
16 Q  Do you have a photo of it being visible somewhere?
17 A  I possibly -- I do not in my photo log, but I
18    possibly do in my CD provided.
19 Q  Did any of the contents of these paint cans or cans
20    ignite?
21 A  I don't know if they actually ignited, but some of
22    them opened and had leaking product.
23 Q  Did any explode?
24 A  It does not look like any exploded.
25 Q  When you say open and leaking product what does that

Page 30

1  A  No, I did not.
2  Q  Did you ask her what damage had been done to the
3     home by the looters?
4  A  I don't recall if I did or not, to be honest.
5  Q  Other than them -- what did you say that you -- you
6     said you saw evidence that they tried to take the
7     water heater.  What was that evidence?
8  A  I believe it was cutting of some of the piping.
9  Q  Was any of the copper taken out of the house?
10 A  I don't recall any being taken, no.
11 Q  And apart from the water heater you don't know what
12    else they tried to take or did take; is that
13    correct?
14 A  Correct.
15 Q  Do you know whether any arrests were made?
16 A  No, I don't.
17 Q  In addition to the looters didn't Mrs. Chapman tell
18    you there had been two break-ins to the home in the
19    month prior to the loss?
20 A  Yes, she did.
21 Q  Did you ask her how those people had broken into the
22    home?
23 A  I don't believe I did.  She just said they broke in.
24    She had no other information.
25 Q  I know you're familiar with NFPA 921, correct?

Page 32

1     mean to you?
2  A  That means that the can is open and whatever the
3     contents are is leaking out.
4  Q  I understand that, but would that have been caused
5     by the fire?
6  A  It could have been.  It could have been caused by
7     suppression, it could have been caused by somebody
8     manipulating them.
9  Q  Let's talk about suppression.  I know that you were
10    out there I think 11 days after the fire; is that
11    right?
12 A  Yes.
13 Q  Do you know what happened to the loss location
14    during those 11 days?
15 A  Between suppression and me being out there?
16 Q  You being out there, yeah.
17 A  No, I don't.
18 Q  I think Mrs. Chapman told you that there had been
19    looters in the home during that period of time; is
20    that correct?
21 A  Yes.
22 Q  Did you ask her what they had taken?
23 A  I saw evidence of them trying to get the water
24    heater.
25 Q  Did you ask her what they had taken?

Page 31

1  A  Yes.
2  Q  Do you agree with me -- let's see.  I've got the
3     2014 edition.  Do you believe that the determination
4     of the cause of a fire requires the identification
5     of those factors that were necessary for the fire to
6     have occurred?
7  A  Yes.
8  Q  Do you agree that those factors include the presence
9     of a competent ignition source, the type and form of
10    the first fuel ignited and the circumstances such as
11    failures or human actions that allowed the factors
12    to come together to start the fire?  Do you agree?
13 A  Yes.
14 Q  Okay.  Were you able to identify the fuels in the
15    area of origin at the time of the fire?
16 A  There was the common combustibles.  There was the
17    paint cans and there were some other materials down
18    on the floor and then the structural framing.
19 Q  You took those samples, right?
20 A  That's correct.
21 Q  You say common combustibles.  What were they?
22 A  I've got to recall what was down there.
23 Q  Okay.
24 A  It looked like some paper products or possibly some
25    rags down there.  And there was actually a wood

Page 33

9 (Pages 30 to 33)



CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.                    DEPOSITION OF KEVIN G. PIKE

| | |
|---|---|
| 1 pallet. | 1 origin that was on the ground and one was up in the |
| 2 Q   A wood what? | 2 ceiling of the basement, right? |
| 3 A   Pallet. | 3 A   Yes. |
| 4 Q   Did the wood pallet show evidence of having been | 4 Q   So there could not have been a trailer attaching the |
| 5 burned? | 5 two? |
| 6 A   Yes, it had fire damage to it. | 6 A   I didn't see evidence of a trailer. |
| 7 Q   Do you agree with the following in 19.6.5.1, "Cause | 7 Q   Would you agree with the following, and this is from |
| 8 undetermined" and I'm going to quote, "In all | 8 Kirk's Fire Investigation. |
| 9 circumstances where all hypothesized fire causes | 9 A   Which edition? |
| 10 have been eliminated and the investigator is left | 10 Q   Seventh.  "It should be noted that multiple points |
| 11 with no hypothesis that is evidenced by the facts of | 11 of ignition are not necessarily proof of arson. |
| 12 the investigation the only choice for the | 12 Flames from a large ordinary combustible fire can |
| 13 investigator is to conclude the fire cause or | 13 melt and ignite the polystyrene light diffusers used |
| 14 specific causal factors remains undetermined"? | 14 in ceiling fixtures, draperies or the asphalt from a |
| 15 A   I agree with that statement, but that's not | 15 collapsing roof."  Do you agree with that?  I know |
| 16 prevalent in this investigation. | 16 we didn't have any of that here, but do you agree |
| 17 Q   Good answer, but I'm just asking if you agree.  Do | 17 with that? |
| 18 you agree with the following, which is the rest of | 18 A   Can I see the -- |
| 19 this paragraph, "It is improper to base hypotheses | 19 Q   Of course.  It's under the paragraph that says, |
| 20 on the absence of any supportive evidence"? | 20 "False Multiple Origins." |
| 21 A   I agree with that but, again, it's not prevalent. | 21 A   I would agree that those are some false -- could be |
| 22 Q   I'm just asking if you agree. | 22 false positives for multiple sets. |
| 23 A   I agree with that. | 23 Q   So sometimes -- all I'm asking is there are |
| 24 Q   Okay.  Do you agree with the following sentence; "It | 24 circumstances if you have two sets that it may not |
| 25 is improper to opine a specific fire cause, ignition | 25 necessarily be arson.  You would agree with that? |
| Page 34 | Page 36 |

| | |
|---|---|
| 1 source, fuel or cause classification that has no | 1 A   Yes.  Not two sets, two areas of origin. |
| 2 evidence to support it, even though all other such | 2 Q   Two areas of origin.  What was the ignition source? |
| 3 hypothesized elements were eliminated"? | 3 A   Open flame. |
| 4 A   I agree with that. | 4 Q   And that's based on using evidence of just ruling |
| 5 Q   Okay.  Now you're saying, and I'm going to have to | 5 everything else out, right? |
| 6 ask you why, why don't -- why doesn't this | 6 A   Well, and putting together the totality of all the |
| 7 particular paragraph apply to this particular fire? | 7 circumstances that's the only thing I couldn't |
| 8 A   Because I have a hypothesis that can say how this | 8 eliminate as starting this fire. |
| 9 fire started and I have the supporting evidence of | 9 Q   What other options did you consider? |
| 10 an incendiary fire. | 10 A   I considered them all.  Electrical and spontaneous |
| 11 Q   You have no samples, right? | 11 combustion.  I looked at smoking, asked about |
| 12 A   Correct, but I have other evidence that supports an | 12 candles. |
| 13 incendiary fire. | 13 Q   What percentage of the time that you investigated |
| 14 Q   What other evidence do you have that supports an | 14 fires for State Farm did you find the fire to have |
| 15 incendiary fire? | 15 been incendiary? |
| 16 A   I have two separate and unconnected fires and I | 16 A   I don't know a percentage. |
| 17 also -- | 17 Q   Do you do investigations for them on their |
| 18 Q   And the significance of that is? | 18 subrogation work, as well? |
| 19 A   That fires simultaneously in two different locations | 19 A   Yes. |
| 20 are not normal.  I should say if you have two | 20 Q   That would be when they sue the -- in your opinion |
| 21 separate and unconnected fires burning at the same | 21 why don't you describe what subrogation is? |
| 22 time it's an indicator of an incendiary fire. | 22 A   When a product or an action or somebody is found |
| 23 Q   Always? | 23 liable for the cause of the fire the insurance |
| 24 A   Not always, but in this case, yes. | 24 company may go after that person that's liable for |
| 25 Q   If I understand you correct, there was one area of | 25 their losses. |
| Page 35 | Page 37 |



1   Q   So the insurance company is reimbursed for whatever
2     they pay out to the insured if they can prove a
3     product caused the loss, right?
4   A   I guess. I don't know -- I know the Reader's Digest
5     version.
6   Q   Okay. When you are investigating fire losses that
7     do not involve subrogation would you say at least 75
8     percent of the cases that you look at you determine
9     the fire cause is incendiary?
10   A   I couldn't put a number on how many are incendiary
11     versus --
12   Q   You've never figured it out?
13   A   I've never sat down and looked at numbers to see how
14     many are incendiary versus accidental versus the
15     causes. I never sat down and looked at those
16     numbers.
17   Q   Have you ever found a fire cause to be undetermined?
18   A   Oh, yes.
19   Q   Do you have a report that shows undetermined?
20   A   Oh, yeah.
21   Q   Okay. Did you smell any gasoline or any ignitable
22     liquid when you were in the home?
23   A   I don't recall smelling any, no.
24   Q   Well, if you had you would have put it in your
25     report, right?

Page 38

1   A   I think --
2   Q   Was it about this case?
3   A   I think she asked me if I was coming to be deposed
4     and I said yeah. I don't remember speaking any
5     details of -- I talk to her on multiple occasions.
6   Q   Right. Do you bill for those phone calls?
7   A   That one I didn't, no.
8   Q   Do you bill for some of the phone calls?
9   A   When the case is open and I'm actively working on a
10     case, yes.
11   Q   But other than that you don't?
12   A   Not always, no.
13   Q   If you had talked to Ms. Shubitowski in any detail
14     about this particular loss would there have been a
15     billing record produced or created as a result of
16     that?
17   A   If she was asking for further work. Once the case
18     is closed, she calls me to talk about something I'll
19     talk to her and not bill her.
20   Q   How many open cases do you have with Ms. Shubitowski
21     as the representative of State Farm?
22   A   Open cases?
23   Q   Well, cases -- let's say how many -- strike that.
24     How many origin and cause investigations have you
25     done for State Farm that involved Ms. Shubitowski in

Page 40

1   A   Yes.
2   Q   You did no investigation as to if this fire was
3     incendiary who may have set it, did you?
4   A   No, I did not.
5   Q   Did you talk to Ms. Shubitowski about that at all
6     during your conversation in May of 2015?
7   A   I talked to her about my cause of the fire. That's
8     what I was hired to do is make a determination on
9     how the fire started.
10   Q   Did you talk to her about suspicions she may have
11     had or you may have had regarding who may have set
12     this fire?
13   A   I don't recall any exact details of that
14     conversation other than the note that I have in the
15     file.
16   Q   Did you have any conversations with Ms. Shubitowski
17     about this particular loss other than that May 2015
18     conversation?
19   A   I'm sure I have, yes.
20   Q   Are there notes pertaining to those conversations?
21   A   No.
22   Q   Do you recall when you last spoke to Ms.
23     Shubitowski?
24   A   I believe it was last week.
25   Q   What did you guys discuss?

Page 39

1     the last year?
2   A   A handful. Maybe four or five. And that's off the
3     top of my head, because I'd have to look back
4     because I normally don't get my assignments from Ms.
5     Shubitowski.
6   Q   Right. You get your assignments from the adjuster
7     and then she gets involved, right?
8   A   Correct.
9   Q   How many cases do you have that you've had in the
10     last year that she's been involved with?
11   A   I know one because it's still active. I'm going to
12     it tomorrow. But --
13   Q   You're going to it tomorrow, being the loss location
14     or a deposition?
15   A   The loss location to investigate it tomorrow.
16   Q   Okay.
17   A   But other than that I don't recall offhand how many,
18     other than that one, specifically.
19   Q   The only time you were at this loss location was
20     December 2 of 2015?
21   A   I believe so.
22   Q   Is it 2015?
23   A   Yeah, it was 2015.
24   Q   `14. I think --
25   A   Sorry. December of `14.

Page 41

11 (Pages 38 to 41)



CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.                    DEPOSITION OF KEVIN G. PIKE

1  Q   The last time you were there, the only time you were
2      there, was December 2nd of 2014?
3  A   Correct.
4  Q   What were the purposes in preparing this report?
5  A   **It was requested by the client that I prepare a**
6      **report.**
7  Q   And it says you sent a copy to Mary Williams.  Did
8      you send a copy to anybody else?
9  A   **Not that I recall off the top of my head.**
10 Q   I presume the photographs that you took were those
11     you felt were relevant to the goal of your
12     investigation?
13 A   **I guess I don't understand the question.**
14 Q   I don't blame you.  The photographs in the log
15     what's the significance of the photographs attached
16     to the report?
17 A   **I go through my photographs after I -- as I'm making**
18     **my report and pull a number of them out to highlight**
19     **specific areas of the house and show a reference to**
20     **the cause of the fire.**
21 Q   Did you have an opportunity to speak to Ms.
22     Shubitowski after you did your investigation, but
23     before you prepared your written report?
24 A   **I'm trying to recall on this, because I don't know**
25     **if I talked to her -- I don't recall specifically.**

Page 42

1      engineer.
2          MR. RIZZO:  What's the date?
3          THE WITNESS:  The 5th.  December 5th.
4  BY MS. DAVIS:
5  Q   Would any and all contacts you had with anybody from
6      State Farm during this period of time be referenced
7      in this invoice?
8  A   **Not necessarily in the invoice.  That's just -- like**
9      **I said, I don't recall.  That's the time I have**
10     **noted that I spoke with the client.**
11 Q   You have a note from a May 2015 phone call with Lisa
12     Shubitowski.  Do you have notes of any other
13     conversations you may have had with her prior to the
14     preparation of your written report?
15 A   **No, I do not.**
16 Q   It says peer review.  Who was the peer that you
17     reviewed this report with?
18 A   **I don't know.  I'd have to go back through the**
19     **timesheets and figure out who.  There's three other**
20     **guys on the team, so I peer-review all theirs as the**
21     **manager, but mine it might be whoever is available**
22     **at that time.  I don't know who did it.**
23 Q   And that took a half an hour and it was basically
24     somebody else on your team reading your report,
25     right?

Page 44

1  A   **Correct.**
2  Q   Did the person who reviewed it make any changes?
3  A   **Not that I recall, no.**
4  Q   Did they have any questions?
5  A   **Not that I recall, no.**
6  Q   When you talked to Detective Bigelow did you ask him
7      whether or not there had been any recent arson fires
8      in the neighborhood or on the street?
9  A   **I don't recall specifically discussing that with**
10     **him.**
11 Q   Did you ever discuss the prevalence of arson fires
12     in the city of Flint with Detective Bigelow?
13 A   **For this case, specifically or in general?**
14 Q   In general.
15 A   **I'm sure him and I have talked about fires in Flint**
16     **in general.**
17 Q   What would those conversations consist of?
18 A   **I can't recall.  I talked to him numerous times.**
19 Q   I just read and I don't have it with me, the NFPA
20     came out with some classifications and said that
21     Flint has the second most amount of fires, just
22     fires to residential property in the country.  Would
23     you agree with that?
24 A   **Without seeing the document that you read I wouldn't**
25     **make an opinion on it.**

Page 45

1  Q   You went out there and I'm going to look back at
2      your invoice.
3          MS. DAVIS:  If we can mark this as an
4      exhibit.
5          (Exhibit Number 3 was marked for
6          identification at 11:05 a.m.)
7  BY MS. DAVIS:
8  Q   I have attached your -- marked your invoice as
9      Exhibit 3; is that correct?
10 A   **Yes.**
11 Q   Okay.  It says that you went out there on December 2
12     of 2014, right?
13 A   **Yes.**
14 Q   You spent 4.5 hours doing an origin and cause
15     investigation, photograph and document loss site,
16     right?
17 A   **Correct.**
18 Q   Okay.  It says on December 5th, 2014 you had contact
19     with client.  Who would you have been in touch with
20     or do you know who you would have been in touch
21     with?
22 A   **In this case it would have been Mary Williams.**
23 Q   You're sure?
24 A   **That's who -- yeah, she's the one who hired me.  I**
25     **would call her to get approval for an electrical**

Page 43

CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.                          DEPOSITION OF KEVIN G. PIKE

---

1   Q   Would you disagree with that?
2   A   Again, not seeing the document, I want to see the
3       source of what you're asking me --
4   Q   It was -- I thought I had it, but I don't.
5   A   They have a lot of fires.
6   Q   Yeah, Flint has a lot of fires.  Actually, I think
7       Detroit was first and Flint was second.  That
8       wouldn't surprise you?
9   A   That wouldn't surprise me.
10  Q   Were there any fire patterns that led to your
11      conclusion that there were multiple points of origin
12      in this case?
13  A   Yes.
14  Q   Show me what they are.
15  A   They were in the pictures we described earlier.
16      There was the fire on the floor in the southwest
17      corner near the paint cans, on the pallet, and then
18      10 to 12 feet away to the north there was a fire in
19      the ceiling.  Those are two distinct fire patterns.
20  Q   When you finished your investigation on December 2nd
21      had you reached an opinion as to the origin or cause
22      of this particular -- had you reached an opinion as
23      to the cause of this fire?
24  A   On this, let me think back.  Probably I had a
25      hypothesis, but I didn't reach my final conclusion

Page 46

---

1   A   Yes, I did.
2   Q   Did you talk to Bigelow about your findings?
3   A   I don't specifically recall calling him back.  I may
4       have, but I don't note a specific call on this case
5       to him.  Normally I would call him back and tell him
6       what I found.
7   Q   Is there any particular reason you didn't talk to
8       the responding firefighters?
9   A   I believe the information I had from the scene could
10      make my call -- my determination from what I had and
11      I didn't feel it necessary to talk to them on this
12      case.
13          MS. DAVIS:  Thanks.  I don't have any
14      other questions.
15          MR. RIZZO:  Thank you.
16          (Deposition concluded at 11:14 a.m.)
17          ** ** ** ** **
18
19
20
21
22
23
24
25

Page 48

---

1       until after I got a report from Mr. Pawlyn.
2   Q   A verbal report, right?
3   A   Correct.
4   Q   And your hypothesis was that this was an incendiary
5       fire, correct?
6   A   Correct.
7   Q   And that's because you couldn't rule out any other
8       -- you ruled out -- strike that.  You ruled out all
9       other potential causes for this particular fire,
10      right?
11  A   At which time?  On the 2nd or after I spoke with Mr.
12      Pawlyn?
13  Q   Well, obviously after you spoke with Mr. Pawlyn you
14      ruled out electrical, right?
15  A   Correct.  But my strong working hypothesis on the
16      2nd was that I had an incendiary fire because I had
17      multiple sets.
18  Q   And I think you told me, but I forgot.  Why didn't
19      you take samples?
20  A   Because in the one area there was the paint and
21      stain cans that would have given me a false positive
22      and in the other area there was no material left
23      because of the damage to take any sample.
24  Q   When you were a firefighter did you ever fill out a
25      Michigan Fire Incident Report?

Page 47

---

1   STATE OF MICHIGAN   )
2                       ) ss.
3   COUNTY OF MACOMB    )
4
5           I certify that this transcript, consisting
6   of forty-eight (48) pages, is a complete, true, and
7   correct transcript of the testimony of KEVIN G. PIKE held
8   in this case on April 6, 2017.
9           I also certify that prior to taking this
10  deposition KEVIN G. PIKE was sworn to tell the truth.
11          I also certify that I am not a relative or
12  employee of or an attorney for a party; or a relative or
13  employee of an attorney for a party; or financially
14  interested in this action.
15
16
17
18
19
20  Christine A. Lerchenfeld, CER6501
21  Notary Public, Macomb County, Michigan
22  My Commission Expires:  07/07/2020
23
24
25

Page 49

13 (Pages 46 to 49)

NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

**A**

**a.m** 1:18 4:3 5:11 9:3,6 43:6 48:16
**able** 27:19 33:14
**absence** 34:20
**access** 17:16
**accidental** 38:14
**account** 27:9
**accurate** 27:9
**acting** 1:16
**action** 37:22 49:14
**actions** 33:11
**active** 41:11
**actively** 40:9
**actual** 6:12
**addition** 15:1 32:17
**address** 6:23
**adjuster** 41:6
**adjusters** 8:1,8
**admin** 15:24,24 16:24
**affirm** 4:8
**ago** 7:23 8:3
**agree** 7:15 33:2,8,12 34:7,15,17,18,21 34:22,23,24 35:4 36:7,15,16,21,25 45:23
**allowed** 33:11
**Allstate** 5:5
**amount** 45:21
**and/or** 6:17 11:15
**answer** 13:7 17:24 34:17
**answering** 12:14
**Antonio** 19:23
**anybody** 10:9 11:11 11:11,14 12:16 21:13 27:4 42:8 44:5
**apart** 32:11
**apparently** 15:16
**APPEARANCES** 1:19 2:1
**Appearing** 1:24 2:6
**apply** 35:7
**approval** 16:12 43:25
**April** 1:17 4:2 49:8
**area** 9:21,22,24 28:5 28:12 29:6,10,13 29:22 33:15 35:25

47:20,22
**areas** 28:2 29:15 37:1,2 42:19
**arrests** 32:15
**arrived** 11:16
**arson** 10:5 36:11,25 45:7,11
**asked** 8:2 37:11 40:3
**asking** 26:2 34:17 34:22 36:23 40:17 46:3
**asks** 13:25
**asphalt** 36:14
**assign** 18:18
**assigned** 18:12,15 18:16 22:10
**assignment** 21:19
**assignments** 13:3 41:4,6
**assume** 6:2
**attached** 15:19 42:15 43:8
**attaching** 36:4
**attorney** 49:12,13
**attorneys** 5:20
**August** 11:23,24
**availability** 18:24
**available** 18:9 44:21
**average** 15:14
**awake** 19:11

**B**

**back** 6:22 9:6 11:7 17:4,5 30:11 41:3 43:1 44:18 46:24 48:3,5
**background** 4:21
**barred** 12:4
**base** 34:19
**based** 15:21 18:20 22:17 23:13 27:8 37:4
**basement** 21:2,5 25:20 28:5,24 36:2
**basically** 22:8 44:23
**bathroom** 20:12 28:13
**bathtub** 28:12
**Beaver** 1:17
**behalf** 1:24 2:6
**believe** 6:11,16 8:5

8:10 10:4,17 11:23 12:2 27:24 32:8,23 33:3 39:24 41:21 48:9
**benefit** 8:4
**Big** 1:17
**Bigelow** 10:5,7,25 11:2,4 12:16 21:17 26:16,23 45:6,12 48:2
**bill** 15:17,18,19 40:6 40:8,19
**billing** 7:7 40:15
**blame** 42:14
**boss** 9:18
**bottom** 8:8
**Brandon** 19:4
**break-ins** 21:9,14 32:18
**Brian** 17:24
**broke** 32:23
**broken** 23:16 32:21
**bucket** 30:2,5,6
**buckets** 30:4
**bunch** 23:9 30:1
**burned** 34:5
**burning** 35:21
**burns** 29:6

**C**

**C.V** 4:24
**call** 9:11 43:25 44:11 48:4,5,10
**called** 11:6 18:14 19:11
**calling** 48:3
**calls** 40:6,8,18
**candles** 37:12
**cans** 28:8,9 30:1,19 30:19 33:17 46:17 47:21
**captions** 19:13
**case** 1:6 7:19 18:12 22:1 35:24 40:2,9 40:10,17 43:22 45:13 46:12 48:4 48:12 49:8
**cases** 38:8 40:20,22 40:23 41:9
**CASUALTY** 1:8
**caught** 28:18
**causal** 34:14
**cause** 6:7,12,13 9:13

10:16,22 15:6 20:22 23:2 33:4 34:7,13,25 35:1 37:23 38:9,17 39:7 40:24 42:20 43:14 46:21,23
**caused** 31:4,6,7 38:3
**causes** 23:1,10 34:9 38:15 47:9
**CD** 8:6 14:24,25 25:2 29:20 30:18
**ceiling** 21:2 28:10 28:14,24 29:18 36:2,14 46:19
**CER6501** 2:11 49:20
**Certified** 2:12
**certify** 49:5,9,11
**changed** 4:21
**changes** 45:2
**Chapman** 1:4 4:13 6:21 11:22 12:18 14:10 19:20 26:11 26:19 31:18 32:17
**Chapman's** 27:8
**charge** 6:6,15,19 7:4
**charged** 16:23
**checklist** 18:17
**choice** 34:12
**Christine** 1:14 2:11 49:20
**circuits** 25:23
**circumstances** 33:10 34:9 36:24 37:7
**city** 45:12
**classification** 35:1
**classifications** 45:20
**clearly** 26:2
**client** 8:17 42:5 43:19 44:10
**close-up** 24:5 25:2,7
**closed** 24:25 40:18
**closer** 8:19
**Clostermann** 19:4
**clothing** 28:25
**collapsing** 36:15
**combustible** 29:3 36:12
**combustibles** 29:10 33:16,21
**combustion** 37:11
**come** 22:12 33:12

**coming** 40:3
**commencing** 1:18
**Commission** 49:22
**common** 28:13 33:16,21
**companies** 5:18,20 5:21
**company** 1:9 18:11 37:24 38:1
**competent** 33:9
**complete** 22:20 49:6
**completely** 30:8
**components** 16:3
**Concern** 9:17
**conclude** 34:13
**concluded** 48:16
**conclusion** 22:12 46:11,25
**condition** 23:20
**conduct** 15:7 22:2
**conducted** 10:15
**conducting** 6:6,9
**confirm** 12:10 21:12
**confirmed** 11:17 12:12
**consent** 14:13,14,16 14:17
**consider** 37:9
**considered** 29:22 37:10
**consist** 45:17
**consistent** 14:19 21:4 22:3
**consisting** 49:5
**contact** 19:19 43:18
**contacts** 44:5
**contents** 3:1 30:19 31:3
**continued** 2:1
**conversation** 8:22 12:17 39:6,14,18
**conversations** 39:16 39:20 44:13 45:17
**cooperative** 14:11
**copper** 32:9
**copy** 7:12 8:25 9:8 10:20 14:7,22 16:18 42:7,8
**Corbett** 1:7 4:17
**corner** 28:6 29:23 46:17
**Corporation** 2:13
**correct** 5:19 6:18

NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

7:17,18 9:14,15
9:16,18,19 12:25
13:15,23 14:6,18
14:20 15:5 17:3
18:24 19:15,21
20:5,6,19,20,23
21:10,22,23 22:4
23:13,14 24:16
25:13,24,25 26:22
31:20 32:13,14,25
33:20 35:12,25
41:8 42:3 43:9,17
45:1 47:3,5,6,15
49:7
**correctly** 9:17 10:18
10:21
**couldn't** 37:7 38:10
47:7
**country** 45:22
**County** 1:15,16
49:3,21
**couple** 6:22
**course** 13:1 22:14
22:22 36:19
**court** 1:1,14 4:7,16
6:17
**cover** 6:22 7:1
**created** 40:15
**crews** 12:2 26:17,20
26:23,25 27:3,7
27:15
**current** 5:13 6:9
**curriculum** 3:10
5:13
**cutting** 32:8

_____
**D**
**damage** 9:22 26:8
28:3,19,20 29:8
32:2 34:6 47:23
**date** 44:2
**Dave** 19:4
**Davis** 1:20 3:5 4:12
4:19 5:8,12 9:7
17:21 18:3,4 43:3
43:7 44:4 48:13
**days** 31:10,14
**December** 9:15
16:16 41:20,25
42:2 43:11,18
44:3 46:20
**Defendant** 1:10 2:6
**dep** 4:15,24 5:1

**department** 7:8
12:7,10,15 20:21
21:13,24 27:21
**depending** 15:11
**depends** 18:24
**depose** 4:13
**deposed** 4:20 40:3
**deposing** 5:6
**deposition** 1:12,13
4:22 5:4 6:17 9:8
41:14 48:16 49:10
**depositions** 5:7
**describe** 37:21
**described** 46:15
**designated** 20:21
**detail** 40:13
**details** 39:13 40:5
**Detective** 21:17
26:16 45:6,12
**determination** 33:3
39:8 48:10
**determine** 11:14
21:14 23:15,16,20
26:16,22 27:1,19
38:8
**determined** 23:2
**Detroit** 46:7
**develop** 22:11,13
**developing** 22:17
**dictate** 16:5
**dictation** 16:7
**didn't** 12:10 14:17
15:3 22:24 24:11
28:20 30:7,10
32:17 36:6,16
40:7 46:25 47:18
48:7,11
**difference** 27:19
**different** 19:13
35:19
**diffusers** 36:13
**Digest** 38:4
**direction** 17:25
**directly** 26:24
**disagree** 46:1
**discuss** 39:25 45:11
**discussing** 45:9
**disk** 23:25 24:9
**disks** 8:12
**distinct** 28:2 46:19
**District** 1:1,2 4:16
4:16
**division** 5:17

**document** 8:21
43:15 45:24 46:2
**documents** 13:4
**doesn't** 19:16 35:6
**doing** 43:14
**don't** 4:14 8:12
16:25 21:24 24:13
25:1 31:17 32:16
32:23 35:6 37:21
40:11 41:4 42:13
42:14 45:19 46:4
48:3,4,13
**door** 12:4,5,6 26:4,4
26:4,7,9,17 27:2,6
27:15,16
**doors** 12:12
**double-side** 7:13
**draperies** 36:14
**draws** 29:7
**Durand** 19:23
**dwelling** 6:21

_____
**E**
**earlier** 46:15
**easier** 7:14
**Eastern** 1:2 4:16
**edition** 33:3 36:9
**either** 23:25 25:1
29:1
**electrical** 17:4,7,10
17:18 18:5 23:7
25:22 28:7 29:23
37:10 43:25 47:14
**electronic** 2:12
12:22 13:11,18
16:8,9 17:14
**electronically** 8:11
12:19,24
**elements** 35:3
**eliminate** 23:11 37:8
**eliminated** 23:1,7,8
23:9 34:10 35:3
**elimination** 23:13
**email** 14:9 16:13
**employee** 49:12,13
**engineer** 17:4,7,10
44:1
**entered** 12:5
**entry** 26:4,7,8,9
27:3,21
**establish** 27:5
**estate** 10:2
**EUOs** 8:1

**event** 24:14
**events** 23:17
**evidence** 22:15,16
28:16 29:9 31:23
32:6,7 34:4,20
35:2,9,12,14 36:6
37:4
**evidenced** 34:11
**exact** 8:16 39:13
**examination** 3:5
4:18 11:18 44:22
**examine** 23:18
**excuse** 26:2
**exhibit** 3:10,11,12
5:9,10,13 8:24 9:4
9:8 43:4,5,9
**EXHIBITS** 3:9
**experience** 28:25
**Expires** 49:22
**explain** 22:6
**explained** 9:25
**explode** 30:23
**exploded** 30:24
**exterior** 12:5 24:22
25:12 26:5

_____
**F**
**fact** 23:4 26:22
**factors** 18:19 33:5,8
33:11 34:14
**facts** 34:11
**failures** 33:11
**false** 9:24 36:20,21
36:22 47:21
**familiar** 32:25
**Farm** 1:8 4:14 6:19
8:15,23 18:13
21:21 37:14 40:21
40:25 44:6
**Farm's** 7:20
**Farmington** 1:22
**fee** 6:14
**feel** 15:3 48:11
**feet** 46:18
**felt** 42:11
**figure** 44:19
**figured** 38:12
**file** 7:6,9,11 8:11
10:2 13:12,21
16:8,9,19 17:14
17:15,16,17 39:15
**fill** 19:9,13 47:24
**filled** 11:9

**final** 46:25
**financially** 49:13
**find** 24:2 29:9 37:14
**finding** 11:5
**findings** 11:7 21:4
48:2
**fine** 9:1
**finish** 15:10
**finished** 46:20
**fire** 1:8 6:1,2 7:20
8:14 10:14,21
11:1,9 12:1,2,3,6
12:10,15 14:3
15:11 16:23 20:19
20:21,22 21:1,5
22:9,22,25 23:2,5
23:7,12,17,21
24:25 26:17,19,23
26:25 27:2,7,15
27:17,21 28:2,18
28:23 29:4,5,7,12
30:11 31:5,10
33:4,5,12,15 34:6
34:9,13,25 35:7,9
35:10,13,15,22
36:8,12 37:8,14
37:23 38:6,9,17
39:2,7,9,12 42:20
46:10,16,18,19,23
47:5,9,16,25
**firefighter** 47:24
**firefighters** 18:8,12
11:14 26:12,15
48:8
**fires** 5:3 6:3 10:1
35:16,19,21 37:14
45:7,11,15,21,22
46:5,6
**Firm** 2:14
**first** 20:2 33:10 46:7
**five** 5:23 15:8 41:2
**fixtures** 36:14
**flame** 29:1 37:3
**Flames** 36:12
**Flint** 7:3 10:5,9
18:23 21:13 45:12
45:15,21 46:6,7
**floor** 1:18 28:9
33:18 46:16
**following** 34:7,18,24
**forced** 12:6 26:17
26:19 27:2,6,15

NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.                    DEPOSITION OF KEVIN G. PIKE

27:16,21
**forcible** 26:8
**forcing** 27:20
**forgot** 47:18
**form** 13:3,5,6,8,9,10
    13:18,24,24 14:3
    14:4,4,13,14,16
    14:17 19:12 33:9
**forth** 14:1
**forty-eight** 49:6
**found** 15:20 27:24
    28:2 37:22 38:17
    48:6
**foundation** 25:15
**four** 15:8 41:2
**framing** 29:5 33:18
**front** 7:9 12:4 30:2
**fuel** 33:10 35:1
**fuels** 33:14
**furnishings** 14:19
**further** 40:17

**G**

**G** 1:12,13 3:4 4:5
    49:7,10
**gain** 27:3
**gasoline** 38:21
**gather** 22:10,15,16
**general** 45:13,14,16
**generally** 7:16 15:9
**geographical** 18:20
**given** 17:12 47:21
**glass** 23:18 26:4
**go** 6:22 7:2 16:14,21
    17:4 19:6 21:7
    22:10,13 23:9,10
    23:15 24:21,21
    26:1,3 27:24
    28:23 37:24 42:17
    44:18
**goal** 42:11
**goes** 19:12
**going** 10:13 18:18
    27:14 29:4 34:8
    35:5 41:11,13
    43:1
**Good** 4:12 34:17
**gotten** 9:24
**Grand** 2:4
**gray** 30:5
**great** 12:23
**ground** 36:1
**group** 6:1,2

**guess** 38:4 42:13
**guy** 18:5 21:25
**guys** 18:21 39:25
    44:20

**H**

**half** 5:23 44:23
**hand** 4:8
**handful** 41:2
**handle** 21:20
**handwritten** 8:22
**handwrote** 13:14
**hanging** 8:12
**happened** 31:13
**haven't** 4:25 15:18
**he's** 18:6,10
**head** 41:3 42:9
**heard** 21:1
**heater** 31:24 32:7
    32:11
**heavier** 28:2
**held** 49:7
**higher** 24:23
**highlight** 42:18
**Highway** 1:21
**Hills** 1:22
**hired** 22:1 39:8
    43:24
**home** 11:15,21,25
    20:8 22:14,17,23
    31:19 32:3,18,22
    38:22
**Hon** 1:7
**honest** 32:4
**hour** 6:11 44:23
**hours** 7:7 15:9,17
    15:22,22,24 16:25
    17:1 43:14
**house** 20:4 21:9
    23:8 27:3 29:8
    32:9 42:19
**human** 33:11
**hypotheses** 34:19
**hypothesis** 22:11,12
    22:13,17,19,21
    23:4,6,12 34:11
    35:8 46:25 47:4
    47:15
**hypothesized** 34:9
    35:3

**I**

**I'd** 41:3 44:18

**I'll** 9:2 15:19 16:11
    16:13 40:18
**I'm** 8:20 13:5,13
    15:12 19:11,11,25
    19:25 22:16,17
    24:18 26:2 27:13
    29:16 34:8,17,22
    35:5 36:23 39:19
    40:9 41:11 42:17
    42:24 43:1 45:15
**I've** 4:20 5:3 7:15
    14:25 16:12 28:25
    29:2 33:2,22
    38:13
**identification** 5:11
    9:5 33:4 43:6
**identify** 8:20 33:14
**ignitable** 29:2 38:21
**ignite** 29:1 30:20
    36:13
**ignited** 30:21 33:10
**ignites** 29:4
**ignition** 10:22 33:9
    34:25 36:11 37:2
**immediately** 11:25
**important** 24:15
**impossible** 10:19
**improper** 34:19,25
**incendiary** 22:22,25
    23:5,12 28:17
    35:10,13,15,22
    37:15 38:9,10,14
    39:3 47:4,16
**incident** 10:14 11:9
    22:10 47:25
**include** 15:4 33:8
**includes** 17:18
**indicator** 35:22
**information** 22:11
    27:9,12 32:24
    48:9
**inputting** 13:2
**inquired** 17:23
**installed** 20:12
**instructions** 8:8
**insurance** 5:18,20
    5:21 37:23 38:1
**insured** 7:24 8:4
    11:17 14:2 19:20
    38:2
**intact** 24:25 25:6
**interested** 49:14
**interview** 11:18

13:5
**interviews** 7:17,21
    7:25 8:3
**investigate** 6:3
    10:13 41:15
**investigated** 37:13
**investigating** 10:8,9
    38:6
**investigation** 6:1,2
    6:10 8:14 9:13
    10:16 15:14 21:21
    22:14,19,23 27:5
    34:12,16 36:8
    39:2 42:12,22
    43:15 46:20
**investigations** 6:7
    15:6 22:3 37:17
    40:24
**investigator** 34:10
    34:13
**investigators** 6:5
    7:21 8:1 16:2 19:1
**invoice** 3:12 7:6,8
    16:18 43:2,8 44:7
    44:8
**involve** 16:1 38:7
**involved** 40:25 41:7
    41:10
**iPad** 12:19,24 13:2
    13:19,20,22 14:4
**it's** 5:23,23 6:16 7:7
    7:15,20 8:4,16,17
    8:22 9:21 10:18
    10:19 13:11,11,13
    13:18 14:3,5
    15:19 16:8,19
    17:19 20:16 22:18
    26:11 30:6 34:21
    35:22 36:19 41:11

**J**

**Jim** 19:4
**JO** 1:20
**John** 1:7 4:17
**Judge** 4:17

**K**

**keep** 16:9
**Kermit** 7:3
**KEVIN** 1:12,13 3:4
    4:5 49:7,10
**kind** 19:8 28:11
**Kirk's** 36:8

**kitchen** 20:11,12
    28:13
**know** 4:20 7:6,22
    8:7,16 10:10
    11:24 12:20,21
    13:16 14:1 17:19
    18:9 19:7 29:12
    29:20 30:21 31:9
    31:13 32:11,15,25
    36:15 37:16 38:4
    38:4 41:11 42:24
    43:20 44:18,22

**L**

**large** 36:12
**leaking** 30:22,25
    31:3
**led** 46:10
**left** 34:10 47:22
**Lerchenfeld** 1:14
    2:11 49:20
**let's** 15:9 24:1 31:9
    33:2 40:23
**levels** 29:8
**liable** 37:23,24
**light** 36:13
**lights** 20:12
**liquid** 29:2 38:22
**Lisa** 8:23 44:11
**list** 14:1 18:17
**listed** 9:21 10:21
**little** 8:12 24:23
**live** 19:20
**lived** 19:23
**location** 17:2 18:20
    19:21 21:15 31:13
    41:13,15,19
**locations** 35:19
**locked** 11:15,25
**log** 8:6 23:25 24:1,5
    24:20 25:1,5
    29:20 30:17 42:14
**long** 5:22 15:12
    29:12
**longer** 18:5
**look** 5:16 15:16
    16:20 24:1 25:4
    30:24 38:8 41:3
    43:1
**looked** 22:24,25
    23:8 33:24 37:11
    38:13,15
**looking** 8:20 17:24

19:17 28:4
**looks** 15:22 30:6
**looters** 27:16,22
    31:19 32:3,17
**loss** 6:20,20 10:7
    11:21 17:1,17
    19:21 21:15 31:13
    32:19 38:3 39:17
    40:14 41:13,15,19
    43:15
**losses** 20:19 37:25
    38:6
**lot** 4:20 8:10,12
    28:19,20 46:5,6
**Lyon** 2:3

**M**

**M** 2:2
**Macomb** 1:15 49:3
    49:21
**major** 8:17
**making** 42:17
**Malinowski's** 5:6
**manager** 6:1 18:15
    44:21
**manipulating** 31:8
**mark** 5:8 43:3
**marked** 3:9 5:10
    8:24 9:4 43:5,8
**Mary** 18:12 42:7
    43:22
**material** 29:3 47:22
**materials** 33:17
**matter** 4:10,13
**mean** 17:16 22:7,24
    22:25 31:1
**means** 6:3 31:2
**mechanical** 23:8
**meeting** 7:23
**melt** 30:7,9,10 36:13
**melted** 30:8,14
**met** 14:10
**method** 22:4,9
**Michigan** 1:2,16,18
    1:22 2:4 4:1,17
    10:14 11:9 47:25
    49:1,21
**mileage** 6:13
**mind** 8:24
**mine** 44:21
**minus** 4:24
**minute** 30:1
**month** 21:9 32:19

**morning** 4:12 19:12
**mortgage** 20:8
**multiple** 26:7 36:10
    36:20,22 40:5
    46:11 47:17

**N**

**near** 46:17
**necessarily** 36:11,25
    44:8
**necessary** 15:4 33:5
    48:11
**needed** 10:1
**neighborhood** 45:8
**Network** 2:13
**never** 7:8 38:12,13
    38:15
**new** 20:12,12,13
**newspaper** 28:21
**newspapers** 29:3
**NFPA** 32:25 45:19
**normal** 35:20
**normally** 15:7 41:4
    48:5
**north** 12:6 46:18
**Northwestern** 1:21
**Notary** 1:14 49:21
**note** 3:11 8:22 9:8
    14:9 16:11 39:14
    44:11 48:4
**noted** 36:10 44:10
**notepad** 8:20
**notes** 12:17,22 13:2
    17:22 27:14 39:20
    44:12
**notice** 4:15
**number** 2:14 3:10
    3:11,12 5:10 9:4,8
    9:22,23 25:18
    38:10 42:18 43:5
**numbers** 5:3 38:13
    38:16
**numerous** 45:18
**NW** 2:3

**O**

**O'Meara** 1:7 4:17
**Oakland** 1:16
**observations** 22:18
**obviously** 47:13
**occasions** 40:5
**occurred** 9:15 33:6
**offhand** 27:13 41:17

**office** 5:6 11:11
    12:20 18:21
**Oh** 38:18,20
**okay** 5:7 6:25 8:6
    9:2 11:24 12:23
    13:20 14:10,19
    16:22 18:3 19:16
    20:3,8,18 24:14
    26:6 27:1,11 28:1
    28:6 30:5 33:14
    33:23 34:24 35:5
    38:6,21 41:16
    43:11,18
**once** 11:3 40:17
**open** 12:6 26:17,19
    27:2,6,15,16,20
    29:1 30:25 31:2
    37:3 40:9,20,22
**opened** 18:10 30:22
**operative** 19:9
**opine** 34:25
**opinion** 37:20 45:25
    46:21,22
**opportunity** 42:21
**opposed** 26:17
    27:21
**options** 37:9
**ordinary** 36:12
**origin** 6:6,12,13
    9:12,22,23 10:15
    15:6 33:15 36:1
    37:1,2 40:24
    43:14 46:11,21
**Origins** 36:20
**outline** 19:8
**overview** 25:6
**owned** 20:4,11

**P**

**P-a-w-l-y-n** 18:8
**P31263** 1:20
**P32357** 2:2
**pack** 28:11
**packet** 7:10
**page** 3:3 6:22 7:1
    8:8 23:15 24:23
    26:2,3 27:24,24
**pages** 6:22 49:6
**paid** 20:9
**paint** 9:23 28:8,9
    30:1,19 33:17
    46:17 47:20
**pallet** 34:1,3,4 46:17

**panel** 28:7
**paper** 13:16,18 14:5
    33:24
**paragraph** 20:2
    21:7 26:3,5 28:4
    34:19 35:7 36:19
**Pardon** 25:10
**part** 13:4 21:19 30:9
**particular** 6:20 10:7
    17:17 22:23 23:22
    24:16 28:24 29:13
    35:7,7 39:17
    40:14 46:22 47:9
    48:7
**party** 49:12,13
**paths** 19:9
**patterns** 12:12
    46:10,19
**Pawlyn** 18:8 47:1,12
    47:13
**pay** 38:2
**peer** 15:22 16:1
    44:16,16
**peer-review** 44:20
**pending** 4:14,15
**people** 6:3 8:12
    32:21
**percent** 5:18 8:18
    8:19 38:8
**percentage** 37:13,16
**percentages** 8:16
**period** 31:19 44:6
**person** 37:24 45:2
**pertaining** 39:20
**ph** 5:5,6 10:5 19:4,4
    19:5,23
**Phil** 5:5
**phone** 9:11 40:6,8
    44:11
**photo** 8:6,6 23:25
    23:25 24:1,5,7,9
    24:20 25:1,2,5,8
    25:11,22 29:19,20
    29:21,24,25,25
    30:2,16,17
**photograph** 25:12
    25:17 26:1 29:13
    30:15 43:15
**photographs** 15:3
    23:22 29:19 42:10
    42:14,15,17
**photos** 14:22 15:1
    24:7,12,14,23

26:10 29:24
**physical** 11:18
**physically** 13:19
**picture** 26:8 30:11
**pictures** 46:15
**piece** 13:16,18 14:5
**Pike** 1:12,13 3:4 4:5
    4:12 49:7,10
**piping** 32:8
**place** 28:24
**Plaintiff** 1:5,24
**plans** 20:6
**plastic** 30:6
**please** 4:8 5:9 14:8
    22:6
**points** 36:10 46:11
**Police** 21:13
**policy** 7:20
**polystyrene** 36:13
**portion** 19:6
**position** 5:25
**positive** 9:24 47:21
**positives** 36:22
**possibly** 12:5 23:7
    30:17,18 33:24
**potential** 23:1 47:9
**pouring** 29:2
**preparation** 44:14
**prepare** 17:7,20
    42:5
**prepared** 42:23
**preparing** 42:4
**presence** 33:8
**presume** 5:16 42:10
**prevalence** 45:11
**prevalent** 34:16,21
**print** 24:11
**printed** 13:11 24:13
**prior** 11:21,23,25
    32:19 44:13 49:9
**probably** 8:2,17
    13:11 16:19 23:23
    24:9 46:24
**problem** 14:13,14
    14:17
**process** 23:13
**produce** 12:21
    16:25
**produced** 7:7 11:1
    12:20 40:15
**product** 30:22,25
    37:22 38:3
**products** 33:24

NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

**proof** 36:11
**property** 45:22
**protected** 24:24
**prove** 38:2
**provided** 14:24
  24:10 25:3 30:18
**Public** 1:14 49:21
**pull** 42:18
**purposes** 42:4
**put** 13:8 16:11,25
  24:14 27:14 38:10
  38:24
**putting** 7:24 37:6

**Q**

**question** 7:4 12:14
  13:6 42:13
**questions** 10:6
  13:25 14:1 26:2
  45:4 48:14
**quick** 5:16 9:2
**quite** 7:23
**quote** 34:8

**R**

**rafter** 28:11 29:10
**rafters** 28:16
**rags** 33:25
**raise** 4:7
**Rapids** 2:4
**rate** 6:9
**reach** 46:25
**reached** 46:21,22
**read** 7:13 9:17 13:7
  16:2 45:19,24
**Reader's** 38:4
**reading** 44:24
**real** 9:2 10:2
**reason** 48:7
**recall** 10:12 11:6
  26:24 27:13 32:4
  32:10 33:22 38:23
  39:13,22 41:17
  42:9,24,25 44:9
  45:3,5,9,18 48:3
**received** 11:3 17:9
**record** 7:16,21,25
  9:3,5,6 40:15
**recording** 8:3
**referable** 6:19
**reference** 42:19
**referenced** 9:9 44:6
**regarding** 9:12 10:7

39:11
**Registration** 2:14
**Rehmann** 5:17,17
  5:22 6:19 11:11
  17:10 18:5,14
**reimbursed** 38:1
**relative** 49:11,12
**relevant** 42:11
**remains** 34:14
**remember** 10:18,21
  40:4
**remnants** 28:21
  29:9
**remodeled** 20:11
**report** 10:14,21
  11:1,9 13:8,9
  14:22 15:1 16:3,5
  16:23 17:8,12,20
  19:6 20:1,14,16
  24:15,16,19 27:14
  38:19,25 42:4,6
  42:16,18,23 44:14
  44:17,24 47:1,2
  47:25
**REPORTED** 2:11
**Reporter** 1:15 2:12
  4:7
**Reporting** 2:13
**reports** 8:9 15:11
  19:8
**representative**
  40:21
**requested** 42:5
**requests** 12:21
**requires** 33:4
**residence** 14:20
**residential** 45:22
**responding** 11:8
  48:8
**rest** 7:11 34:18
**result** 40:15
**review** 10:14 15:23
  16:1 44:16
**reviewed** 44:17 45:2
**right** 4:8 7:1 10:18
  17:2 19:14,24
  20:9,13 21:2
  24:18,19 25:14,17
  25:21,24 31:11
  33:19 35:11 36:2
  37:5 38:3,25 40:6
  41:6,7 43:12,16
  44:25 47:2,10,14

**Rizzo** 2:2 16:12
  17:19,23 44:2
  48:15
**Road** 1:17
**ROBIN** 1:20
**roof** 20:13 36:15
**rule** 47:7
**ruled** 47:8,8,14
**ruling** 37:4

**S**

**Saginaw** 18:22
**sample** 47:23
**samples** 9:18,20
  10:1 33:19 35:11
  47:19
**sat** 38:13,15
**save** 13:21
**saved** 16:8 17:14
**saw** 29:16 31:23
  32:6
**saying** 13:13 35:5
**says** 9:17 20:14 21:8
  24:21 26:3,7 28:2
  28:5 36:19 42:7
  43:11,18 44:16
**scanned** 8:11
**scenarios** 8:2
**scene** 11:19 13:4
  15:12 48:9
**scientific** 22:3,9
**second** 1:17 16:20
  28:15 29:16 45:21
  46:7
**secure** 11:15,25
**see** 7:8,11 10:2
  13:13 15:21 22:18
  24:1,3 25:4,17,19
  25:24,25 26:5
  28:15,16,20 30:9
  30:11 33:2 36:6
  36:18 38:13 46:2
**seeing** 45:24 46:2
**seen** 15:18
**sell** 20:6
**send** 8:6 42:8
**sends** 12:20
**sense** 18:22 19:16
**sent** 8:9,10 10:4
  42:7
**sentence** 34:24
**separate** 9:25 17:15
  35:16,21

**September** 5:24
**Sergeant** 10:4,7,25
  11:2,4 12:16
  26:23
**service** 28:7
**set** 13:4 39:3,11
**sets** 14:1 36:22,24
  37:1 47:17
**setting** 28:23
**seven** 8:2 25:9
**Seventh** 36:10
**Seventy-five** 8:18
**shadow** 25:16
**she's** 41:10 43:24
**sheet** 10:3
**Shinski** 19:5
**show** 15:19 26:1,8
  34:4 42:19 46:14
**showed** 26:7
**showing** 24:15,24
  25:6,22
**shows** 25:14 29:21
  30:1,10 38:19
**Shubitowski** 8:23
  9:11 39:5,16,23
  40:13,20,25 41:5
  42:22 44:12
**side** 12:5 23:19 24:3
  24:4 25:12,20
  30:14
**sided** 10:19
**signed** 14:13,14,16
  14:16
**significance** 35:18
  42:15
**signing** 14:17
**similar** 13:24
**simultaneously**
  35:19
**single-family** 14:20
**single-side** 7:13
**site** 43:15
**SIU** 21:19,21,24
**smell** 38:21
**smelling** 38:23
**smoke** 23:19
**smoking** 23:9 37:11
**smolders** 29:5
**solemnly** 4:8
**somebody** 12:3
  15:23 18:18 26:18
  28:23 31:7 37:22
  44:24

**son** 19:23
**sorry** 19:11 41:25
**source** 33:9 35:1
  37:2 46:3
**south** 24:22 25:12
**southwest** 28:6
  29:23 46:16
**speak** 42:21
**speaking** 40:4
**special** 8:1 21:21
**specific** 12:3 34:14
  34:25 42:19 48:4
**specifically** 11:6
  27:23 41:18 42:25
  45:9,13 48:3
**spent** 17:1 43:14
**spoke** 39:22 44:10
  47:11,13
**spontaneous** 37:10
**spot** 24:24
**spots** 26:7
**ss** 49:2
**staff** 15:24
**stain** 47:21
**staining** 23:19,19
**stains** 9:23
**start** 15:10 33:12
**started** 21:2,5 29:18
  35:9 39:9
**starting** 37:8
**state** 1:8,15 4:14
  6:19 7:20 8:10,15
  8:23 18:13 21:21
  37:14 40:21,25
  44:6 49:11
**statement** 12:7 27:8
  34:15
**States** 1:1 4:16
**stationed** 18:21
**Stayer** 19:4
**steel** 26:4
**steps** 22:8
**stop** 8:3
**storm** 26:4
**street** 2:3 7:3 45:8
**stress** 7:25
**strike** 29:12 40:23
  47:8
**strong** 47:15
**structural** 29:5
  33:18
**stuff** 5:3 8:10 28:25
  29:3

CHAPMAN v. STATE FARM FIRE AND CASUALTY CO.                    DEPOSITION OF KEVIN G. PIKE

subrogation 37:18
  37:21 38:7
sue 37:20
Suite 1:21 2:3
summary 10:2
support 35:2
supporting 35:9
supportive 34:20
supports 35:12,14
suppression 11:2
  31:7,9,15
sure 16:3 19:25
  23:10 39:19 43:23
  45:15
surprise 46:8,9
suspicions 39:10
swear 4:8
sworn 49:10

            T
TABLE 3:1
take 5:16 15:9 16:20
  18:23 22:8 32:6
  32:12,12 47:19,23
taken 1:13 9:18,20
  31:22,25 32:9,10
talk 10:6,25 11:4,8
  11:12,14 12:16
  21:12 26:15,23,25
  27:4 28:15 31:9
  39:5,10 40:5,18
  40:19 48:2,7,11
talked 10:8 12:2
  21:17 29:15 39:7
  40:13 42:25 45:6
  45:15,18
talking 13:1,5 29:16
  29:17
team 11:2 18:19
  19:1 44:20,24
tell 4:9 6:23 32:17
  48:5 49:10
tells 18:17
Template 19:18,19
test 22:11
testify 6:15
testimony 49:7
Thank 4:15 6:25
  19:19 48:15
Thanks 48:13
that's 6:12 8:5 10:6
  10:20 12:8 15:18
  17:21 19:22 20:7

20:14,16,16 21:11
  23:6 25:12,19
  27:8 30:14 33:20
  34:15 37:4,7,24
  39:7 41:2 43:24
  44:8,9 47:7
theirs 44:20
there's 5:1,2 6:2,3,5
  6:13,22 10:2 13:3
  13:18 17:17,22
  19:7 22:8,9,9
  23:19 24:15,17,19
  25:4,6,7,15 29:20
  30:4,5 44:19
thing 28:11 37:7
think 5:7,23 18:15
  18:25 19:17 31:10
  31:18 40:1,3
  41:24 46:6,24
  47:18
THOMAS 2:2
thought 46:4
three 6:5 19:2 30:4
  44:19
Thursday 1:16 4:2
till 22:19
time 11:20 14:2
  17:11 18:15 23:21
  24:25 31:19 33:15
  35:22 37:13 41:19
  42:1,1 44:6,9,22
  47:11
times 45:18
timesheet 16:25
timesheets 44:19
told 8:5 11:7,21
  12:8 18:25 19:20
  20:7,15,17,18,21
  21:1,8,11 22:2
  26:19 27:13,14,16
  27:20 31:18 47:18
Tom 18:8
tomorrow 41:12,13
  41:15
top 24:21 41:3 42:9
totality 37:6
touch 43:19,20
trailer 36:4,6
transcript 49:5,7
Travel 6:13
tried 32:6,12
Troy 1:18 4:1 18:10
true 19:7 49:6

truth 4:9,9,10 49:10
try 18:20
trying 19:25 31:23
  42:24
turn 7:6
two 4:25 9:25 21:8
  25:14 28:2 29:15
  32:18 35:16,19,20
  36:5,24 37:1,1,2
  46:19
two- 10:18
type 21:25 33:9

            U
unconnected 9:25
  35:16,21
understand 11:3
  17:1 26:21 31:4
  35:25 42:13
understanding 7:16
  10:23 17:20,21
  26:11,13,14
undetermined
  20:22 34:8,14
  38:17,19
undue 7:24
unintentional 10:22
unit 8:14 21:21
United 1:1 4:15
up-to-date 5:13
updated 4:24
updates 5:2
use 13:4,7 14:3,4
  29:3
usually 18:20
utilities 29:7
utility 28:5

            V
VAMEROLYN 1:4
varies 15:11,13
verbal 47:2
version 38:5
versus 4:14 23:20
  38:11,14,14
visible 30:14,16
visual 22:18
vitae 3:10 5:14
vs 1:6

            W
Wait 30:1
walk 22:24

wall 25:15 28:13
  30:12
want 8:9,12 13:16
  16:20,21 46:2
wasn't 10:12 21:19
water 31:23 32:7,11
way 27:5
we're 6:11
week 15:7,8 39:24
weeks 4:25
went 10:15 17:4
  43:1,11
west 1:17 24:4 25:20
what's 5:25 7:12
  15:18 19:11 42:15
  44:2
where's 13:10
Who's 5:4
Williams 18:12 42:7
  43:22
window 23:22 24:6
  25:7,20,25
windowpane 23:16
  23:18 24:16
windows 20:13
  24:24 25:6,14,19
WITNESS 3:3 4:11
  44:3
wonder 17:22
Wonderful 14:7
wood 33:25 34:2,4
word 19:17
words 20:24
work 5:18 6:12 8:14
  15:12,22,25 18:11
  21:25 37:18 40:17
worked 7:15
working 22:16,19
  40:9 47:15
wouldn't 45:24 46:8
  46:9
write 13:6,19,20,22
written 17:7 42:23
  44:14
wrote 13:17

            X

            Y
Yeager 5:5
yeah 7:12 16:19
  17:11 28:9 31:16
  38:20 40:4 41:23

43:24 46:6
year 41:1,10
years 5:23 7:23 8:3
yesterday 17:25
You'd 16:24
you're 10:18 12:14
  13:1,2 18:18,22
  19:25 24:19 32:25
  35:5 41:13 43:23
  46:3
you've 16:10 38:12
  41:9

            Z

            0
07/07/2020 49:22

            1
1 3:10 5:10,13 9:22
1-800-632-2720
  2:15
10 25:18 46:18
10:03 1:18 4:3
10:05 5:11
10:11 9:3
10:13 9:6
100 6:11 29:21
104 1:21
106 29:25 30:1
11 31:10,14
11.25 15:22
11:05 43:6
11:14 48:16
111 29:25
12 23:15 26:3 27:25
  46:18
129 29:19
14 15:17 41:24,25
15-cv-14232 1:6
1500 1:17
15th 8:23 9:12
19.6.5.1 34:7
195 6:16
1999 20:4

            2
2 3:11 9:4,8,23
  16:16 41:20 43:11
200 2:3
2002 20:9
2011 5:24
2014 9:15 16:16

Network Reporting
STATEWIDE COURT REPORTERS
800-632-2720

| | | | | |
|---|---|---|---|---|
| 33:3 42:2 43:12<br>43:18<br>**2015** 8:23 9:12 39:6<br>39:17 41:20,22,23<br>44:11<br>**2016** 4:23<br>**2017** 1:17 4:2 49:8<br>**220** 2:3<br>**23** 26:10<br>**248** 1:23<br>**25** 16:23<br>**26** 26:10<br>**2nd** 42:2 46:20<br>47:11,16 | **98** 5:17 | | | |

| **3** |
|---|
| **3** 3:12 43:5,9<br>**3.25** 15:23<br>**30300** 1:21 |

| **4** |
|---|
| **4** 3:5<br>**4.5** 17:1 43:14<br>**43** 3:12<br>**451-8111** 2:5<br>**48** 49:6<br>**48084** 1:18<br>**48334** 1:22<br>**49503** 2:4 |

| **5** |
|---|
| **5** 3:10 15:22<br>**5/15/15** 3:11<br>**50** 8:19<br>**5413** 7:3<br>**5th** 43:18 44:3,3 |

| **6** |
|---|
| **6** 1:17 4:2 49:8<br>**616** 2:5 |

| **7** |
|---|
| **7** 23:15 25:11<br>**75** 38:7 |

| **8** |
|---|
| **8** 26:3<br>**8151** 2:14 |

| **9** |
|---|
| **9** 3:11 27:24<br>**921** 32:25<br>**932-0100** 1:23 |



# Rehmann

**CURRICULUM VITAE FOR**
**KEVIN PIKE, CFI/CFEI**
**Rehmann Corporate Investigative Services**



5800 Gratiot Ave. Suite 201, Saginaw, MI 48603
Phone 989.790.0450
Kevin.pike@rehmann.com

## PROFESSIONAL PROFILE:

- National Board Certified fire investigator with extensive training and expertise in fire pattern analysis, accidental & intentional fire causes, explosions, electrical fire causes, building construction, interviewing and evidence collection.
- International Association of Arson Investigators – Certified Fire Investigator;
- Elected Board Member International Association of Arson Investigators
- National Association of Fire Investigators – Certified Fire and Explosive Investigator
- Conducted over 1800 such investigations ranging from small incidental fires to major commercial total losses with accidental or intentional causes.
- Testified as an Expert witness in the area of origin and cause investigations in District, Circuit and Federal courts for trial and depositions. Testified in multiple other cases involving fire investigations and fire code violations in Probate, District and Circuit Courts
- In over 150 intentional fires investigated for the City of Saginaw, this investigator collected evidence and/or provided testimony resulting in 21 arrest warrants being issued involving 30 individuals. This has led to convictions in all cases.
- Former State of Michigan and National Fire Protection Association (NFPA) Fire Inspector I specializing in Code enforcement, construction plan reviewing and fire & life safety inspections
- Over thirteen years of experience as a professional fire fighter with extensive training in fire science, fire suppression, hazardous materials and emergency medical response.
- Former State certified Fire service instructor with courses taught in fire suppression techniques, fire science, salvage and overhaul, fire scene preservation and hazardous materials.
- Former Adjunct Instructor for the Fire Science Program at Delta College, University Center, MI
- Michigan Arson Prevention Committee, 2009 Investigator of the Year

## PROFESSIONAL LICENSES/CERTIFICATIONS:

- Board Certified Fire Investigator *(National Board on Fire Service Professional Qualifications, NFPA 1033)*
- International Association of Arson Investigators – Certified Fire Investigator – January 2007 thru 2022
- National Association of Fire Investigators – Certified Fire and Explosive Investigator – June 2007 thru 2017
- State of Michigan Fire Inspector – 2000 to 2005
- National Fire Protection Association Fire Inspector I

- ◆ Former Professional Investigator Agency License Holder – State of Michigan
- ◆ Former Michigan Firefighters Training Council certified Fire Instructor
- ◆ Hazardous Materials Response Specialist
- ◆ OSHA Hazardous Waste Operations Supervisor Level
- ◆ State of Michigan Emergency Medical Technician – 1991 to 2004
- ◆ Michigan Firefighters Training Council certified
    - o Firefighter I & II,
    - o Fire Officer I, II, & III
    - o Hazardous Materials Specialist

## PROFESSIONAL EXPERIENCE:

- ◆ **Rehmann CIS –** September 2011 to present
    - o Manager of Insurance Defense Group/Senior fire investigator assigned to the Saginaw office. Conduct origin and cause investigations and scene documentations for assigned cases. Manage clients and case files. Manage other investigators assigned to the division and coordinate investigation assignments. Business development for the fire division. Manage equipment and supplies for all Rehmann fire investigation offices.

- ◆ **Preferred Investigations, LLC –** October 2009 to August 2011
    - o Owner of a private detective agency. Manage daily operations including all hiring decisions, financial record keeping, and general business operations. Manage and conduct Origin and Cause, Fraud and General investigations.

- ◆ **Preferred Consulting & Investigation, LLC –** December 2002 to September 2009
    - o Co-owner of a private detective and security consulting agency. Manage daily operations including all hiring decisions, financial record keeping, and general business operations. Manage and conduct all origin and cause investigations and all fire and life safety inspections. Develop emergency response plans for schools, healthcare and manufacturing facilities. Installation of closed circuit television (CCTV) and electronic card access control systems. Conduct general investigations for domestic and insurance matters.

- ◆ **City of Saginaw Fire Department -** March 1991to August 2002
    - o Assigned to Fire Suppression, Training and the Fire Prevention Bureau throughout eleven year career. Responded to over 5000 fire, Emergency Medical and Hazardous Materials incidents. Conducted over 280 origin and cause investigations ranging from car fires to major commercial structures including fire fatalities, accidental or intentional in nature. Testified in District and Probate courts for various cases investigated. Conducted over 400 fire & life safety inspections including plan reviews and follow-up inspections. Presented over 50 fire safety presentations for various audiences. Attended numerous training sessions on investigation procedures, fire causes, evidence collection, interviewing, code enforcement, suppression activities, hazardous materials and legal updates. Instructed various training sessions for the Saginaw City and

Saginaw County fire academies and in-service training for Saginaw Fire Department members.

- ◆ **Saginaw Township Fire Department** – August 1989 to March 1991
  - ○ Assigned to the fire suppression division as a paid, on-call fire fighter. Responded to over 150 fire and hazardous materials incidents. Assisted in departmental training sessions. Conducted station maintenance and apparatus response readiness. Attended training sessions on various topics involving fire suppression, emergency medical treatment and hazardous materials response.

## DISTINGUISHED AWARDS:
- ◆ Firefighter of the year, Saginaw Fire Department 1993
- ◆ 3 Meritorious Service Awards, Saginaw Fire Department (lifesaving)
- ◆ Certificate of Merit, Saginaw Fire Department (Outstanding achievement award)
- ◆ Chief Special Recognition Award, Saginaw Fire Department (dedicated service)
- ◆ Certificates of Recognition, Saginaw Fire Department (Award for excelling in profession)
- ◆ Michigan Arson Prevention Committee, 2009 Investigator of the Year

## EDUCATION:
- ◆ **Associates Degree in Applied Science in Fire Science**, Delta College University Center, MI, April 1994
- ◆ **Associates Degree in Applied Science in Criminal Justice**, Delta College University Center, MI, April 1992

## PROFESSIONAL DEVELOPMENT:
- ◆ Michigan State Police Basic Fire Investigation Course – 9/99
- ◆ Michigan State Police Advanced Fire Investigations Course – 3/00
- ◆ Michigan Juvenile Arson School 1999, 2000 & 2001
- ◆ Macomb College Car Fire School sponsored by Herndon and Associates – 7/99
- ◆ Reid Interviewing and Interrogations School – 8/99
- ◆ Michigan IAAI Arson School – 1999, 2003 - 2015
- ◆ MAPC Proper Protocol for Subrogation Seminar – 11/3/05
- ◆ Saginaw Police Department Firearms Safety course – 3/00
- ◆ Investigation of Gas & Electric Appliance Fires – 5/99
- ◆ Fireworks Awareness Seminar sponsored by MIOSHA – 5/00
- ◆ International Building Codes Updates seminar -6/01
- ◆ Basic Inspections Principles – National Fire Academy; Emmetsburg, Maryland – 8/00
- ◆ Michigan Building Code Plan review for Alarm Systems – 6/03
- ◆ Michigan Firefighters Training Council Instructors course
- ◆ Drug (Meth.) Lab Awareness course
- ◆ Fire Fighter Training Councils Fire Officer I,II, & III curriculum entailing 20 different courses
- ◆ Assisted with instructing FST105, Hazardous Materials for the First Responder at Delta College – Winter Term 2004
- ◆ Public Agency Training Council Arson Case Management course – 6/2007
- ◆ Public Agency Training Council Fire Pattern Recognition & Identification – 8/2005
- ◆ CFI Trainer – Investigating Motor Vehicle Fires. Tested and passed- 1/2010

- CFI Trainer – Introduction to Fire Dynamics and Modeling. Tested and passed- 4/2011
- MAPC Vehicle Theft and Fire School – 2012
- CFI Trainer – NFPA 1033 and your career. Tested and passed- 5/2013
- CFI Trainer – Explosion Dynamics. Tested and passed- 10/2013
- IAAI International School – Las Vegas, NV – 4/2014. Tested and passed
- CFI Trainer – Effective Investigation and Testimony. Tested and passed – 7/2014
- CFI Trainer – Basic Electricity. Tested and passed – 6/15/2015
- CFI Trainer – Electrical Safety. Tested and passed – 6/16/2015
- CFI Trainer – Investigating Natural Gas Systems. Tested and passed – 6/17/2015
- CFI Trainer – Digital Photography. Tested and Passed – 7/31/2016
- OSHA 48 hr. HAZWOPER Supervisor training – 10/19/2016
- OSHA Lead Exposure in Construction training – 10/19/2016
- OSHA Class IV 2-Hr Asbestos Awareness training – 10/19/2016
- CFI Trainer – Accreditation, Certification and Certificates. Tested and Passed – 11/10/2016

## PROFESSIONAL MEMBERSHIPS:
- International Association of Arson Investigators (MI Chapter) -Elected Board Member (5/ 2010 to 11/2015)
- International Association of Arson Investigators – Michigan Chapter
- International Association of Arson Investigators
- National Association of Fire Investigators
- International Association of Fire Fighters, Local 102 (Ret.)
- Michigan Arson and Prevention Committee Member – 3/2009 to 11/2015

## EXPERT WITNESS TESTIMONY:
- 70th District Court – Spring of 2004: Holden Trial for a fire at 1603 Wadsworth, Saginaw MI on 11/24/00
- 10th Circuit Court – June 2006: Holden Trial for a fire at 1603 Wadsworth, Saginaw MI on 11/24/00
- Deposition @ Ogne, Alberts & Stuart P.C. – April 2006 re: Lapeer Awning Fire 12/04
- Deposition for Reisinger Law Firm, PLLC – August 2006 re: Roth house fire; PC & I, LLC  Case # 04-034
- Deposition for Kepes & Wine, P.C. – May 2007 re: Jimmie McGee and George Price vs. Dorothy Clemons; PC&I, LLC Case# 06-139
- 40th Circuit Court – Feb. 2007 re: Frankenmuth Insurance vs. Detroit Edison; Case # 05-035980-NZ(H); PC&I, LLC # 04-2710
- Deposition @ Ogne, Alberts & Stuart P.C. – January 2008 re: Salva Homes house fire; PC & I, LLC Case # 05-230
- Deposition for Mark Bryant v Ferrell Gas – March 2008; USDC-ED Case # 07-10447. PCI, LLC Case # 05-305
- Deposition for Greg Meter – January 2008 re: House fire at 839 S. 4th in Saginaw, MI. PCI, LLC Case # 06-107
- Circuit Court Trial in Macomb County – August 2008: Frankenmuth Insurance vs. Hollywood Construction re: Case No. 06-5264-NZ/PC&I, LLC Case 05-230
- 64B District Court Trial in Montcalm County – September 2008 re: State of Mi vs. James Westra. PC& I, LLC Case # 07-117 & 07-225.

- Deposition for Reisinger Law Firm, PLLC – January 2009 re: Ciccarelli house fire; PC & I, LLC Case # 07-026
- 8th Circuit Court Trial in Montcalm County – January 2009 re: State of Mi vs. James Westra. Case # 08-M-11109-FH; PC& I, LLC Case # 07-117 & 07-225.
- Deposition for Rose Holton vs. Pioneer State Mutual – February 2009. PC & I, LLC case #08-375
- Deposition for Frankenmuth Insurance vs. Pioneer State Mutual – July 2009. PC & I, LLC case #06-070
- 70th District Court – August 2009: State of MI vs. Willie Black; PC 7 I, LLC case # 08-307
- Deposition at Garan, Lucow, & Miller offices for Fire loss Auto Club Insurance/Browne vs. American Fireplace – January 2010. Preferred Investigations case # 09-305
- Deposition for Acovski vs. Allstate Insurance – March 2010. Preferred Investigations Case # 08-162
- Deposition at Garan, Lucow, & Miller; Nationwide Mutual vs. Frankenmuth Insurance, 67th District Court 08-88902– April 2010. Preferred Investigations Case # 07-248
- 17th District Court – March 2012: State of MI vs. Horace Lee; 12-106231. RCIS Case # 12-877509
- 36th District Court – April 2012: State of MI vs. Jujuan Auld; 12-056061. Preferred Case # 11-016 (RCIS 12-877551)
- US District Court – Eastern District of Michigan; May 3, 2012. Martell, et al. vs. IDS Property Casualty Insurance CO. 10-cv-14896
- Deposition at Denenberg Tuffley – 2012; Ronald Upton loss for Allstate Insurance. RCIS case # 12-882082
- 3rd Circuit Court – August 2012; State of MI vs. Horace Lee 12-3025; RCIS Case # 12-877509
- 70th District Court – January 2, 2013: State of MI vs. Daniel Wells; Preferred Case # 11-217 (RCIS 12-876577)
- Deposition at Rehmann CIS – May 2013: Holly Duke vs. Liberty Mutual Insurance; 11-869486. 34th Circuit Court; 12-65828-CK
- Deposition at Hewson & Van Hellmont – June 2013: Horace Lee vs. Liberty Mutual Insurance; Eastern District Court; 2:11-cv-14998
- 10th Circuit Court. February 5th 2014. Re: People of the State of Michigan vs. Wells, Daniel Willard. Case# 13038170FH.
- 37A District Court – September 2, 2014: State of MI vs. Jamil Sami Kawas. Case # 142005; RCIS Case # 14-974201
- Deposition at Patrick, Johnson & Mott – September 2014: Tangara Andring vs. Allstate Insurance; Wayne County Circuit Court
- 36th District Court – January 14, 2015; State of MI vs. Derrick & Natasha Hill. Case # 14-63563-01-02. RCIS case # 13-928850
- Deposition at Rehmann CIS Saginaw office – February 16, 2015: Lashawn Davis vs. Safeco Insurance. RCIS case # 13-922536
- Deposition at Plunkett Cooney Bloomfield Hills office – August 20, 2015: Tharmond Ligon v Liberty Insurance Corporation. Case # 14-011902-CK; RCIS file # 14-986079
- 10th Circuit Court January 2016. Re: Erika and Phillip Hudson Jr. vs. State Farm Fire and Causality Company. Case # 13-021302-CK-3; RCIS 12-911264
- Deposition Rehmann CIS Saginaw office – March 24, 2016: Auto Owners Insurance vs Consumers Energy Company. Case No. 15-105418-NZ. RCIS file # 13-976182

- Deposition Horizon Conference Center – May 4, 2016: Gregory & Deborah Manley vs Farm Bureau Insurance. Case No. 15-006588-CK. RCIS file # 12-885410
- Deposition at Ripka Boroski – May 11, 2016: Mohammed S. Ahmed vs. Allstate Insurance. Case No. 4:15-cv-11836. RCIS file # 14-986274
- Deposition at Patrick, Johnson and Mott – January 23, 2017: Dominique Sullivan vs. Allstate Insurance. Case No. 2:16-cv-10779. RCIS file # 15-1074834

## COURSES TAUGHT:
- FST 104W Arson Awareness; Winter 2008 at Delta College
- FST 224W Fire Investigations; Fall 2008 at Delta College

## ARTICLES AND PUBLICATIONS:
- Case Summary article; October 2009 issue of the Arson News – MI Chapter IAAI
- Closed Circuit TV & Security Camera Systems; January 2104 issue of the Arson News – MI Chapter IAAI

# Rehmann

5-15-15

LISA S.  - STATE FARM
CALLED.

CONCERN FROM HER BOSS WHY
NO SAMPLES TAKEN

A/o #1   TOO MUCH DAMAGE

AD #2   STAINS & PAINTS
     FALSE POSITIVE



PLAINTIFF'S DEPOSITION
EXHIBIT
#2
PIXE
4-6-17

rehmann.com

From.Rehmann CIS                     989 790 3601        12/31/2014 10:29     #789 P.002/027



**Rehmann**
*Business wisdom delivered.*

CPAs & Consultants    Wealth Advisors    Corporate Investigators

| | |
|---|---|
| Page: | 1 |
| Date: | 12/31/14 |
| Client: | 202988 |
| Job: | 1051238 |
| Inv#: | CIS19728 |

**INVOICE**

Mary Williams
State Farm Insurance
PO Box 661011
Dallas, TX 75266-1011

Rehmann Corporate Investigative Services
A subsidiary of The Rehmann Group, LLC
Saginaw Office
989.790.0450
TAX ID# 38-3567911

**Total Fee**
**Fire Investigation - Vamerolyn Chapman & Michael Lewis**                                  1,431.50
**Claim # 22-562D-932**

12/02/14 Travel to/from loss location.
   1.50 Hours    @ $100.00

12/02/14 Contact and interview insured. Conduct fire origin and cause investigation. Photograph
and document loss site. Debris removal and reconstruction.
   4.50 Hours    @ $100.00

12/05/14 Contact with client. Provided update and received approval for electrical engineer.
Contact with electrical engineer.
   .50 Hour    @ $100.00

12/12/15 Contact with electrical engineer after the completion of his examination.
   .25 Hour    @ $100.00

Dictate report, prepare diagram, photo log and photo CD. Review and edit report.
   3.50 Hours    @ $100.00

Peer review.
   .50 Hour    @ $100.00

Admin - initial case set up. Contact with investigator. Mail request for copy of incident report. Order
weather report. Report transcription and finalization.
   3.25 Hours    @ $70.00

Total Hours 14.00

Total Expenses
Photo Fee ($50)
Fire Report ($25)
75 Miles

   Current Total                                                              $    1,431.50



Credit terms: Unpaid invoices 30 days after the invoice date are subject to a finance charge of 1 1/2% per month (18% per annum).
35c1436505363WPSDZDM4 Received 12/31/2014 9'30'23 AM [Central Standard Time]

# EXHIBIT D

2014 WL 12461045
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Gainesville Division.

Owners Insurance Company, Plaintiff,
v.
Dewey C. White and Mulberry
Community, LLC, Defendants.

CIVIL ACTION NO. 2:12-cv-00233-WCO
|
Signed 01/23/2014

**Attorneys and Law Firms**

Mark Thomas Dietrichs, Melissa Kaye Kahren, Swift,
Currie, McGhee & Hiers, LLP, Atlanta, GA, for Plaintiff.

James Stuart Teague, Jr., Keisha Leigh Martin
Chambless, Teague & Chambless, LLP, Cumming, GA,
for Defendants.

## ORDER

William C. O'Kelley, Senior United States District Judge

**\*1** The court has before it for consideration defendants'
motion to exclude the testimony of William Dodd [51],
plaintiff's motion to exclude the testimony of Loren
Griswold [44], plaintiff's motion for summary judgment
[45], and defendants' motion to strike errata to the
deposition of Travis Dunigan [52].

Defendants' motion to exclude Dodd's testimony is
granted in part. Dodd may not testify that the fire at
issue was intentional based on his inability to identify
an accidental cause; the remainder of his testimony is
permissible. Plaintiff's motion to exclude Griswold's
testimony is granted. Plaintiff's motion for summary
judgment is granted in part; defendants' counterclaim
for breach of fiduciary duty (Count III) is dismissed.
Defendants' motion to strike errata to the deposition of
Travis Dunigan is granted.

Plaintiff, Owners Insurance Company, filed this
declaratory judgment action to determine whether a fire
on the insured property constitutes a covered loss. The
property is a defunct winery. On October 9, 2011, a
fire started in a pile of boxes and wine bottles in the
rear left corner of an unoccupied building. The property
did not have utilities services and was unoccupied, so
an accidental fire seems unlikely. However, there is no
direct evidence indicating that the fire was the result of an
intentional act either. The case exemplifies a surprisingly
common insurance koan: If a fire starts in a building and
nobody knows why, is it a covered loss?

Plaintiff contends the loss qualifies as "vandalism"
damage to "vacant" property, which is excluded under
the policy. (*See* Policy 16, ECF No. 1-1) (excluding
"vandalism" damage if "the building where loss
or damage occurs has been vacant for more than
60 consecutive days"). Defendants contend there is
insufficient evidence to establish that the damage qualified
as "vandalism." Both parties seek to advance their
theories of the case through expert testimony on the fire's
cause and origin. Both parties have a pending motion to
exclude the opposing party's cause and origin expert.

### I. Defendants' Motion to Exclude William Dodd

Plaintiff hired William Dodd, a certified fire investigator,
to determine the fire's cause. Dodd visited the site on
October 26, 2011. Dodd found extensive damage to the left
side of the building. He concluded the fire originated in a
pile of wine bottles and cardboard boxes in the back left
portion of the building. Dodd did not find any evidence
indicating the use of an accelerant.

With no satisfactory answer at this point, Dodd looked
for any evidence indicating an accidental cause. Dodd
immediately eliminated electrical and mechanical issues
because the building did not have working utilities.
Additionally, the building was unoccupied, so Dodd
eliminated manufacturing and domestic mishaps from the
list of potential causes. Dodd also eliminated a weather
event, like a thunderstorm, as a potential accidental
cause because there were not any thunderstorms near
the property around the time of the fire. Finally, Dodd
eliminated careless smoking as a potential fire cause
because the heat from a cigarette would not be sufficient
to start a fire in corrugated cardboard and wine bottles
unless it was in "an insulated environment." (Dodd Depo.
63, ECF No. 35-1).

**\*2** Dodd did not find a satisfactory explanation based
on an accidental cause. Therefore, Dodd concluded that

Owners Insurance Company v. White, Slip Copy (2014)
2014 WL 12461045

the fire was intentionally set "using the available materials and a match or lighter as the ignition source." (Dodd Expert Report 1, ECF No. 38-1). The inference is known as "negative corpus." As Dodd explained in his deposition:

> Well again, using negative corpus, you have no electrical or mechanical fire causes to cause it. You have an unoccupied building that is not occupied. I had no identifiable ignition source there, so again— identifying the cause of the fire. So by process of elimination, there was nothing there accidentally to cause the fire, thereby believing it was an intentional act. And I did find evidence of vandalism there. I had broken bottles everywhere.

Dodd Depo. 58, ECF No. 35-1.

Negative corpus is a term of art in the fire investigation community. The practice allows a fire investigator to determine what started the fire—the "ignition source" in causation parlance—and classify the fire as intentionally set if the investigator examines and eliminates all accidental causes. *See* NAT'L FIRE PROTECTION ASS'N, NFPA 921: GUIDE FOR FIRE AND EXPLOSION INVESTIGATIONS § 18.6.5 (2011) ("NFPA 921"). [1]

[1] NFPA 921 classifies fires as undetermined, accidental, or incendiary. Both parties used the terms "intentional" and "incendiary" interchangeably. There is a slight difference between the two. An incendiary fire is "a fire that has been deliberately ignited under circumstances in which the person knows the fire should not be ignited." NFPA 921 § 22.1 (2011). In other words, intentionally setting the fire is necessary but not sufficient to label a fire as incendiary; the NFPA's definition includes the additional requirement that the person knew that the fire should not have been started under the circumstances.

Defendants believe that Dodd's testimony is inadmissible in its entirety. Defendants contend that Dodd's physical investigation of the property was inadequate and that his use of the negative corpus methodology to classify the fire as incendiary is impermissible.

**A. Standard of Review**

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand or to determine a fact in issue, the court may allow testimony on the fact in issue by a qualified witness. *See* FED. R. EVID. 702. "The use of 'science' to explain how something occurred has the potential to carry great weight with a jury ... [and] the trial judge plays an important role as the gate-keeper in monitoring the evidentiary reliability of such testimony." *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 920 (11th Cir. 1998). The court acts as a "gatekeeper" against pseudoscience by ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "Scientific knowledge" is admissible, but speculation and subjective assessments are not. *See id.* at 590.

Expert testimony is admissible when: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact at issue. *Trammel v. Paxton*, 2008 WL 7514367, at *4 (quoting *United States v. Frazier*, 387 F.3d 1260 (11th Cir. 2004)). The party offering the expert testimony has the burden of establishing the admissibility of the testimony. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1321 (11th Cir. 1999).

**B. Dodd May Testify About the Facts He Uncovered During His Investigation**

 *3 Dodd may testify about his investigation of the property and his process for eliminating accidental fire causes. Defendants do not contest Dodd's qualifications as a fire investigator. Instead, defendants contend that he did not adequately eliminate potential accidental ignition sources. (Mot. Exclude 8-9, ECF No. 51-1). Defendants point to Dodd's failure to collect or test fire debris, to determine the weather conditions on the day of the fire, and to adequately eliminate accidental human actions as the fire's cause.

To the extent that Dodd's observations during his investigation can be considered an expert opinion,

defendants' perceived defects with Dodd's investigation are better explored through cross-examination rather than the wholesale exclusion of Dodd's testimony. The court's role as a gatekeeper is to assess the proposed expert's methodology, not the conclusions generated by the methodology. *See* McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004) ("[A] court should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate.") (citation omitted). Whether Dodd properly eliminated potential accidental causes goes towards the weight rather than the admissibility of his testimony. *See* Daubert, 509 U.S. at 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### C. Dodd's Conclusion That the Fire Was the Result of an Intentional Act is Inadmissible

Defendants also object to Dodd's use of negative corpus. Defendants point to recent changes to NFPA 921. In 2011, the NFPA amended NFPA 921 and expressly rejected the use of negative corpus as a method for classifying a fire as "incendiary." The NFPA condemns negative corpus as "not consistent with the Scientific Method" and states that it "should not be used because it generates un-testable hypotheses ..." NPFA 921 § 18.6.5 (2011). Defendants argue that Dodd's methodology is inconsistent with authorities in his field and inadmissible under FRE 702. The court agrees.

The NFPA clearly rejects the use of negative corpus as a violation of the scientific method. The methodology does not generate testable hypotheses. A hypothesis based on negative corpus is not testable or falsifiable by experimental techniques. Opinions based on negative corpus should be excluded as unreliable and inapposite to the principles undergirding Rule 702.

Plaintiff argues that NFPA 921 does not form the "standard of care" for cause and origin investigations and cites caselaw finding that a "lack of compliance with NFPA 921 does not disqualify" a cause and origin expert. (Resp. Mot. Exclude 13, ECF No. 58) (citing Nelson v. Gen. Elec. Co., 2006 WL 5537590, 2006 U.S. Dist. LEXIS 97474, at *24 (N.D. Ga. Aug. 1, 2006) (Evans, J.)). That may be true, but a lack of compliance with the scientific method certainly disqualifies an expert witness.

Plaintiff contends that other sections of NFPA 921 support Dodd's conclusion. Plaintiff points to section 22.2.3, which illustrates when the process of elimination can be used to classify a fire as incendiary:

> When the fire damage at the origin is inconsistent with the known or reported fuel load, limited rates of heat release, or limited potentially accidental ignition sources, the fire may be incendiary. An example of all three is an isolated burn at floor level in a large, empty room.

**\*4** NFPA § 22.2.3 (2011).

Plaintiff's argument conflates the process of elimination with the negative corpus methodology. NFPA 921 did not abolish the process of elimination as a legitimate scientific technique. The process of elimination remains a cornerstone of the scientific method. However, the scientific method does not allow an investigator to opine on what started the fire *when there is no evidence supporting his opinion.* As the heading to NFPA § 18.6.5 states, negative corpus is an "inappropriate use of the process of elimination." Dodd concluded that a match or lighter started the fire because those are the two most likely things an individual would use, not because he found any evidence indicating the use of either.

However, plaintiff's argument and the NFPA hypothetical suggest a middle ground not advocated by plaintiff: Is it permissible for Dodd to testify that the fire was incendiary based on the lack of credible accidental causes? The court believes the question must be answered in the negative and finds the district court's reasoning in Somnis v. Country Mutual Insurance Company persuasive. 840 F. Supp. 2d 1166 (D. Minn. 2012).

In Somnis, a fire investigator concluded that a fire in a homeowner's house was the result of an intentionally set fire after the investigator eliminated all accidental fire causes. Id. at 1169. The homeowner filed a motion to exclude the investigator's opinion.

The court concluded that the investigator's opinion, which he reached by using the negative corpus methodology, was inadmissible. The court noted that the investigator's opinion amounted to no more than an inference that the absence of an accidental explanation suggested that the

Owners Insurance Company v. White, Slip Copy (2014)
2014 WL 12461045

fire was incendiary. *Id.* at 1172. Accordingly, the court perceived "no reason why an expert [was] necessary to draw that inference for the jury." *Id.* The investigator did nothing more than draw an inference that the jury was capable of drawing on its own. *Id.* at 1173 (quoting *United States v. Hines*, 55 F. Supp. 2d 62, 64 (D. Mass. 1999) ("Simply put, 'expert testimony may be admitted [only] where the inferences that are sought to be drawn are inferences that a jury could not draw on its own.' ")).

The court also highlighted the interplay between FRE 403 and 702. Considering the powerful effect that scientific testimony dispensed by an expert can have on a jury, the court was particularly concerned that allowing the investigator's opinion "might lead the jury to simply rely on the expert's opinion" rather than make its own determinations on matters within its competence. *Id.* (quoting *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 212 (D. Mass. 2009) ("Permitting [the investigator] to draw an inference that the jury can reach on its own would do 'little more than put [ ] his imprimatur on the [insurance company's] case.' ")).

The court believes that *Somnis*' reasoning is sound. Dodd's opinion is that the absence of accidental causes suggests that the fire was incendiary. This is a reasonable inference and one that the NFPA appears to accept as permissible in section 22.2.3. However, scientifically permissible and legally admissible are not synonyms. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The jury does not need an expert to draw inferences within the jury's competence; an expert who does so fails to provide "helpful" testimony under Rule 702. *See Frazier*, 387 F.3d at 1262-63 ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.") (citation omitted). Dodd may testify that he could not identify an accidental cause for the fire, and the jury will be fully capable of concluding whether the lack of accidental causes and other evidence at trial is sufficient to find for the plaintiff.

## II. Plaintiff's Motion to Exclude Loren Griswold

**\*5** Plaintiff filed a motion to exclude Loren Griswold, defendants' expert witness on the fire's cause and origin [44]. Defendants' pleadings and motions initially

suggested that Griswold was to act solely as a rebuttal witness to Dodd's testimony. However, defendants' statements at the hearing on the pending motions indicate that defendants plan to offer Griswold for two purposes: to refute Dodd's opinion *and* to offer his opinion that, based on his own investigation, the fire should be categorized as "undetermined" instead of "incendiary." Plaintiff seeks to have Griswold excluded due to defendants' violation of Rule 26 and asserts that Griswold's testimony does not satisfy the *Daubert* criteria. The court finds that Griswold's testimony should be excluded as a result of defendants' failure to comply with Local Rule 26.2. Therefore, the court will not address plaintiff's objections to the reliability of Griswold's testimony.

### A. Defendants Failed to Comply with Local Rule 26

Griswold's testimony should be excluded based on the interplay between the federal and local rules governing expert disclosures. Rule 26(a)(2)(A) requires a party to disclose the identity of any expert witness the party may use at trial to present evidence. This disclosure must be accompanied by an expert report prepared and signed by the witness unless the court stipulates or directs otherwise. *See* FED. R. CIV. P. 26(a)(2)(B). Therefore, " '[d]isclosure of expert testimony within the meaning of [Rule 26] contemplates not only the identification of the expert, but also the provision of [the expert's] written report.' " *Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008). Under the federal rules, this disclosure must be made at least ninety days before the date set for trial, subject to an exception if the expert will be used solely as a rebuttal witness. FED. R. CIV. P. 26(a)(2)(D).

However, the local rules require a more prompt disclosure than the federal rules. Local Rule 26.2(C) requires a party to designate a witness as an expert "sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert...." Read together, these two rules require a party to produce the expert's report *prior to the close of discovery. See* OFS Fitel, LLC v. Epstein, Becker and Green, P.C., 549 F.3d 1344, 1362 (11th Cir. 2008) ("The syllogism in *Reese* appears to be: (1) the expert must be deposed before the close of discovery (Local Rule 26.2(C)), (2) the report must come before the expert's deposition (Rule 26(b)(4)(A)), and (3) therefore the expert's report necessarily must come before the close of discovery."); *see also* Reese v. Herbert, 527 F.3d 1253, 1264-65 (11th Cir. 2008). If a party fails to do so, then

2014 WL 12461045

the tardy party shall not be permitted to offer the expert testimony unless the court expressly finds that the failure to comply with Local Rule 26 was justified. *See* LR 26.2(C), NDGa.

Defendants failed to produce Griswold's expert report prior to the close of discovery. Discovery concluded on August 16, 2013. Defendants filed Griswold's expert report on October 2, 2013, nearly fifty days after the close of discovery. (Notice Filing, ECF No. 48-1). Therefore, defendants clearly violated Local Rule 26.2(C). The remaining question is whether that failure was justified.

### B. Defendants' Failure Was Not Justified
Defendants' failure to tender a timely expert report was not justified. During the hearing on the pending motions, defendants' counsel accused plaintiff of "sandbagging" by producing important documents late in the discovery period, which limited defendants' ability to develop their case. The court would be sympathetic to defendants' argument if Griswold were still relevant as a rebuttal witness. However, Griswold's assessment of Dodd's opinion is no longer necessary because Dodd's opinion has been excluded. Since Dodd's opinion on the fire's cause was excluded, Griswold's only purpose is to testify as to whether the fire was accidental, intentional, or undetermined.

**\*6** A party's failure to comply with Local Rule 26.2(C)'s disclosure requirement is "not justified when the party knew or should have known that an expert was necessary before the late stages of the discovery period." *Coyote Portable Storage, LLC v. PODS Enters., Inc.*, 2011 WL 1870593, at \*2 (N.D. Ga. May 16, 2011) (Totenberg, J.) (citation omitted). Defendants knew that whether the fire was intentional would be the linchpin of this litigation; plaintiff made that clear as early as its initial disclosures in January 2013. (Initial Disclosures 3, ECF No. 12) (listing "[w]hether the fire *resulted from the intentional act of a person*" as a legal issue to be tried) (emphasis added). Defendants had no reason to wait until the twilight of the discovery period to have an expert conduct a site investigation and form conclusions based on that site investigation. (*See* Am. Initial Disclosures, ECF No. 33).

Defendants claim that even if the court finds that their expert disclosure was untimely, Griswold's testimony should not be excluded because plaintiff suffered no harm or prejudice. (Defs.' Resp. 18, ECF No. 49). Local Rule 26.2(C) does not allow defendants to avoid the exclusion of their expert even if the untimely disclosure was harmless. *See* LR 26.2(C) (allowing untimely expert testimony *only if* the failure to comply was "justified"); *see also Williams v. Energy Delivery Servs.*, 2005 WL 5976570, at \*3 (N.D. Ga. Sept. 6, 2005) (interpreting *Fredick v. Mercedes-Benz USA, LLC*, 3366 F. Supp. 2d 1190 (N.D. Ga. 2005) and concluding that the plain language of Local Rule 26.2(C) does not allow the admission of untimely but harmless expert testimony); *compare* LR 26.2(C), NDGa, *with* FED. R. CIV. P. 37(c)(1). Therefore, Griswold's testimony shall be excluded because defendants did not comply with Local Rule 26.2(C).

### III. Defendants' Motion to Strike Errata
Defendants also filed a motion to strike errata to Travis Dunigan's deposition [52]. Dunigan is plaintiff's field claims representative who investigated the fire. (Mot. Strike 2, ECF No. 52-1). On July 9, 2013, defendants took Dunigan's deposition. According to the federal rules, Dunigan had until August 9 to submit an errata sheet with any changes to his testimony. *See* FED. R. CIV. P. 30(e). Dunigan did not submit his errata sheet until August 23, 2013. (Mot. Strike 2, ECF No. 52-1). Dunigan made fourteen changes to his deposition testimony; the reason listed for each change is either "incorrect" or "clarification." (*See* Errata Sheet, ECF No. 52-2).

Defendants wish to strike Dunigan's errata sheet as untimely and claim that some of the changes are material alterations to Dunigan's testimony that should be disallowed. (Mot. Strike 5-7, ECF No. 52-1).

Plaintiff claims that the parties reached a mutual agreement to provide deponents with additional time to complete their errata sheets. (Pl.'s Resp. 3-4, ECF No. 61). The confusion results from counsels' apparent inability to directly contact each other. Plaintiff requested two extensions to file Dunigan's errata sheet with *the court reporter's office.* Plaintiff did not hear an objection from defendants, so plaintiff assumed the extension was acceptable.

Around the same time, defendants requested additional time to file the errata sheet for a different deposition. Defendants also made their request to the court reporter rather than to plaintiff. However, the court reporter contacted plaintiff's counsel and actually secured her

acquiescence to an extension, which the court reporter then forwarded to defendants' counsel.

Plaintiff "believed, in good faith, that the parties had mutually agreed to provide their respective deponents" with extensions of time to submit their errata sheets. (Pl.'s Resp. 4, ECF No. 61). The court understands why plaintiff's counsel may have reached that conclusion, but the simple fact is that plaintiff's belief does not matter. Securing an extension from the court reporter is not the equivalent of getting opposing counsel's consent. Pursuant to Rule 30(e), Dunigan had thirty days from the date of his deposition to submit an errata sheet. Dunigan failed to submit his errata sheet within that thirty day window, and defendants did not consent to an extension. Therefore, Dunigan's errata sheet is untimely and shall be excluded. *See, e.g.*, *Welch v. Mercer Univ.*, 304 Fed.Appx. 834, 837-38 (11th Cir. 2008).

### IV. Plaintiff's Motion for Summary Judgment

**\*7** The court now turns to plaintiff's motion for summary judgment [45]. Plaintiff contends the loss qualifies as "vandalism" damage to "vacant" property, which is an exclusion under the policy. (*See* Compl. Ex. A 16, ECF No. 1-1) (excluding "vandalism" damage if "the building where loss or damage occurs has been vacant for more than 60 consecutive days"). Plaintiff also seeks summary judgment on defendants' counterclaims for bad faith denial of insurance coverage and breach of fiduciary duty.

### A. Findings of Fact [2]

[2]    The court's findings of fact primarily draw from defendants' statement of undisputed material facts because plaintiff did not file a response to defendants' statement of undisputed material facts as part of its reply. Therefore, the court deems defendants' facts as admitted because plaintiff did not file a response. *See* LR 56.1(B)(1-3), NDGa.

Defendant Dewey White purchased the property on August 26, 2004. (Statement Material Facts ¶ 1, ECF No. 45-2). The property is a defunct winery in a wooded area. White did not set up electrical service or utilities service at any point after he purchased the property.

On October 9, 2011, Barrow County Emergency Services responded to a fire at the property. Initially, the firefighters could not get to the fire because the area

was heavily overgrown with brush, vines, and trees. The overgrowth was thick enough that the firefighters called in a brush truck to clear a path to the flaming structure. By the time that the firefighters gained access to the structure, the fire died out due to a lack of fuel.

Lieutenant Darst, a member of Barrow County Emergency Services, returned to investigate the property the next day. The outside of the building appeared to be in disrepair. The area outside the building was littered with broken glass from wine bottles, and vines had grown over the undamaged concrete portions of the building. Darst found the interior of the building in a similar state. The building's principal occupants were wine bottles and boxes. Darst found misspelled profanity spray-painted on an interior wall. After examining the building, Darst concluded that the fire originated in the back left portion of the building in a pile of wine bottles and cardboard boxes. He did not find proof of any accelerant or other evidence tending to indicate arson. Darst ultimately concluded that the fire was the result of an "undetermined human act" and that the fire "probably" qualified as an intentional fire.

Plaintiff assigned Travis Dunigan, one of its claims adjusters, to inspect the damage. Dunigan's field notes include the following entry: "Don't feel I can show intent (vandalism) that the fire was set rather than a fire just got out of hand...." After inspecting the property, Dunigan could not say whether the fire was an intentional act or the result of an accident. Dunigan acknowledged that the fire could have been an accident rather than an act of vandalism.

### B. Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party may demonstrate the absence of a genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials." *Id.* at 56(c)(1)(A). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" by identifying the evidence "which it believes demonstrate[s]

2014 WL 12461045

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**\*8** This initial responsibility is discharged when the movant shows that there is no dispute of material fact or that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23. Once the moving party has met its initial burden, the nonmoving party must "go beyond the pleadings," and, utilizing its own evidentiary submissions or those already filed, demonstrate that there is a genuine dispute of material fact such that a trial is required. *Id.* at 324. The non-movant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in favor of the non-movant. *Id.* at 255. In addition to the materials cited by the parties, the court may also refer to other materials in the record. FED. R. CIV. P. 56(c)(3).

"An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (citing *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997)). An issue of fact is considered "genuine" if the "record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Hickson Corp.*, 357 F.3d at 1260. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen,* 121 F.3d at 646 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The moving party is entitled to "judgment as a matter of law" when the non-moving party fails to make a sufficient showing of an essential element of the case on which the non-moving party bears the burden of proof. *Celoxtex Corp.*, 477 U.S. at 322. Summary judgment is inappropriate "where the facts specifically averred by [the non-movant] contradict facts specifically averred by the movant." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990).

### C. The Parties' Positions on Summary Judgment

#### 1. The Insurance Contract

The insurance contract disallows coverage for "vandalism" damage to "vacant property." The relevant section reads:

If the building where a loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage, we will:

Not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(1) Vandalism;

(2) Sprinkler leakage ...;

(3) Building glass breakage;

(4) Theft; or

(5) Attempted theft.

The policy defines "vacancy" as when the damaged building "does not contain enough business personal property to conduct customary operation." Vandalism is not a defined term in the policy.

#### 2. Plaintiff Contends the Fire
#### Was the Result of Vandalism

Plaintiff urges this court to find that the damage to defendants' property was vandalism damage to a vacant structure. Plaintiff claims that Georgia law has found that damage from an intentionally set fire is vandalism. (*See* Mot. Summ. J. 13, ECF No. 45). Plaintiff points to the Eleventh Circuit's decision in *American Mut. Fire. Ins. Co. v. Durrence,* 872 F.2d 378, 379 (11th Cir. 1989) (finding that a "common sense interpretation" of an insurance provision excluding vandalism damage to vacant property would apply to "a fire set in a vacant house by an unknown arsonist or vandal").

Plaintiff believes that defendants may not recover under the policy if: (1) the fire was the direct result of vandalism; (2) the fire was the unintentional result of vandalism; (3) the fire was the result of an intentional act; or (4) the fire was the result of arson. Accordingly, plaintiff claims it is entitled to summary judgment because there is no genuine issue of material fact that the fire resulted from one of the preceding acts.

### 3. Defendants Claim the Policy Does Not Cover Vandalism Damage, Arson Damage, and Damage Due to Accidental Fires

**\*9**  Defendants look to the policy as a whole and claim the insurance policy draws a distinction between "fire" and "vandalism" damage. Defendants point to multiple places in the policy where the policy distinguishes between vandalism and fire as distinct risks of direct physical loss or covered losses. (*See* Defs.' Resp. 7-10, ECF No. 53). Defendants maintain that fire damage of any sort is a covered loss. Defendants claim that the cases cited by plaintiff are inapplicable because the cases have different vacancy exclusions or operative policy language. (*Id.* at 17-18). Defendants conclude that plaintiff is not entitled to summary judgment because a genuine issue of material fact exists as to whether the damage to the insured property falls into the vandalism to vacant property damage exclusion.

### D. Plaintiff is Not Entitled to Summary Judgment on its Vandalism Exclusion Claim

#### 1. Standards of Insurance Contract Construction

Georgia law requires this court to examine the contract as a whole. *Ryan v. State Farm Mut. Auto. Ins. Co.*, 261 Ga. 869, 872 (1992). The reviewing court "must take into consideration the ordinary and legal meaning of the words employed in the insurance contract." *Id.* (citation omitted). If the contract's terms are plain and unambiguous, then the contract must be enforced as written. *Id.* (citation omitted). If the contract is ambiguous, then any ambiguity should be construed in favor of the insured. *Id.* (citation omitted).

An ambiguity exists when "the plain words of a contract are fairly susceptible of more than one written meaning." *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 773 (11th Cir. 2011) (citation omitted). When a contract provision is ambiguous, Georgia courts "apply the rules of contract construction to resolve the ambiguity." *Id.* (quoting *Certain Underwriters at Lloyd's of London v. Rucker Constr., Inc.*, 648 S.E.2d 170, 174 (Ga. Ct. App. 2007) (internal quotation marks omitted)).

Among these rules for contract construction is that "the whole contract should be looked to in arriving at the construction of any part." O.C.G.A. § 13-2-2(4). The court "must approach the policy language with an eye toward whether the relevant language is facially susceptible to multiple interpretations." *See Nationwide Mut. Fire Ins. Co. v. Dillard House, Inc.*, 651 F. Supp. 2d 1367, 1377 (N.D. Ga. 2009). If an insurance contract is capable of being construed two ways, it will be construed against the insurance company and in favor of the insured. *Claussen v. Aetna Cas. & Sur. Co.*, 380 S.E.2d 686, 688 (1989). "This principle is especially true with respect to exclusions from coverage sought to be invoked by the insurer." *Dillard House, Inc.*, 651 F. Supp. 2d at 1377 (quoting *Yeomans & Assocs. Agency, Inc. v. Bowen Tree Surgeons, Inc.*, 618 S.E.2d 673, 679 (2005) (internal quotation marks omitted)); *see also Ryder Truck Rental, Inc. v. St. Paul Fire & Marine Ins. Co.*, 540 F. Supp. 66, 69 (N.D. Ga. 1982) ("Words of exclusion will be given small tolerance when insurance companies choose words of imprecision.") (citation omitted) (internal quotation marks omitted).

#### 2. Fire and Vandalism Are Distinct Causes of Loss

The court finds that the policy is ambiguous. Given that ambiguities in the insurance policy are to be construed against the insurer, the court holds that plaintiff is not entitled to summary judgment for two reasons. First, it is ambiguous whether damage from an intentionally set fire should be categorized as covered "fire" damage or excluded "vandalism" damage. Second, even if vandalism unambiguously included intentionally set fires, there remains a genuine issue of material fact whether the fire was intentionally set.

Fire and vandalism are listed as separate and distinct "causes of loss" throughout the policy. The policy expressly distinguishes between fire and vandalism as "specified causes of loss." (Policy 32, ECF No. 1-1). While the policy excludes vandalism damage to vacant property, the policy does not list fire damage in the vacancy exclusion. The policy clearly provides coverage for fire damage to vacant property. Therefore, the operative question is whether the damage in this case should be considered fire damage or vandalism damage.

**\*10**  In effect, plaintiff asks the court to find that vandalism includes all intentionally set fires. However, the

insurance policy does not evince the intent necessary to sustain such an expansive definition. The policy covers fire damage, with no distinction between damage caused by accidental fires, intentionally set fires, and arson. The court will not retroactively redraft the contract to expand an exclusion by narrowing a covered cause of loss. If plaintiff wanted to limit fire damage coverage to accidental occurrences, it could have easily done so. The insurance policy expressly limits covered losses to accidental occurrences at other points in the policy. (*Id.*) (defining water damage as the "accidental discharge or leakage of water or steam").

In fact, the commercial general liability form appears to expressly contemplate this situation. The general liability form excludes bodily injury "arising out of heat, smoke or fumes from a 'hostile fire' ...." (*Id.* at 49). A "hostile fire" is defined as a fire that "becomes uncontrollable or breaks out from where it was intended to be." (*Id.* at 62). This language squarely addresses how plaintiff could have written the vacancy exclusion to unambiguously exclude intentionally set fires. When the court examines the policy as a whole, it appears obvious that plaintiff cannot reasonably maintain that "vandalism" includes "hostile fires" where plaintiff "itself chose not to include easily available form language that would have readily provided the necessary specificity." *See Crawford v. Gov't Emps. Ins. Co.*, 771 F. Supp. 1230, 1238 (S.D. Ga. 1991) (quoting *Ranger Ins. Co. v. Culberson*, 454 F.2d 857, 863 (5th Cir. 1972)).

Additionally, the policy itself appears to contemplate that vandalism amounts to no more than juvenile facial damage to the property. Generally, an ambiguous word may be given more precise content by the neighboring words with which it is associated. *See Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2042-43 (2012). This principle, known as *noscitur a sociis*, recognizes that what may be ambiguous in isolation could be informed by its context.

The vacancy exclusion precludes property damage for damage caused by vandalism, sprinkler leakage, building glass breakage, theft, and attempted theft. One word immediately comes to mind when examining whether these words share a common element: petty. These excluded losses suggest damage on the order of a fender bender rather than a total loss. *Cf. R & J Dev. Co., LLC v. Travelers Prop. Cas. Co. of Am.*, 2012 WL 1598088, at *3 (E.D. Ky. May 7, 2012) ("Leaky sprinklers, broken glass, and stolen property all typically result in low-level, nonstructural damage."); *see also United Cap. Corp. v. Travelers Indem. Co. of Ill.*, 237 F. Supp. 2d 270, 276-77 (E.D.N.Y. 2002) (noting that "[t]he entire destruction of the building by fire does not seem to be consistent with" the "less catastrophic losses" listed in an identical vacancy exclusion). The court finds further support for its interpretation in the policy's limitation on damage to glass that is part of a building or structure. The limitation provides that the insurance company will not pay above a certain value for "loss of or damage to glass that is part of a building or structure.... This Limitation does not apply to loss or damage by the 'specified causes of loss,' except *vandalism.*" (*See* Policy 29, ECF No. 1-1) (emphasis added).

The court acknowledges that vandalism can be broadly defined to include any and all intentional damage to property but finds that such an expansive definition is unsupported by the policy's language. Additionally, even if the court found that vandalism included all intentional property damage, plaintiff has not provided sufficient evidence to demonstrate that the fire was intentionally set. As discussed above, plaintiff can do no more than establish the absence of accidental causes, which is not equivalent to proving that the fire was intentionally set. Therefore, summary judgment is inappropriate.

### E. Defendants' Claim for Bad Faith is Not Properly Before the Court

**\*11** Plaintiff also requests summary judgment on defendants' counterclaim for bad faith refusal to pay an insurance claim. Plaintiff's motion is denied because defendants' O.C.G.A. § 33-4-6 claim is not properly before the court.

Defendants filed a motion for leave to amend their answer and counterclaim [34]. The court granted defendants' motion, extending them leave to file their amended answer and counterclaim [56]. However, defendants *never filed* their proposed amended answer and counterclaim. Accordingly, defendants do not have a pending claim under § 33-4-6 at this time. Therefore, plaintiff's summary judgment request as to this claim is moot.

### F. Plaintiff is Entitled to Summary Judgment on Defendants' Claim for Breach of Fiduciary Duty

Finally, plaintiff requests summary judgment on defendants' claim for breach of fiduciary duty. Plaintiff correctly notes that any claim for extra-contractual damages based on allegations that an insurer refused in bad faith to pay a claim must be brought under O.C.G.A. § 33-4-6. *See, e.g., Howell v. So. Heritage Ins. Co.*, 448 S.E.2d 275, 275 (Ga. Ct. App. 1994). Defendants apparently recognize the futility of this claim and did not discuss their breach of fiduciary duty claim in their response to plaintiff's motion for summary judgment.

Section 33-4-6 provides the exclusive remedy for an insurer's bad faith refusal to pay insurance proceeds. *McCall v. Allstate Ins. Co.*, 310 S.E.2d 513, 515-16 (Ga. 1984). Additionally, Georgia courts have consistently held that the insurer-insured relationship does not itself impose fiduciary responsibilities upon the insurer. *See Prime Mgmt. Consulting & Inv. Servs., LLC v. Certain Underwriters at Lloyd's London*, 2007 U.S. Dist. LEXIS 94987, at *15 (N.D. Ga. Dec. 28, 2007) (collecting cases). Therefore, plaintiff is entitled to summary judgment on defendants' claim for breach of fiduciary duty (Count III).

**V. Conclusion**

Defendants' motion to exclude the testimony of William Dodd [51] is hereby **GRANTED IN PART**. Dodd may not testify that the fire at issue was intentional based on his inability to identify an accidental cause; the remainder of his testimony is permissible. Plaintiff's motion to exclude the testimony of Loren Griswold [44] is hereby **GRANTED**. Defendants' motion to strike errata to Travis Dunigan's deposition [52] is hereby **GRANTED**; Dunigan's errata sheet is hereby **STRICKEN**. Plaintiff's motion for summary judgment [45] is **GRANTED IN PART**. Plaintiff is entitled to summary judgment on defendants' counterclaim for breach of fiduciary duty (Count III), and the remainder of the motion is **DENIED**.

IT IS SO ORDERED, this 23rd day of January, 2014.

**All Citations**

Slip Copy, 2014 WL 12461045

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

2017 WL 2276983
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan, Southern Division.

Audrey PRUITT, Petitioner,
v.
Anthony STEWART, Respondent.

Case No. 2:15-cv-10812
|
Signed 05/23/2017
|
Filed 05/25/2017

**Attorneys and Law Firms**

Audrey Pruitt, Ypsilanti, MI, pro se.

Christopher M. Allen, Michigan Attorney General, Laura
Moody, Michigan Department of Attorney General,
Lansing, MI, for Respondent.

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

STEPHEN J. MURPHY, III, United States District
Judge

**\*1** The case sounds in habeas under 28 U.S.C. §
2254. Petitioner Audrey Devonne Pruitt challenges her
convictions for arson of a dwelling house, burning of
insured property, and insurance fraud. At the time she
filed the petition, Pruitt was in the custody of the
Michigan Department of Corrections. She has since
been unconditionally discharged from custody. [1] She
claims that the trial court erred in admitting expert
witness testimony regarding the cause of the fire, trial
counsel was ineffective in failing to object to the expert
witness's testimony, and that offense variable 19 was
incorrectly scored. Respondent argues that the claims are
procedurally defaulted, not cognizable on habeas review
and are without merit. For the reasons below, the Court
will deny habeas relief.

---

[1]     Pruitt's discharge does not defeat § 2254's "in custody"
        requirement because the requirement is satisfied as

long as a petitioner was incarcerated at the time a
petition is filed. *Spencer v. Kemna*, 523 U.S. 1, 7
(1998).

## BACKGROUND

Pruitt's convictions arise from a fire at her home in
Buena Vista Township in November 2009. The Michigan
Court of Appeals described the circumstances leading to
Petitioner's convictions as follows:

In December 2008, Mary Liddell sold defendant a home
located in Buena Vista Township, Michigan. Defendant
purchased the home on a $9,000 land contract, putting
$700 down and making payments of $350 per month.
The land contract required defendant to obtain renter's
insurance and Liddell to maintain her homeowner's
insurance on the property. The contract also indicated
that if anything happened to the home, defendant would
not receive any proceeds from Liddell's insurance.
While the land contract did not require defendant to
obtain homeowner's insurance, she nonetheless entered
into a homeowner's insurance policy with State Auto
Insurance (State Auto) on September 4, 2009, insuring
the home for $87,000 and personal property for
$60,900.

Two months later, on November 10, 2009, the home
caught fire. Diana Diaz, who lived across the street
from defendant, was looking through her living room
window when she saw defendant's truck go by and
then saw smoke billowing from defendant's roof. Diaz
called 911. Patrick Brown, who resided next to Diaz,
was outside smoking a cigarette on the morning of the
fire and saw defendant drive to a stop sign at the end
of the street. Brown went inside, got something to eat,
and when he came back out, saw smoke coming from
defendant's home.

Another neighbor, David Thomas, was also outside
that morning when he looked up and saw black smoke
coming from defendant's home. As Thomas started
toward defendant's home, he saw defendant driving
down the street. Thomas ran toward defendant's car
and tried to get her attention by yelling her name
and waving, but defendant kept driving. Thomas then
walked over to Diaz, who was in her front yard and
confirmed that she had already called 911. According to
Thomas, fire trucks arrived 10 to 15 minutes later.

**\*2** Firefighters received a call from dispatch at 9:37 a.m. and arrived at defendant's home at 9:53 a.m. Upon arrival, grayish-brown smoke was escaping from eaves and soffits of defendant's home, suggesting that a "heavy working structure fire" was inside. According to one of the firemen, the fire had spread to the living room along the ceiling but was most intense along the back wall of the kitchen between the refrigerator and the stove; a burnt "v" pattern on the wall at that location indicated the fire's point of origin. The firefighters extinguished the fire and the fire captain conducted an investigation of the property that same day.

Fire Captain Craig Gotham, qualified as an expert in fire cause and origin, testified that he investigated the cause of the fire after it was extinguished. He testified that he ruled out accidental causes because the refrigerator's electrical wiring and the stove's gas fitting were "clean." He found a can of aerosol starting fluid (ether) by a loveseat that was burnt at its spray-nozzle. Gotham also testified that he talked to defendant on the day of the fire. She told him that she left her home around 9:30 that morning to go shopping with her mother and that she had cooked breakfast sandwiches approximately an hour earlier. She also indicated that she did not smoke or use incense or candles.

Keith LaMont, a Michigan State Police forensic analyst, testified that he tested some charred remains taken from the home, but found no ignitable liquid within the samples. LaMont explained that ignitable liquid, such as the starter fluid found in defendant's home, could have been used but been completely consumed by the fire. This was because the ether contained in the starter fluid found at the scene was "very volatile" and could either evaporate or be quickly consumed by the fire, thereby decreasing the likelihood of its detection.

David Row.... was qualified as an expert in the field of fire investigation. Row testified that there are "four processes" used in conjunction to establish the origin of the fire, including witness information, burn pattern analysis, arc mapping, and fire dynamics evaluation. [ ] Row indicated that he began his investigation by questioning defendant regarding her activities on the day of the fire. [4] Row said that defendant told him that she left the home around 9:30 on the morning of the fire.

Row also took into consideration the observations of Diaz.

[4] Row said he asked defendant a multitude of questions, including: whether she had turned everything off when she left the home, had poured grease into the trashcan, or had any circuit breaker trips recently; whether there had been any problems with the stove; whether she had to use a match to light the pilot, and; whether there were candles or incense in the home.

Row then recounted to the jury his visual observations of the exterior and interior of the home, displaying photographs he had taken during his investigation. He testified that both the gas and electric meters were intact and that neither could have caused the fire. Row said that, once inside the home, he systematically went through the rooms and observed evidence of fire damage. According to Row, he was able to rule out certain rooms as the origin of the fire based on the level of damage to personal belongings in the rooms. Based on his observations of low-level burn damage in the kitchen, Row testified that the origin of the fire was an empty "Rubbermaid or Hefty style 33 gallon" garbage can between the stove and refrigerator at or near floor level. The fire damage in this area extended all the way to the floor, where the trashcan had "melted down into a big blob of plastic." Row testified that analysis of the refrigerator cord indicated that it was not the cause of the fire. [5]

[5] Jason McPherson, qualified as an expert in the field of electrical engineering, testified that he assisted Row with the origin and cause study by evaluating the power cord to the refrigerator. According to McPherson, the cord showed no signs that it was the origin of the fire; rather, the condition of the cord merely indicated that it had been burnt by the fire.

Having determined the origin of the fire, Row explained that his next task was to determine its cause. Row testified that two considerations are relevant in this regard, including what material was ignited and what ignition source is hot enough to start the fire, as well as witness statements. Row then stated:

So in this particular case, what I believe was ignited was the trashcan and whatever contents there may have been in the trashcan. This is a pretty thick

plasticized material. I've done quite a bit of testing on these garbage cans to see, you know, how easily they burn versus, you know, how difficult it is to keep them burning, and part of it depends on what was put inside the trashcan in order to help the trashcan catch fire.

But the biggest issue in this particular circumstance is that I have been able to, by my process of elimination here, and by my scientific methodology that I've followed, I have been able to establish that there is no electrical, mechanical or chemical causation for this fire, so the only other plausible explanation is there had to be some kind of an introduction of an open flame to this trashcan and the contents of this trashcan in order for it to be able to ignite.

**\*3** Row then repeated that defendant told him she left her home at 9:30 a.m. and that Diaz saw smoke emanating from the home's soffit area as defendant drove away. Row then explained:

Now, this is a 1,090 square foot house.... So I'm going to give them the benefit of the doubt and say this is approximately 9,000 cubic feet of air that now has to be displaced with smoke to the point where the smoke is now under pressure and it's forcing itself out through the eaves....

So, what then could generate 9,000 cubic feet of smoke in that short of a period of time? And based upon my observations of where the origin of the fire is and what the causation of the fire is, i.e. an open flame application to the trashcan, that trashcan could not have generated 9,000 cubic feet of smoke in the time it would have taken her to basically get into her car and drive down the street.... It just isn't physically possible.

... [T]he fire would have had to have been in progress generating that kind of smoke at the time when [defendant] left the house....

On February 9, 2010, defendant submitted a claim to State Auto, estimating the amount of loss from the fire at $118,035 and claiming $500.[ ] State Auto deemed this statement of loss inadequate and requested another, which defendant submitted on March 19, 2010. This time, defendant estimated the amount of loss to be $116,025 and claimed $116,025. State Auto and defendant completed an inventory of defendant's

personal items, which was composed of multiple pages of personal property less than one-year old and listed several expensive items such as a sewing machine, commercial meat slicer, and a DJ mixing table. The inventory did not, however, list any sewing-related materials, like needles, thread, or cloth, and did not include the amplifier necessary for the DJ table to function. Upon further investigation, State Auto found that defendant's reported income in 2009 was only $5,800, while the inventory indicated that defendant had purchased personal property totaling approximately $23,000 within the past year. State Auto's investigation also determined that the fire was intentionally set and that witnesses had seen defendant driving away from her burning home.[7] Because an intentional act was not covered under the policy, State Auto denied defendant's claim. Subsequently, defendant was charged with and convicted of arson of a dwelling house, arson of insured property, and insurance fraud.

[7] State Auto deposed defendant as part of its investigation; she told State Auto that she left her house on the morning of the fire at 8:50 a.m., contrary to the testimony of her neighbors.

*People v. Pruitt*, No. 313065, 2014 WL 1320253, \*1–3.

Following a jury trial in Saginaw County Circuit Court, Pruitt was convicted and sentenced as follows: 30 months to 20 years imprisonment for arson of a dwelling house, 5 months to 10 years for burning insured property, and 17 months to 4 years for insurance fraud. She filed an appeal in the Michigan Court of Appeals and argued that the trial court admitted Row's expert testimony in violation of Michigan Rule of Evidence 702, that her defense counsel was ineffective in failing to object to the admission of Row's testimony, that several offense variables were incorrectly scored, and that the imposition of a crime victim rights assessment violated the Ex Post Facto Clause. The Michigan Court of Appeals affirmed Pruitt's convictions and sentences. *Pruitt*, 2014 WL 1320253 at \*10. The Michigan Supreme Court denied leave to appeal. *People v. Pruitt*, 497 Mich. 870 (2014).

**\*4** Pruitt then filed the instant habeas petition. She raises these claims:

I. The trial court plainly erred by allowing the fire investigator to opine on the cause of the fire based on

a methodology that has been rejected by the National Fire Prevention Association. Alternatively, counsel rendered ineffective assistance by failing to object.

II. Immaterial statements to firefighters do not implicate the administration of justice. The trial court therefore erred in scoring OV-19 at 10 points.

### STANDARD OF REVIEW

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, a state prisoner is entitled to a writ of habeas corpus only if she can show that the state court's adjudication of her claims—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.' " *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). The "unreasonable application" prong of the statute "permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). For a federal court find to a state court's application of Supreme Court precedent "unreasonable," however, "the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.' " *Id.* at 520–21 (citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

> Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 102–03 (internal quotation marks and citation omitted).

**\*5** Accordingly, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Greene v. Fisher*, 565 U.S. 34, 38 (2011). Section 2254(d) "does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). "[W]hile the principles of "clearly established law" are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (quoting *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)).

Lastly, a federal habeas court must presume the correctness of state court factual determinations. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Id.*

### DISCUSSION

I. Expert Witness Testimony

Pruitt's first claim concerns the admission of David Row's expert testimony. Row concluded that the fire was intentionally set, but Pruitt says he reached his conclusion by process of elimination—also known as "negative corpus"—and the process failed to meet both the admissibility requirements of Michigan Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Respondent argues that this claim is procedurally defaulted, not cognizable on federal habeas review, and meritless.

"[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the Court finds that the interests of judicial economy are best served by first addressing the merits of the claim.

The Michigan Court of Appeals described the "negative corpus" analytical approach this way: "[T]he approach provides that after the elimination of any accidental causes of a fire, it is reasonable to infer that the fire was arson." *Pruitt*, 2014 WL 1320253 at *5. The state court acknowledged that negative corpus has been rejected by the National Fire Protection Association because it is "'not consistent with the Scientific Method' and because 'it generates un-testable hypotheses.'" *Id.* (quoting NFPA 921 § 18.6.5 (2011)). The court of appeals held that most of Row's testimony did not violate Michigan Rule of Evidence 702, but his ultimate conclusion that the fire was intentionally set was inadmissible under Rule 702 because it "rested on a combination of negative corpus and a reliance upon circumstantial evidence not within the purview of his qualification as an arson expert." *Id.* Still, the Michigan Court of Appeals held that admission of this testimony did not violate Pruitt's fundamental rights, as there was ample admissible evidence, exclusive of Row's inadmissible testimony, to support the verdicts:

> Row offered admissible testimony that an open flame in the trashcan started the fire. Row also testified that the smoke analysis and witness testimony regarding when

defendant left the home allowed for the conclusion that defendant was in the home when the fire started. Multiple witnesses testified that they saw defendant driving away from her home as smoke billowed from the home's eaves—the inference being that defendant was in the home for a somewhat extended period after the fire started. Consistent with these witness statements, defendant told Captain Gotham on the day of the fire that she left home at 9:30 a.m. Later, defendant attempted to dispel the inference that she had been in the home when the fire started by telling State Auto that she left the home at 8:50 a.m. Such arguably false exculpatory statements may be considered as evidence of guilt. *See People v. Seals*, 285 Mich. App. 1, 5-6; 776 N.W.2d 314 (2009).

**\*6** In addition, just two months before the fire, defendant obtained an insurance policy ensuring the home for $87,000, an amount far in excess of the $9,000 defendant agreed to pay for the home under the land contract, suggesting a motive for arson. Moreover, several expensive non-functioning items, including a commercial meat slicer and sewing machine, were found in defendant's home, likewise suggesting that defendant put them there so that she could collect insurance proceeds from their loss. Indeed, defendant's insurance policy with State Auto insured $60,900 worth of personal property and defendant's personal property inventory indicated that defendant had purchased $23,000 of personal property in the past year, even though defendant had only made about $5,000 in 2009. Finally, Captain Gotham testified that neither the stove nor the refrigerator caused the fire. Thus, the admission of Row's ultimate conclusions regarding the fire did not affect the trial's outcome or otherwise affect defendant's substantial rights. *Carines*, 460 Mich. at 763.

*Id.* at *6.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 67–68. As a result, "errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citation omitted). To form a basis for habeas corpus relief, a challenged evidentiary ruling must

be so "fundamentally unfair" as to violate due process. *Id.* at 519–20. The Supreme Court has defined "the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990). Infractions that violate fundamental fairness are restricted to offenses against " 'some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Bey*, 500 F.3d at 521 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). A petitioner bears the burden of showing that a principle of fundamental fairness has been violated. *Id.*

Pruitt's claim that the admission of Row's testimony violated *Michigan Rule of Evidence 702* does not raise a claim cognizable on habeas review. *See Estelle*, 502 U.S. at 67–68. The Court thus turns to the question of whether admission of the portion of Row's testimony that rested on negative corpus violated due process.

Whether the admission of this testimony violated fundamental fairness "turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000) (quotation marks and citations omitted). And to evaluate whether a state evidentiary error has resulted in a due process violation, a federal court on habeas review, "consider[s] the strength of the other evidence of guilt." *Hudson v. Lafler*, 421 Fed.Appx. 619, 629 (6th Cir. 2011). Inquiries into the sufficiency of the evidence are relevant "in deciding whether the challenged evidence is a crucial or critical factor in the conviction." *Id.*

The Michigan Court of Appeals held that the portion of Row's testimony that was improperly admitted was "extremely limited in scope" and concluded that the other evidence presented was sufficient to support Pruitt's conviction and that she was not denied a fair trial. *Pruitt*, 2014 WL 1320253 at *5. As detailed by the Michigan Court of Appeals, ample evidence supported a finding that Pruitt intentionally set the fire: the timing of the insurance policy purchase, the high-value items found inside Pruitt's home, the huge discrepancy between Pruitt's income and the cost of her recent purchases, Pruitt's inconsistent statements regarding when she left her home on the morning of the fire, and the insurance company's conclusion that the fire was intentionally set. The Court finds that it was not objectively unreasonable for the state court to determine that the admission of Row's testimony

about the cause of the fire did not deprive Pruitt of a fair trial.

**\*7** Additionally, Pruitt's reliance on *Daubert* is misplaced. The Sixth Circuit has held that *Daubert* cannot provide a basis for habeas relief because *Daubert* concerns the Federal Rules of Evidence which are not relevant to a state criminal conviction. *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998), *cert. denied*, 525 U.S. 935 (1998). Habeas relief is denied on this claim.

II. Ineffective Assistance of Counsel Claim
In her second claim for habeas relief, Pruitt argues that her trial counsel was ineffective for failing to object to the expert witness's testimony that the fire was intentionally set. The Michigan Court of Appeals held that counsel's failure to object to admission of Row's ultimate conclusions regarding the fire fell below an objective standard of reasonableness. *Pruitt*, 2014 WL 1320253 at *7. The Michigan Court of Appeals held, however, that Pruitt was not prejudiced by counsel's failure because no reasonable likelihood existed that, but for counsel's error, the outcome of the trial would have been different. *Id.*

The AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013). The standard for obtaining relief is "difficult to meet." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). In the context of an ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984), the standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). Accordingly, "the question is not whether counsel's actions were reasonable"; but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

An ineffective assistance of counsel claim has two components. A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. To establish deficient representation, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. In order

2017 WL 2276983

to establish prejudice, a petitioner must show that, but for the constitutionally deficient representation, there is a "reasonable probability" that the outcome of the proceeding would have been different. *Id.* at 694.

The Michigan Court of Appeals' decision that Pruitt failed to establish prejudice is not an unreasonable determination of the facts or an unreasonable application of *Strickland*. As discussed in detail above, even if Row had not been allowed to testify as to his ultimate conclusion regarding the fire, ample evidence supported a finding that Pruitt intentionally set the fire. Habeas relief is not warranted on this claim.

### III. Scoring of Offense Variable 19

Pruitt's final claim for habeas corpus relief concerns the scoring of offense variable (OV) 19. Ten points were scored for OV 19 based upon Pruitt's allegedly false statements to the fire captain and the insurance company. Offense variable 19 provides for the scoring of ten points when an offender "interfered with or attempted to interfere with the administration of justice." Mich. Comp. Laws § 777.49. The Michigan Court of Appeals held that the fire captain was a law enforcement officer involved in the investigation of a crime and therefore the trial court properly scored OV19 at ten points. *Pruitt*, 2014 WL 1320253 at *9.

**\*8** Petitioner's argument that the state court erred in scoring her sentencing guidelines is based solely on the state court's interpretation of state law. It does not implicate any federal rights. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("[S]tate courts are the ultimate expositors of state law."). "[A] claim that the trial court mis-scored offense variables in determining the state

sentencing guidelines is not cognizable on habeas corpus review." *Adams v. Burt*, 471 F. Supp. 2d 835, 844 (E.D. Mich. 2007). Habeas relief will be denied.

### IV. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The substantial showing threshold is satisfied when a petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, the Court concludes that reasonable jurists would not debate the Court's conclusion that none of the claims in the habeas petition warrant relief. Therefore, the Court will deny a certificate of appealability.

### CONCLUSION

**WHEREFORE**, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 2276983

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.